## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| OWENS CORNING, *et al.*, | : | Case Nos. 00-3837 (JKF) |
| | : | |
| Debtors. | : | (Jointly Administered) |

**Related to Docket No. 17038**

## DEBTORS' OPPOSITION AND ANSWER TO MOTION OF THE *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS FOR LEAVE TO APPEAL BANKRUPTCY COURT ORDER DENYING MOTION FOR THE APPOINTMENT OF AN OFFICIAL PREFERRED AND EQUITY SECURITY HOLDERS COMMITTEE

Owens Corning and seventeen of its affiliates and subsidiaries, debtors and debtors in possession in the above-referenced bankruptcy cases (collectively, the "Debtors")[1], hereby object to, and answer, the Motion of the *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee") for Leave to Appeal Bankruptcy Court Order Denying Motion for the Appointment of an Official Preferred and Equity Security Holders Committee (the "Motion for Leave") (Bankr. D.I. No. 17038) for the reasons set forth below.

### BACKGROUND

1.    On December 31, 2005, as promised, the Debtors filed their Fifth Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-In-Possession (the "Fifth Amended Plan") and the related Disclosure Statement (the

---

[1]    The Debtors are: Owens Corning, CDC Corporation, Engineered Yarns America, Inc., Falcon Foam Corporation, Integrex, Fibreboard Corporation, Exterior Systems, Inc., Integrex Ventures LLC, Integrex Professional Services LLC, Integrex Supply Claim Solutions LLC, Integrex Testing Systems LLC, Homexperts LLC, Jefferson Holdings, Inc., Owens-Corning Fiberglas Technology Inc., Owens Corning HT, Inc., Owens-Corning Overseas Holdings, Inc., Owens Corning Remodeling Systems, LLC and Soltech, Inc.

"Disclosure Statement"). Following extensive negotiation, the Official Committee of Asbestos Claimants (the "ACC") and the Legal Representative for Futures Claimants (the "FCR") are co-proponents of the Fifth Amended Plan, which is also supported by the steering committee (the "Bank Steering Committee") of the holders of obligations under Owens Corning's primary pre-petition bank credit facility (the "Pre-Petition Credit Facility"). Accordingly, as of today, representatives of holders of approximately 85% of the more than $10 billion of pre-petition unsecured claims against Owens Corning support the Fifth Amended Plan, and are invested in a fair and orderly plan confirmation process. Following the District Court's estimation of contingent asbestos liabilities and the Third Circuit's definitive ruling on substantive consolidation last year, the filing by the Debtors -- with the consent of key creditor constituencies -- of a confirmable plan marks real and substantial progress toward an orderly emergence from chapter 11. The Bankruptcy Court (Fitzgerald, C.J., sitting by designation) has scheduled a hearing on April 5, 2006, to determine the adequacy of the proposed Disclosure Statement for the Fifth Amended Plan and has scheduled hearings on the confirmation of the Fifth Amended Plan itself to begin July 10, 2006.

2.    As a product of substantial negotiation following the Third Circuit's substantive consolidation ruling, the Fifth Amended Plan reflects the economic reality of these cases (which this Court has frequently recognized) that there is currently no reasonable prospect for any recovery by Owens Corning's equity holders, an undisputed fact which only the *Ad Hoc* Committee stubbornly and self-servingly refuses to acknowledge. In fact, under the Fifth Amended Plan, asbestos claimants (whose representatives are plan co-proponents) with claims estimated by this Court after a full trial and opportunity to be heard by all parties-in-interest against Owens Corning alone at $7.0 billion, bondholders with claims of approximately $1.4

billion, and general unsecured creditors with claims of more than $550 million (including subordinated creditors) are not entitled to full payment.[2]  In addition, the Debtors estimate that there are administrative and priority creditors of approximately $135 million.

        3.     In light of these economic realities and the progress toward emergence marked by the Debtors' recent filing of the Fifth Amended Plan, the Motion for Leave appears to be the latest in a series of attempts by the *Ad Hoc* Committee to hinder and delay the Debtors' plan confirmation process and the successful completion of these cases.[3]  The *Ad Hoc* Committee all but concedes that its request before the Bankruptcy Court was based on nothing more than the mere hope that (1) the Fairness in Asbestos Injury Resolution Act of 2005, Bill S. 852, (the "FAIR Act") may be enacted at some indeterminate time in the future and (2) the District Court's $7 billion estimation of Owens Corning's asbestos-related liabilities entered on March 31, 2005 (the "Estimation Decision") "may be reversed by the Third Circuit Court of Appeals," coupled with the conjecture that one or both events may provide a payout to equity

---

[2]     All of these creditors would also be entitled to interest on their claims from the Petition Date before there could be a recovery by equity.

[3]     The *Ad Hoc* Committee filed on December 20, 2005 a companion motion seeking authority to file an action in the Chancery Court of the State of Delaware (the "Delaware Chancery Court") to compel a shareholders' meeting (the "Shareholders' Motion"). The *Ad Hoc* Committee readily admits that it seeks to compel a shareholders' meeting to replace the current members of Owens Corning's board with new members who would, presumably, force the Debtors to abandon the Fifth Amended Plan (and the broad consensus achieved therein) in favor of a speculative plan, based on nothing more than the mere hope that FAIR Act legislation may be enacted at some indeterminate time in the future. After hearing argument on January 30, 2006, the Bankruptcy Court instructed Debtors' counsel to continue the Shareholders' Motion from month to month until the prospects of the FAIR Act became evident.  On February 28, 2006, the *Ad Hoc* Committee filed a petition with this Court (Adv. Pro. No. 06-136) seeking the extraordinary writ of mandamus to compel the Bankruptcy Court to enter an order or judgment in respect of the Shareholder Motion.  The Debtors vigorously oppose the mandamus petition.

holders who are unfortunately out of the money in these cases.[4]  Motion for Leave at ¶ 1.  In light

of the recent developments on Capitol Hill, the chances of legislative success for the FAIR Act is

even more dim, albeit still uncertain, than was the case at the time of the January 30 hearing in

which the Bankruptcy Court prudently denied, consistent with the judgment of the United States

Trustee (the "UST"), the appointment of an official equity committee.[5]  Despite these undisputed

developments, however, the *Ad Hoc* Committee continues its quixotic reliance on the FAIR Act

becoming law at some point in the future.

      4.     The *Ad Hoc* Committee's primary motive, without question, is to force a

distribution to out-of-the-money equity holders from the Debtors' insolvent estates, regardless of

the risk to the Debtors' real parties-in-interest -- the Debtors' asbestos and commercial creditors -

- posed by further delaying or blocking confirmation of the Fifth Amended Plan.  When viewed

---

[4]     Even if the FAIR Act were enacted during this session of Congress, it is not clear that the
equity holders would be entitled to any distribution.

[5]     At the January 30 hearing, counsel for the *Ad Hoc* Committee advised the Bankruptcy
Court that "I think that the passage of the FAIR Act is highly likely, Your Honor."
January 30, 2006 Hearing Transcript, p. 59 (copy attached as Exhibit A).  Moreover, the
*Ad Hoc* Committee repeats this optimism in its Motion for Leave, reiterating language
from the initial Motion of *Ad Hoc* Committee of Preferred and Equity Security Holders
for the Appointment of an Official Preferred and Equity Security Holders Committee
(Bankr. D.I. No. 16495) (the "Motion for Appointment"):

> The preferred and equity securities clearly have substantial value when
> properly evaluated in accordance with the applicable legal standards . . .
> The enactment of the FAIR Act or reversal of the Estimation Decision,
> each of which is likely, will drastically slash the Debtors' asbestos-related
> liabilities and correspondingly enhance the securities value.

Motion for Leave, ¶ 9.  Far from these predictions however, as widely reported, on
February 14, 2006, the FAIR Act failed to obtain enough votes to overcome a procedural
challenge to its funding feasibility.  Consequently, the FAIR Act has been removed from
the Senate floor pending further developments.

in this light, there is no legitimate purpose for the relief sought by the *Ad Hoc* Committee before the Bankruptcy Court or the prosecution of an immediate interlocutory appeal before this Court.[6]

      5.    The *Ad Hoc* Committee's brazen contention that "the Cases cry out for the immediate appointment of an Official Security Holders Committee" (Motion for Leave at ¶ 1) lacks any principled basis and is disputed by the UST and every major constituency in the Debtors' chapter 11 cases. On three prior occasions shareholders of the Debtors requested the appointment of an official equity committee, and on each occasion the UST, based on her sound discretion,[7] summarily denied each request. The *Ad Hoc* Committee's most recent request, also rejected by the UST, was followed by the Motion for Appointment that was fully briefed, including objections by the Debtors, the UST, the Steering Committee, the ACC and the FCR. See Bankr. D.I. Nos. 16697, 16687, 16664, 16710 and 16698, respectively.

---

[6]    According to the Motion for Leave, the members of the *Ad Hoc* Committee currently are: Catalyst Investment Management Co., LLC; Deutsche Bank Securities Inc.; Hain Capital Group, LLC; Harbinger Capital Partners Master Fund I. Ltd. f/k/a Harbert Distressed Investment Master Fund, Ltd.; Plainfield Asset Management LLC; and Tudor Investment Corporation. As has been made clear to the Bankruptcy Court, several of these sophisticated financial institutions (or their affiliates) also hold significant debt positions across the Debtors' capital structure. See Objection of Debtors to Motion of *Ad Hoc* Committee of Preferred and Equity Security Holders for the Appointment of an Official Preferred and Equity Security Holders Committee, pp. 8-9 (Bankr. D.I. No. 16697).

[7]    Pursuant to 11 U.S.C § 1102, the UST is authorized to appoint a committee of unsecured creditors in all chapter 11 cases and " . . . may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. 1102(a)(1)(emphasis added). The plain language of the statute makes clear that the appointment of an additional committee is a discretionary act of the UST, and courts have consistently affirmed this interpretation. See In re Dow Corning Corp., 212 B.R. 258, 264 (E.D. Mich. 1997); In re Trans World Airlines, Inc., No. 90-115, 1992 WL 168152 (Bankr. D. Del. March 20, 1992) (copy attached as Exhibit B); see also In re Columbia Gas Systems, Inc., 133 B.R. 174, 175 (Bank. D. Del. 1991)(selection of committee members within the United States trustee's discretion).

6.    At the hearing on the Motion for Appointment, after extensive argument by counsel for the respective parties, the Bankruptcy Court entered an interlocutory order[8] denying the *Ad Hoc* Committee' request, *without prejudice*, and on February 17, 2006, the Bankruptcy Court entered an order (the "Order") on the docket memorializing that decision. See Bankr. D.I. No. 16982. The Order was based upon, *inter alia*, the Bankruptcy Court's factual findings that "[t]here is no evidence before me that the debtor is solvent at this point in time in any way," and "I don't see how at this point equity is entitled to a distribution or will get a distribution under any scenario . . . ." January 30, 2006 Hearing Transcript, p. 73. However, as a flexible accommodation to the *Ad Hoc* Committee, the Bankruptcy Court took pains to observe that:

> [i]f the FAIR Act passes and this case is still pending, if the $7 billion [estimated asbestos claim] number is low enough that in fact equity stands a chance of recovering funds at that point I will certainly hear the [*Ad Hoc*] Equity Committee's motion and probably have a much different reaction to it than I have now. But as of today, this motion is denied without prejudice.

Id.

## ARGUMENT

7.    As set forth below, the Motion for Leave should be denied because (i) the *Ad Hoc* Committee should not be granted leave to appeal pursuant to the collateral order doctrine (or, to the extent applicable, Fed. R. Bankr. P. 8003), (ii) the *Ad Hoc* Committee has failed to

---

[8]    The *Ad Hoc* Committee does not (nor could it) contend that the Bankruptcy Court's order denying its Motion to Appoint is final. Orders denying shareholder requests for official committee status are not final because they "do not resolve particular disputes within the overall bankruptcy case; they simply affect the committee structure within which the various disputes in the reorganization proceeding will be considered." In re Edison Bros. Stores, Inc., No. CIV.A. 96-177, 1996 WL 363806, at *2 (D. Del. June 27, 1996) (copy attached as Exhibit C).

satisfy 28 U.S.C. §§ 158 and 1292, and (iii) the *Ad Hoc* Committee has not satisfied its burden of

proving that "exceptional circumstances" exist that would warrant granting the Motion for

Leave.[9]

## I. THE COLLATERAL ORDER DOCTRINE IS INAPPLICABLE

8. The *Ad Hoc* Committee asserts that appellate review of the Bankruptcy

Court's decision is warranted under the collateral order doctrine, under which courts in this

jurisdiction deem "a 'small class' of collateral orders" to be final "even though they do not

terminate the underlying litigation." United States Fire Ins. Co. v. Asbestospray, Inc., 182 F.3d

201, 208 (3d Cir. 1999). Three conditions must be met for the collateral order doctrine to apply:

the order must "(1) conclusively determine the disputed question, (2) resolve an important issue

completely separate from the merits of the action, and (3) be effectively unreviewable on appeal

from a final judgment." In re Worldcom, Inc., No. 02-13533, 2005 WL 1208519, at *1

(S.D.N.Y. May 19, 2005) (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47

(1949)) (copy attached as Exhibit D). A decision is not reviewable as a collateral order unless it

satisfies all three requirements. See, e.g., In re Diet Drugs, 401 F.3d 143, 158 (3d Cir. 2005);

United States v. Weiss, 7 F.3d 1088, 1089 (2d Cir. 1993).

9. The *Ad Hoc* Committee blithely ignores Third Circuit precedent that holds

that the collateral order doctrine is a "narrow exception" to the general "final judgment" rule,

limited to review of orders "affecting rights that will be irretrievably lost in the absence of an

---

[9]     The Motion is not the proper forum in which to raise the merits of the underlying appeal.
Accordingly, this Objection does not address that portion of the Motion that attempts to
bootstrap the merits of the underlying appeal onto the issue of whether leave to appeal
should be granted in the first place. The Debtors request that that portion of the Motion
be stricken from the record and reserves all rights to object in the future, if necessary, to
that portion of the Motion.

immediate appeal." In re Johns-Manville Corp., 824 F.2d 176, 180-81 (quoting Richardson-Merrell Inc. v. Koller, 472 U.S. 424, 430-31 (1985)); Diet Drugs, 401 F.3d at 158. The "possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement." Richardson-Merrell Inc., 472 U.S. at 436; see also Germain v. Connecticut Nat'l Bank, 930 F.2d 1038, 1040 (2d Cir. 1991) (it is not enough "that postponement of vindication may ultimately prove less efficient than an immediate review, or that ultimate vindication may require a second trial before a different trier of fact"). The Third Circuit has consistently cautioned "[w]e apply this test stringently, as the Supreme Court has cautioned that the collateral order doctrine is a 'narrow' exception to the finality requirement ... that should not be permitted to swallow the general rule." Adapt of Philadelphia v. Philadelphia Hous. Auth., 417 F.3d 390, 394-95 (3d Cir. 2005); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1072 (3d. Cir. 1983) (same). As with the other purported grounds for leave to appeal, the Ad Hoc Committee cannot meet this standard.

## A.    The Order Does Not Conclusively Determine the Disputed Question

10.    The Supreme Court has recognized that two types of nonfinal orders exist "those that are 'inherently tentative' and those that are 'technically amendable, but made with the expectation that they will be the final word on the subject addressed.'" Diet Drugs, 401 F.3d at 166 (J. Ambro, concurring) (citing Christy v. Horn, 115 F.3d 201, 204 (3d Cir. 1997) (citing Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 277 (1988)). The Bankruptcy Court's Order, by its terms, is clearly the former. "An order is conclusive when no further consideration is contemplated by the [lower] court, which excludes from review any decision which is tentative, informal or incomplete." Id. at 159. In Diet Drugs, the Third Circuit held that the conclusiveness prong was not met where the District Court vowed to revisit its decision to

award interim attorneys fees in the future after it determined the overall value of a settlement to which the fees related, in determining a final fee award. Id. at 157. Because "the District Court has expressed unequivocally that it intends to revisit the issue and make a final fee award," the orders were not conclusive. Id. at 159.

11.    Similarly, in the present case, the Bankruptcy Court's order denying the appointment of an official committee, *without prejudice*, is explicitly conditioned upon the non-occurrence of future legislative and appeal developments.    In denying the Motion for Appointment *without prejudice*, the Bankruptcy Court put the parties on notice that it would not only revisit the issue if the FAIR Act becomes law ("at that point I *will certainly* hear the Equity Committee's motion") -- the very contingency that was the predicate of the *Ad Hoc* Committee's request for official committee status in the first place -- but also indicated that the Bankruptcy Court will "probably have a much different reaction to [the shareholders' request at that time]. . . ." January 30, 2006 Hearing Transcript, at 77-78 (emphasis supplied).

12.    There is no dispute that the ultimate relief the *Ad Hoc* Committee seeks -- a plan of reorganization that provides for a payout to currently out-of-the-money equity holders -- is necessarily contingent upon the passage of the FAIR Act into law and/or the Third Circuit's reversal of the Estimation Decision.[10] The Bankruptcy Court's decision was based on the central allegations in which the *Ad Hoc* Committee's Motion for Appointment was predicated (*i.e.*, there

---

[10]    Of course, no one seriously contends that Owens Corning's asbestos liability should be reduced to zero. As amply addressed in oral argument on the Motion for Appointment, even if this Court on a hypothetical remand of the Estimation Decision were to accept the absolute lowest amount of asbestos exposure put forward by Owens Corning's banks, $2 billion, that reduction standing alone would not put equity in the money in these chapter 11 cases. Moreover, as noted in footnote 4 above, the passage of the FAIR Act, standing alone, many not put equity in the money.

is value for equity should the FAIR Act become law and/or should the Third Circuit reverse the Estimation Decision) tested under the prism of the evidentiary record before the Bankruptcy Court at that time (*i.e.*, the Debtors are hopelessly insolvent). Nothing in the Bankruptcy Court's interlocutory order prevents the *Ad Hoc* Committee or any of its members from renewing their request if circumstances respecting the status of Fair Act or the appeal of this Court's Estimation Decision drastically change. Since the Bankruptcy Court has expressed unequivocally its intention to revisit the issue of appointment of an official equity committee should the FAIR Act become law, its decision explicitly leaves open the potential for further adjudication of this issue before the trial court. In sum, based on the terms of the subject order, whether the UST or the Bankruptcy Court will ever appoint an official equity committee during the course of these chapter 11 cases has not yet been conclusively decided.

### B.    The Order Cannot be Completely Separated from the Merits of Underlying Action

13.    The Third Circuit has found that where the effect of a court order is to stay the litigation of an issue (as opposed to an order that refuses to adjudicate the merits), then the order does not resolve an issue separate from the merits of the underlying action. Michelson v. Citicorp Nat. Services, Inc., 138 F.3d 508, 517 (3d Cir. 1998). When "an order ... does no more than establish the timetable for litigating the merits of a controversy," the separate issue prong is not met. Id. In this case, the Bankruptcy Court has decided that the proper time to decide irrevocably whether the interests of shareholders should be represented by an official committee is when they are able show that they have interests to represent -- if for example, the FAIR Act becomes law or the Third Circuit reverses the Estimation Decision. Again, as discussed, the Bankruptcy Court did not conclusively determine that the shareholders will never be entitled to official representation.

14.    The "completely separate" prong is also not satisfied in cases where the core issue to be decided exists in the context of and is intertwined with the merits of an ongoing proceeding in the lower court. Philadelphia Hous. Auth., 417 F.3d at 394-95. The core issue that was tentatively decided by the Bankruptcy Court was that shareholders have not presented any evidence that they have an equity interest in Owens Corning. This very issue is a plan confirmation issue -- whether the shareholders are treated fairly and equitably under the Fifth Amended Plan. As this Court is well aware, plan confirmation is a core bankruptcy proceeding which is ongoing in the Bankruptcy Court and scheduled for final hearing commencing on July 10, 2006. Thus, the second prong of the collateral order test, separability of the issue from the underlying litigation, is not satisfied.

**C.    The Unreviewability Prong is Not Satisfied Because The *Ad Hoc* Committee Cannot Show Irreparable Harm**

15.    For the purposes of the collateral order doctrine, the unreviewability prong is met where failure to review immediately may well cause significant irreparable harm. Diet Drugs, 401 F.3d at 159. Irreparable harm is a high standard, requiring a showing that any potential harm is more than monetary. In re Pan-Europe Communications, M-47, 2003 U.S. Dist. LEXIS 1297, *8-10 (S.D.N.Y. Jan. 30, 2003) (copy attached as Exhibit E). In the present case, whether an official equity committee is appointed will be determined by which event comes earlier (1) the passage of the FAIR Act (or the complete reversal of this Court's Estimation Decision) or (2) the confirmation of the Debtors' Fifth Amended Plan. In either event, the failure of this Court to immediately review the Bankruptcy Court's decision will have

no effect on the outcome of confirmation, much less cause significant harm to the *Ad Hoc* Committee or any of its members.[11]

16.    Not surprisingly, the Motion for Leave is silent as to any such potential harm -- let alone irreparable harm -- that may befall the *Ad Hoc* Committee members if they are denied an immediate interlocutory appeal. No irreparable harm can exist where, as here, old equity is unfortunately out of the money. Stated differently, even if this Court were to grant the Motion for Leave and then overturn the Bankruptcy Court's decision and order the appointment of a shareholders' committee, absent passage of the FAIR Act and other material changes in the Debtors' economics, the *Ad Hoc* Committee members will still be tilting at windmills in their attempt to wring value out of the insolvent estates.

17.    The *Ad Hoc* Committee is not without access to the Bankruptcy Court if an official committee is not appointed. In the Matter of Interco Inc., 141 B.R. 422, 425 (Bankr. E.D. Mo. 1992). An "Ad Hoc group can effectively participate in the final stages of the reorganization proceedings without official committee representation." Id. The *Ad Hoc* Committee concedes that it seeks official status for the sole purpose of opposing the Fifth Amended Plan. Yet as discussed more fully below, the *Ad Hoc* Committee has already exercised its right to be heard on a number of issues before the Bankruptcy Court, including that Court's recent extension of the Debtors' exclusivity period, the underlying order at issue here, and its motion to vacate the Bankruptcy Code's automatic stay in order to launch yet another line of

---

[11]    At least one other court has determined that in the context of analyzing the applicability of the collateral order doctrine to the denial of a request for official committee status, the prospective appellant will "be able to challenge the denial of the request for official committee status separately from the validity of the confirmed plan at the conclusion of the bankruptcy proceeding." In re Johns-Manville Corp., 824 F.2d at 181 (2d Cir. 1987) (citing Richardson-Merrell Inc. v. Koller, 472 U.S. at 438 (1985)).

litigation in the Delaware Chancery Court to oust the current Board of Directors (which the *Ad Hoc* Committee has separately appealed to this Court).

18.    Yet, as the United States Trustee sagely observed, the real motivation of the *Ad Hoc* Committee is to shift the burden of paying the undoubtedly considerable costs and expenses that its lawyers (and other professionals) are incurring in pursuing these bootless litigation expeditions in several different courts simultaneously to the Debtors' estates -- at the expense of the real parties-in-interest in these cases, the asbestos and commercial creditors. See January 30, 2006 Hearing Transcript, at 71 ("[t]his isn't an issue of adequate representation. It's an issue of who pays. The [*Ad Hoc*] Equity Committee clearly wants the estate to pay for their participation in these cases . . . . Why is it then that the estate has to pay[?]"). In fact, counsel for the *Ad Hoc* Committee represented in its 2019 Statement filed with the Court that it "may at some future time seek to have its fees and disbursements paid by the Debtors' estates." See Bankr. D.I. 17003. This attempt to shift the burden of fee reimbursement to the Debtors' estates is even more outlandish where, as here, each of the members of the *Ad Hoc* Committee, on information and belief, acquired its stock holdings during the pendency of these chapter 11 cases with its eyes wide open, well aware of the financial condition of the Debtors and the other material developments throughout these cases that are a matter of public record. As a matter of law, there can be no irreparable harm to the Debtors' sophisticated financial institutional shareholders by expecting them to pay for their chosen professionals out of their own pockets rather than foisting that burden involuntarily upon the Debtors' creditor body.

**D.    Edison is Neither Controlling Nor Persuasive**

19.    The *Ad Hoc* Committee's exclusive reliance on In re Edison Bros. Stores, Inc., No. CIV.A. 96-177, 1996 WL 363806 (D. Del. June 27, 1996) to support its proposition

that the collateral order doctrine applies in this situation is misplaced. As an initial matter, this Court is not bound by the Edison decision since "it is clear that there is no such thing as the law of the district." Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991). As the Third Circuit has stated:

> Even when the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior "resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of stare decisis does not compel one district court judge to follow the decision of another." State Farm Mutual Automobile Insurance Co. v. Bates, 542 F. Supp. 807, 816 (N.D. Ga. 1982). Where a second judge believes that a different result may obtain, independent analysis is appropriate. Id.

Armstrong, 928 F.2d at 1371.

20.    More importantly, however, the facts of Edison are distinguishable from those before this Court. First, in Edison, the appellants' assertion of the debtors' solvency was not disputed. In stark contrast to Edison, based upon the clear and unrebutted record before the Bankruptcy Court, the Debtors are hopelessly insolvent at this time. The Bankruptcy Court, having presided over these complex chapter 11 cases now for over five years, is in the best position to assess the relevant facts and circumstances and make factual determinations as to the Debtors' financial condition, and, unlike the Edison case, there is no basis here to disturb the Bankruptcy Court's findings that equity is currently out of the money. For example, the Order below was based upon the Bankruptcy Court's factual findings that "[t]here is no evidence before me that the debtor is solvent at this point in time in any way" and "I don't see how at this point equity is entitled to a distribution or will get a distribution under any scenario . . . ." January 30, 2006 Hearing Transcript, at 73. Accordingly, the Bankruptcy Court could not find that the Owens Corning shareholders had any substantial interest in the reorganization which

would merit official representation at the cost of the estates' creditors. Id. at 77-78 ("I don't see how at this point equity is entitled to distribution or will get a distribution under any scenario, and at this point in time, I, therefore, am denying this motion.").

21.    Second, in Edison, non-insider shareholders sought appointment of an official equity committee because, in their view, insider shareholders of the debtors could not adequately represent the interests of non-insider shareholders since their interests were not aligned. Edison, 1996 WL 363806 at *1. Thus, in the context of analyzing the second requirement of the collateral order doctrine -- that the order must resolve an important issue completely separate from the merits of the action -- the Edison court determined that the "important issue" decided by the bankruptcy court was whether these non-insiders who were not otherwise represented would be able to "effectively participate in the reorganization." Id.[12]

22.    Here, in contrast, the *Ad Hoc* Committee cannot legitimately complain that it cannot effectively participate in the reorganization. It is beyond cavil that the *Ad Hoc* Committee's lack of official status does not mean that it is excluded from the reorganization process or from participating in the important issues arising therein. The *Ad Hoc* Committee is comprised of financially secure and sophisticated institutions that are already adequately represented by sophisticated counsel in these chapter 11 cases, and thus is well capable of appearing and being heard in a range of bankruptcy issues regardless of whether it is labeled as an "Official Security Holders Committee" or not. There is thus no concern that the ability to effectively participate will be lost since the *Ad Hoc* Committee is currently, and presumably will

---

[12]    It is for this limited reason, it appears, that the Securities and Exchange Commission ("SEC") supported the non-insider shareholders' underlying motion and its motion for an interlocutory appeal. Here, in contrast, every major constituency in the Debtors' chapter 11 cases opposed the *Ad Hoc* Committee's Motion to Appoint.

continue to be, actively involved in these proceedings.   Moreover, as has been amply demonstrated before the Bankruptcy Court, the *Ad Hoc* Committee is composed of numerous members who simultaneously hold multi-million dollar debt claims against certain of the Debtors. These so-called "shareholders" actually wear multiple hats in these proceedings. As this Court is aware, the *Ad Hoc* Committee members wearing their creditor hats are already represented by official court-appointed fiduciaries in the Official Committee of Unsecured Creditors whose substantial professional fees and costs have been reimbursed by the Debtors' estates for over five years. Now, incredibly, if the *Ad Hoc* Committee has its way, the same conglomerate institutions would potentially have the "benefit" of two separate sets of counsel for the same bankruptcy cases, thereby proliferating the administrative expense burdens in these cases even further.

   23. Under these circumstances, the issue ultimately is not one of adequate representation but, rather, of who will pay for that representation. As the UST correctly noted in its objection to the Motion to Appoint:

> One wonders if this is not an issue of adequate representation, but an issue of the estate paying for the fees and expenses of the informal committee. As discussed below, equity is not powerless in this case and has a voice to assert its interests. The only logical conclusion then as to why an official committee is being requested is so the estate can be charged for their fees and expenses. That appears to be the case because there is no legitimate argument that equity is inadequately represented, therefore, this Court should not authorize the forming of another committee so that another set of professionals can be paid by this estate.

See Bankr. D.I. No. 16687. The only benefit to be conferred by official status would be payment of the *Ad Hoc* Committee's professionals' fees by the Debtors under 11 U.S.C. § 330 at the expense of the real parties in interest in these cases – the Debtors' creditors. This is not the type of "important issue separate from the merits of the action" contemplated by the collateral order

doctrine. The determination of this issue has no impact on the ongoing disputes between the *Ad Hoc* Committee and the Debtors, nor does it impact the success of any efforts to reach a fully consensual plan.

       24.     Third, the district court in <u>Edison</u> was concerned that since the bankruptcy court denied the shareholders' request for a committee without prejudice, if the Court denied appellate review, the Court and the parties would be "in a guessing game of when such an issue has been developed enough for review without being mooted by the passage of time." <u>Edison</u>, 1996 WL 363806 at \*3. In this case, it is crystal clear when the issue should be revisited -- if and when the FAIR Act becomes law during this session of Congress, or if and when the Third Circuit reverses the Estimation Decision.   <u>See</u> January 30, 2006 Hearing Transcript, at 77-78 ("If the FAIR Act passes and this case is still pending, ... at that point I will certainly hear the Equity Committee's motion and probably have a much different reaction to it than I have now.")

       25.     Finally, even with the presumption of a solvent debtor and with the support of the SEC (both of which are glaringly absent here), it is instructive to note that the district court in <u>Edison</u> ultimately found that the Bankruptcy Court did not abuse its discretion in finding that an equity committee was not necessary to assure adequate representation of the shareholders. <u>See</u> <u>In re Edison Bros. Stores, Inc.</u>, No. CIV.A. 96-177, 1996 WL 534853 (D. Del. Sept. 17, 1996) (copy attached as Exhibit F). The futility of the *Ad Hoc* Committee's appeal, though not necessarily a factor in this Court's analysis of whether to accept a premature appeal, cannot be ignored.

## II.   THE *AD HOC* COMMITTEE'S APPEAL SHOULD NOT BE PE PERMITTED PURSUANT TO 28 U.S.C. § 158(a)

26.    The *Ad Hoc* Committee's fall-back argument is that it should be granted leave to appeal under 28 U.S.C. § 158(a), which governs a district court's jurisdiction to review appeals from bankruptcy court orders.    Section 158(a)(3), which applies to appeals from interlocutory orders, provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals ... with leave of the court, from ... interlocutory orders and decrees," but does not provide specific statutory criteria pursuant to which courts can determine whether leave should be granted.  28 U.S.C. § 158(a)(3).  Accordingly, district courts, including district courts in this jurisdiction, look to the familiar three-pronged standard set forth in 28 U.S.C. § 1292(b) in the context of appeals from interlocutory decisions of the district courts when considering whether to grant leave to appeal from interlocutory orders of the bankruptcy courts. See, e.g., Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm., 321 B.R. 147, 156 (D.N.J. 2005) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 302 (E.D. Pa 1982) and In re Bertoli, 58 B.R. 992, 995 (D.N.J. 1986)).

27.    Pursuant to section 1292(b)'s standards, interlocutory appeals of bankruptcy court orders are allowed only when each of the following three requirements is satisfied: (1) a controlling question of law is involved; (2) the question is one where there is substantial ground for difference of opinion; and (3) an immediate appeal would materially advance the ultimate termination of the litigation.    Baron & Budd, 321 B.R. at 156. Additionally, an appellant must establish that "exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment."  In re Delaware & Hudson Ry. Co., 96 B.R. 469, 473 (D. Del.), aff'd, 884 F.2d 1383 (3d Cir. 1989)

(citing Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978)). None of these standards

supports granting an interlocutory appeal of the Order here.

### A.   This Appeal Does Not Involve A Controlling Question of Law

28.    The Third Circuit has defined a controlling question of law as including

"at the very least every order which, if erroneous, would be reversible error on final appeal."

Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir.), cert. denied, 419 U.S. 885 (1974). In

determining whether an issue presents a controlling question of law, "the critical focus is on

whether a different resolution of the issue would eliminate the need for trial." FDIC v. Parkway

Exec. Office Ctr., No. 96-121, 1997 U.S. Dist. LEXIS 14939, at *7 (E.D. Pa. Sept. 24, 1997)

(copy attached as Exhibit G). See also Koken v. Viad Corp., No. 03-5975, 2004 WL 1240672 at

*1 (E.D. Pa. May 13, 2004) (citing FDIC, 1997 U.S. Dist. LEXIS 14939) (copy attached as

Exhibit H). Moreover, the subject question must involve a "pure" question of law as opposed to

a factual determination. In re Newshaminy Office Bldg. Assoc., 81 B.R. 301 (E.D. Pa.

1987)("The requirements of §1292(b) provide that such factual determinations of the bankruptcy

court are not reviewable in an interlocutory appeal")(citing Link v. Mercedes Benz of North

America, Inc., 550 F.2d 860, 863 (3d Cir.), cert denied, 431 U.S. 933 (1977)). The policy behind

allowing an interlocutory appeal of a pure question of law, unlike a factual determination, is that

decisions of law can be reviewed quickly and cleanly without having to study the record.

Ahrenholz v. Board of Trustees, 219 F.3d 674 (7th Cir. 2000).

29.    First, the denial of official committee status is not a controlling issue of

law that if determined differently would eliminate the need for trial – i.e., the confirmation

hearing on the Debtors' Fifth Amended Plan.    The denial of official committee status simply

affects the number and composition of official committees within which the plan confirmation

issues in these cases will be considered, and, more pointedly, whether the members of the *Ad Hoc* Committee -- or the Debtors' creditors -- should bear the costs of such committee's busy professionals. It does not resolve specific disputes in these cases generally. The parties will move toward confirmation of the Fifth Amended Plan. If the past provides any prologue here, the *Ad Hoc* Committee will presumably continue to contest the Fifth Amended Plan and otherwise seek to disrupt the Debtors' reorganization efforts. The denial of official committee status will not impact the need for "trial" at all. It merely keeps in place the *ad hoc* structure of the shareholders' committee without prejudicing their rights to continue to be heard in these proceedings under 11 U.S.C. § 1109.

30. Second, more significantly, the *Ad Hoc* Committee's proposed appeal does not rest on a matter of "pure law," but instead raises an issue of fact (or, even if one accepts the *Ad Hoc* Committee's argument that there are *bona fide* grounds on which to dispute the legal standard that the Bankruptcy Court applied, at most the appeal raises a mixed issue of law and fact). See, e.g., In re Penn-Dixie Indus., Inc., 9 B.R. 936, 938 (S.D.N.Y. 1981) (bankruptcy court's conclusion under section 1102(c) of the Bankruptcy Code that committee was "representative of the different claims or interests to be represented" was a finding of fact). Though the *Ad Hoc* Committee attempts to argue that the Bankruptcy Court decided whether the *Ad Hoc* Committee's interests were adequately represented in this case, the Bankruptcy Court actually decided a much more preliminary and fundamental issue -- whether the shareholders even have any cognizable economic stake in these proceedings. This is a factual determination based on a long record in these bankruptcy cases, including this Court's claims estimation decision and the amount of assets available for distribution as reflected in the Disclosure Statement. See January 30, 2006 Hearing Transcript, at 73. The Bankruptcy Court -- the

statutorily designated expert in core determinations of this kind -- answered no, after due deliberation and with extensive, unrebutted factual support in the record. Any appellate decision of whether an official shareholders' committee should be appointed will hinge upon the purely factual determination that the shareholders are out of the money and have no meaningful economic interest in the estates based upon current facts and circumstances.

        31.    Leave to appeal is often denied in instances involving discretionary matters, as District Courts typically are not interested in refereeing every decision of the Bankruptcy Court. In re G-I Holdings, Inc., No. 05-4630, 2005 U.S. Dist. LEXIS 31896 at *24 (D.N.J. 2005)("Judicial Economy is not served by this Court serving as the referee to every decision made by the Bankruptcy Court") (copy attached as Exhibit I). Similarly, in Delaware and Hudson, the District Court refused to entertain an appeal from the Bankruptcy Court in a matter also involving a factual determination. Delaware and Hudson, 96 B.R. at 472. In that case, the District Court observed that the Bankruptcy Court, "in its discretion clearly considered the facts supporting a transfer but found them unpersuasive." Id. The District Court added that "the decision of the Bankruptcy Judge was the result of the careful weighing of the conflicting interests and equities based upon the particular circumstances of the case before her, including the financial restrictions of [the appealing party]." Id. Easily, the District Court denied the motion for leave to appeal.

**B.**    <u>There is Not a Substantial Grounds for Difference of Opinion</u>

        32.    Substantial grounds for difference of opinion exist when there is conflicting precedent and genuine doubt as to the correct legal standard. P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 161 F. Supp. 2d 355, 359-60 (D.N.J. 2001); FDIC, 1997 U.S.

Dist. LEXIS 14939, at *7; see also Dorward v. Consolidated Rail Corp., 505 F. Supp. 58, 59 (E.D. Pa. 1980) ("Substantial grounds for difference of opinion may be demonstrated by adducing conflicting and contradictory opinions of court which have interpreted and ruled upon the particular question of law."). "[A] scarcity or void of judicial opinion alone is insufficient to justify an interlocutory appeal." In re Magic Rests., Inc., 202 B.R. 24, 26 (D. Del. 1996). Instead, "a judicial conflict on the issue is required to conclude that substantial ground for difference of opinion exists." Id.

33.     There is no judicial conflict or genuine doubt over the standards to apply in analyzing a request to appoint an official equity committee. These standards are clear and not disputed by the *Ad Hoc* Committee.[13]     The appointment of creditors and equity holders' committees is governed by section 1102(a)(1) of the Bankruptcy Code, which provides in relevant part as follows:

> . . . as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

11 U.S.C. § 1102(a)(1) (emphasis added).

34.     The Bankruptcy Code also provides that a bankruptcy court may consider whether the appointment of additional creditors committees or of an equity committee is appropriate:

---

[13]     The application of these standards are set forth in the Objection of Debtors to Motion of *Ad Hoc* Committee of Preferred and Equity Security Holders for the Appointment of an Official Preferred and Equity Security Holders Committee (Bankr. D.I. No. 16697), which is incorporated by reference herein (copy is attached as Exhibit J).

> On request of a party in interest, the court may order the
> appointment of additional committees of creditors or of equity
> security holders <u>if necessary to assure adequate representation</u> of
> creditors or of equity security holders.

11 U.S.C. § 1102(a)(2) (emphasis added).

    35.    Whether or not equity security holders have "adequate representation" must be determined by the facts of each case, and, in each case, due deference should be given to the judgment of the United States Trustee, which in this case denied three separate requests for the appointment of an official equity committee for largely the same reasons relied upon by the Bankruptcy Court in its denial of the subject order. <u>Edison</u>, No. CIV.A. 96-177, 1996 WL 534853, at *3 (citing <u>In re Johns-Manville Corp.</u>, 68 B.R. 155, 159 (S.D.N.Y. 1986)); <u>In re Northwestern Corp.</u>, No. 03-12872, 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004) (copy attached as Exhibit K); <u>In re Williams Communications Group, Inc.</u>, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002). The Debtors submit that there are no substantial grounds for a difference of opinion on the relevant legal issues, and that shareholders, given the facts of these cases, are more than adequately represented by the *Ad Hoc* Committee (and, to the extent many of the members also wear creditor hats, by other official creditor committees in these cases).

    36.    Accordingly, because courts in this jurisdiction are unanimous on this issue, and because the issue is neither difficult nor one of first impression, the appeal does not involve an issue over which there is "substantial grounds for difference of opinion."

## C.    An Immediate Appeal Will Not Advance the Litigation, and May Further Burden the Underlying Chapter 11 Cases

    37.    The *Ad Hoc* Committee cannot, in good faith, argue that this appeal will "materially advance" the ultimate termination of the litigation, as opposed to their own subjective litigation interests. <u>See</u> <u>Edison</u>, 1996 WL 363806, at *3 (finding that appeal from an

order denying an equity committee does not advance the ultimate termination of the litigation, rather advances the rights of the appellants). Factors the Court should examine in determining whether an immediate appeal will materially advance the ultimate termination of the litigation within the meaning of section 1292(b) include whether the appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less expensive. See, e.g., Titelman v. Rite Aid Corp., No. 00-2865, 2002 WL 32351182, at *3 (E.D. Pa. Feb. 5, 2004) (copy attached as Exhibit L); Orson, Inc. v. Miramax Film Corp., 867 F. Supp. 319, 322 (E.D. Pa. 1994).

      38.    An immediate appeal from the Order would not eliminate any of these factors. No matter whether the Order is upheld or reversed on interlocutory appeal, the Bankruptcy Court will need to oversee extensive confirmation-related discovery, as well as the confirmation hearing itself. Cf. Dal-Tile, 203 B.R. 554, 557 (denying Dal-Tile's request for leave to appeal the bankruptcy court order on the ground that immediate appeal from the order would not materially advance the litigation where fact-finding with respect to the value and validity of Dal-Tile's claim would be necessary on remand regardless of the district court's decision of the appeal). Likewise, reversal of the Order will not eliminate any complex issues so as to simplify the confirmation hearing or other litigation in the pending chapter 11 cases. On the contrary, granting the *Ad Hoc* Committee official status undoubtedly would complicate, not simplify, these proceedings. Indeed, the appointment of an official equity committee would unnecessarily add another layer of administrative cost, complexity and potential further delay to these longstanding cases, with no corresponding benefit to any party with a cognizable economic interest.

39.     By its very composition, the formation of an official committee of out-of-the-money equity holders is constitutionally incapable of materially advancing the ultimate goal of chapter 11 cases -- the successful confirmation of a plan of reorganization that inures to the benefit of the Debtors' real stakeholders, in these cases, the creditors. Where, as here, the sole purpose of an official committee would be to object to the confirmation of a plan of reorganization and to litigate the valuation of the debtor, the appointment of an official committee is improper.  In re Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996)(denying the appointment of a committee based on the timing of the motion as the sole purpose of the committee would be to object to the confirmation of the plan and to litigate the valuation of the debtor).

40.     Second, official status should not be granted when any potential role in the reorganization that an official committee could have played has been largely superseded at this late stage in the process and such appointment at this late stage in the game would only serve to delay the confirmation process to the detriment of creditors holding billions of dollars of tort and commercial claims.  In re Johns-Manville Corp., 68 B.R. at 159.  As stated above, the *Ad Hoc* Committee is motivated to delay the confirmation process and seeks to do just that by filing its Motion for Leave.

41.     Third, even if a committee were appointed, it would not change the very clear reality of these cases -- the Debtors are insolvent, and the shareholders will receive no distribution under the Fifth Amended Plan.  The formation of an official committee cannot hasten or ensure the passage of the FAIR Act, compel a reversal of the Estimation Decision, nor repeal the laws on the books today, including the absolute priority rule of section 1129(b) of the Bankruptcy Code.    Simply stated,    an official committee cannot alter the underlying

reorganization value available for distribution to creditors in these cases, or the multiple billions of dollars of claims asserted against the Debtors that must under the law be paid in full before equity is entitled to any recovery.

        42.    Consequently, allowing the appellate process to proceed at this time would have no material effect on these cases, and would, on the other hand, further burden the Debtors and their creditors with further administrative cost, litigation uncertainty and delay. Viewed in this light, the *Ad Hoc* Committee's attempt to jump start a premature appeal of the Bankruptcy Court's denial of its motion to appoint an official equity committee is merely a litigation tactic designed to artificially increase the *Ad Hoc* Committee's perceived hold-up leverage in these mature cases.

### 4.    No Exceptional Circumstances Exist Warranting Interlocutory Review

        43.    Finally, this appeal does not involve the type of exceptional circumstances warranting leave to appeal under section 158(a)(3). Indeed, research reveals no such occasion in the Third Circuit where section 1292(b)'s requirements have not been met, yet the District Court found exceptional circumstances. In fact, in the very case cited by the *Ad Hoc* Committee for this proposition, Edison, this Court declined to characterize a dispute surrounding the appointment of an official committee as presenting "exceptional circumstances." Edison, 1996 WL 363806, at *3. The *Ad Hoc* Committee will still presumably pursue its opposition to plan confirmation and other litigation regardless of its status, whether *ad hoc* in nature or official. The reality is, with or without the relief the *Ad Hoc* Committee seeks, its constituents are not harmed and their status remains unchanged. Consequently, there is nothing "exceptional" about the circumstances presented in these cases to warrant an immediate appeal.

## CONCLUSION

For these reasons, the Debtors respectfully request that the Court deny the Motion for Leave and grant the Debtors such further relief as the Court deems just and proper.

Dated:  March 9, 2006

SAUL EWING LLP

By: _____
Norman L. Pernick (No. 2290)
Domenic E. Pacitti (No. 3989)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899-1266
(302) 421-6800

-and-

SIDLEY AUSTIN LLP
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
One South Dearborn Street
Chicago, IL  60603
(312) 853-7000

Guy S. Neal
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000

Co-Counsel for Owens Corning, *et al.*,
Debtors and Debtors-in-Possession

**Exhibits To Debtors' Opposition And Answer
To Motion Of The *Ad Hoc* Committee Of Preferred And Equity Security Holders
For Leave To Appeal Bankruptcy Court Order Denying Motion For The Appointment
Of An Official Preferred And Equity Security Holders Committee**

| | |
|---|---|
| Exhibit A | January 30, 2006 Hearing Transcript (Excerpt) before the Honorable Judith K. Fitzgerald |
| Exhibit B | In re Trans World Airlines, Inc., No. 90-115, 1992 WL 168152 (Bankr. D. Del. 1992) |
| Exhibit C | In re Edison Bros. Stores, Inc., No. CIV.A. 96-177, 1996 WL 363806 (D. Del. June 27, 1996) |
| Exhibit D | In re Worldcom, Inc., No. 02-13533, 2005 WL 1208519 (S.D.N.Y. May 19, 2005) |
| Exhibit E | In re Pan-Europe Communications, M-47, 2003 U.S. Dist. LEXIS 1297 (S.D.N.Y. Jan. 30, 2003) |
| Exhibit F | In re Edison Bros. Stores, Inc., No. CIV.A. 96-177, 1996 WL 534853 (D.Del. Sept. 17, 1996) |
| Exhibit G | FDIC v. Parkway Exec. Office Ctr., No. 96-121, 1997 U.S. Dist. LEXIS 14939 (E.D. Pa. Sept. 24, 1997) |
| Exhibit H | Koken v. Viad Corp., No. 03-5975, 2004 WL 1240672 (E.D. Pa. May 13, 2004) |
| Exhibit I | In re G-I Holdings, Inc., No. 05-4630, 2005 U.S. Dist. LEXIS 31896 (D.N.J. 2005) |
| Exhibit J | Objection of Debtors to Motion of *Ad Hoc* Committee of Preferred and Equity Security Holders for the Appointment of an Official Preferred and Equity Security Holders Committee (Bankr. D.I. No. 16697) |
| Exhibit K | In re Northwestern Corp., No. 03-12872, 2004 WL 1077913 (Bankr. D. Del. May 13, 2004) |
| Exhibit L | Titelman v. Rite Aid Corp., No. 00-2865, 2002 WL 32351182, at *3 (E.D. Pa. Feb. 5, 2004) |

533692.3 3/9/06

# EXHIBIT "A"

1      UNITED STATES BANKRUPTCY COURT
                DISTRICT OF DELAWARE

2

3   IN RE:                          .    Chapter 11
                                     .
4   OWENS CORNING, et al.,          .    Case Nos.00-03837(JKF)
                                     .    Jointly Administered
5          Debtors.                 .
                                     .    Jan. 30, 2006 (10:43 a.m.)
6                                    .    (Wilmington)

7                        **EXCERPT OF**

                 TRANSCRIPT OF PROCEEDINGS
8   BEFORE THE HONORABLE JUDITH K. FITZGERALD
           UNITED STATES BANKRUPTCY COURT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22       Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

23

24

25

16874

1     think July 31 is fine.

2           MR. PERNICK: Okay.

3           THE COURT: All right.   What agenda item is that,

4     20?   Is that what we're on?

5           MR. PERNICK: That was number 20.

6           THE COURT: All right, I'll have the order entered

7     as it was filed on the motion.

8           MR. PERNICK: Thank you, Your Honor, and that takes

9     us to item number 11, which is the motion for the appointment

10     of an Equity Committee, and I believe that's Mr. Gray's

11     motion.

12           MR. GRAY: Your Honor, the Ad Hoc Committee actually

13     has two motions before the Court.   The first is the -

14     requesting confirmation that it may proceed in the Delaware

15     Chancery Court to compel Owens Corning to convene a

16     shareholders meeting, and also, as was mentioned, we have a

17     motion requesting the appointment of an official Equity

18     Committee.   I'm happy to consider either motions in the order

19     that the Court wishes.

20           THE COURT: Well, you've already heard my concerns

21     about the appointment of an Equity Committee.   I need some

22     information somewhere that indicates to me that the equity

23     actually is in the money, and I just don't see it, and if the

24     answer is that it only is if I consider the FAIR Act, I'm not

25     considering the FAIR Act.   It's not a statute.   I can't

1  consider that act at this point.  So, maybe we should address
2  that because that's my concern.

3          MR. GRAY: That's fine, Your Honor.  I'm happy to
4  start off with that motion and in fact that element.  As the
5  Court is well aware, 1102(a)(2) provides - of the Bankruptcy
6  Code provides the Court with the ability to appoint official
7  committees, if necessary, to assure adequate representation,
8  and the courts have looked at various factors.  One of the
9  factors is, as the Court mentioned, the prospect for recovery
10  for equity.  Your Honor, I will not go into the FAIR Act
11  issues again.  We do believe that the FAIR Act is an issue
12  that the Court should consider in the analysis, but the other
13  two points as well that are part of the analysis are that,
14  number one, the $7 billion asbestos estimation ruling is on
15  appeal to the Third Circuit.  Opening briefs have been filed
16  with the Third Circuit and responsive briefs are due next
17  month.  We think that the grounds for reversal of that
18  decision are meritorious, and we would also note that Credit
19  Suisse, which is the agent for the Bank Group and my
20  understanding part together with the Steering Committee
21  agreeing to the latest plan that the debtors have filed, is
22  also an appellant in that estimation appeal and has gone
23  ahead and continued to pursue its appeal of the estimation
24  ruling and has filed an extensive brief in connection with
25  that appeal.  So, we think that if that challenge is

1   successful with respect to the $7 billion estimation ruling

2   that there will be substantial value for equity as well.  And

3   then the other factor, Your Honor, with respect to the

4   solvency/reasonable possibility of overturn for equity is the

5   issue of the market capitalization.  Your Honor, based on the

6   price per share as of the close of business last Friday,

7   January 27th, with respect to the common stock, the common

8   stock was trading at $4.25 per share and approximately 21,as

9   of last week, approximately $21 per share for the preferred.

10  Given the outstanding amounts of shares of common stock and

11  preferred securities, 55.4 million approximately of the

12  common and 4 million approximately of the preferred

13  outstanding, there is a market capitalization of over $235

14  million for the common stock and $84 million for the

15  preferred securities.  We believe, Your Honor, that the Court

16  should take into account the market cap of the shares.  It's

17  not a speculative indicator of value.  There are numerous

18  holders in the market.  Even the debtors concede that there

19  are over at least 6,500 holders of the common stock alone out

20  in the marketplace.  Your Honor, I would also point out that

21  no less an authority than the United States Supreme Court has

22  determined that the market, particularly in the plan

23  confirmation context, that the market is the best indicator

24  of value, and that the Court made that determination in the

25  LaSalle decision.

1    THE COURT: And I don't disagree with that, but did

2 I get the numbers correct?  Two hundred thirty-five million

3 and 84 million respectively?

4    MR. GRAY: Correct.

5    THE COURT: Okay, then even just taking the asbestos

6 liability issue alone, just that, if the Circuit even reduces

7 the asbestos liability down to a billion dollars, equity's

8 not in the money.

9    MR. GRAY: Your Honor, the market capitalization, we

10 believe, takes into account the debt.  It represents the

11 residual value that's left over after accounting for both the

12 liabilities and the assets of the companies.  That residual

13 value we believe is reflected in the market capitalization.

14 We believe that the market has taken into account the

15 asbestos-related claims estimation amounts.

16    THE COURT: Well, maybe it has.  I don't have any

17 way of knowing whether it has or not, but since you're saying

18 that it's largely institutional investors who are buying at

19 least at the preferred level, I'll just assume for purposes

20 of this discussion that that's the case, that it has taken it

21 into account.  Nonetheless, the issue for equity to get some

22 funds is what the debtor's assets are worth.  So, the debtor

23 - and that's a liability, the 235 million is a liability from

24 the debtor's side because it has to pay the money back in the

25 event that the company does something that returns a

1  distribution to equity.  It's not a value additive for the

2  debtor.  So, the asset value for the debtor is what I really

3  need to look to, and I don't know what that is, but I don't

4  think the market capitalization is the way to get there.

5      MR. GRAY: Well, Your Honor, the total distributable

6  value that the debtors have indicated in their latest

7  disclosure statement indicates that they would have 5.9

8  billion to 6.7 billion of total distributable value.  Putting

9  aside for the moment the asbestos liabilities, the total

10  amount of debt, as best as we can tell from the disclosure

11  statement, including post-petition interest, potential post-

12  petition interest for other unsecured creditors, other than

13  the post-petition interest that would be paid to the banks

14  under the current plan is over $4 billion.  So, there is

15  substantial millions of dollars, almost $2 billion in fact,

16  of extra potential value that would find its way to equity.

17      THE COURT: If there were no asbestos liabilities.

18  Did I -

19      MR. GRAY: If you add in the asbestos liabilities at

20  say a billion dollars, which is - and I know Your Honor is

21  concerned about the FAIR Act, but if you took into account

22  the FAIR Act, the FAIR Act would reduce those liabilities to

23  approximately a billion as the bondholder group pointed out

24  in its papers down from $7 billion.  So even if you add in

25  the billion, you're still talking, based on the debtor's

1   numbers, and I'm not standing here today agreeing with what

2   the debtors are proposing in their plan, but even using the

3   debtor's numbers, you're still talking about residual value

4   of between a half a billion and $1.3 billion that would be

5   left over for equity.

6           THE COURT: Okay.  If I took the FAIR Act into

7   consideration and thought that somehow or other it had some

8   meaning that I could attribute to it, which I don't see how

9   it does, but even if I did that, there is a court

10  determination that has said that the asbestos liabilities are

11  now $7 billion.  That's subject to appeal.  You've got one

12  heck of a burden, somebody does, to set aside 7 billion and

13  come down to no billion for current and future liabilities in

14  a company that was the market leader in the products that it

15  made and acknowledges that it has asbestos liabilities and

16  what its pre-petition settlements and litigations were with

17  the current claimants let alone the futures to take into

18  consideration.  So, the likelihood that you're going to get

19  the 7 billion reduced to zero isn't very high, I think.  Now,

20  it may go back for a new trial, but coming from 7 billion to

21  zero dollars is not likely.

22          MR. GRAY: I don't think it would have to go down to

23  zero dollars, Your Honor.

24          THE COURT: But it has to go down to less than 2.

25          MR. GRAY: It would have to go down possibly to less

1   than 2, and I understand Your Honor's point, but the bottom

2   line is, Your Honor, is that the concern for the preferred

3   and the equity security holders is that if the debtor's plan

4   proceeds without accounting for the possibility of lower

5   asbestos liabilities, another constituency will be getting a

6   windfall presumably that would be the asbestos claimants, but

7   another party out there will get a windfall purely because of

8   the chance that the plan would be confirmed before enactment

9   of the FAIR Act.  And -

10          THE COURT: Plans are confirmed before statutes are

11  amended all the time.  I mean this argument just doesn't hold

12  any water.  If we had to wait for Congress to pass different

13  statutes all the time, we'd never get plans confirmed.

14          MR. GRAY: Your Honor, there is precedent for

15  including forward -

16          THE COURT: It doesn't matter.  I understand there's

17  precedent.  There's lots more precedent for not including it.

18  So far there are only two cases that have, and I've had over

19  15 on my docket, none of which but those two have - one of

20  those on my docket has included it, so there's a lot more

21  precedent not to include it.  So where does that get us?

22          MR. GRAY: Well, I think that the passage of the

23  FAIR Act is highly likely, Your Honor.  As has been mentioned

24  in previous remarks to the Court this morning, it has already

25  merged from the Senate Judiciary Committee.  The majority

1  leader, Senator Frist, has indicated it's at the top of the

2  legislative agenda.  Moreover, my understanding is, is that

3  the Senate is expected to hear the asbestos bill as early as

4  next Monday on the Senate floor.

5      THE COURT: Well, if they pass something between now

6  and when this plan goes out, definitely at that point in

7  time, assuming that there's still a bankruptcy case or a

8  bankruptcy spin to this at all, then the documents will have

9  to be amended.  I have no qualm about saying that, but unless

10  and until they're passed, these documents do not need to be

11  amended.

12      MR. GRAY: Your Honor, I'd like to now turn and I'll

13  try to be very brief on the other factors that courts examine

14  in connection with equity committee motions.  I don't think

15  that there's any dispute that we meet the large and complex

16  case factor.  I don't think that there's any real dispute and

17  the debtors have certainly not raised one with regards to the

18  widely traded shares factor.  In fact, with respect to the

19  common stock, as when we filed our papers last December, over

20  the - I think it was the six to seven-week period prior to

21  our filing in December, the shares of the common stock were

22  trading at about 350 thousand per day on average.  As of last

23  week the average trading volume has increased to over 1.1

24  million shares per day.  That's, again, remembering that

25  we're talking about 55 million shares outstanding.  Your

1   Honor, we also think with respect to the time limits factor,
2   that our motion is timely.  We are at a critically important
3   phase in these cases.  The debtors are pursuing their plan,
4   not including the FAIR Act component that we discussed.  The
5   debtors are not close to a fully consensual plan.  It appears
6   that there are disagreements with major bondholders and with
7   the trade claimants regarding their treatment under the
8   debtor's plan and the plan structure.  In short, there's a
9   lot more time in negotiation that will have to be
10  accomplished within the next few weeks for the solicitation
11  and confirmation process to be completed and result in a
12  consensual plan if one is attainable.  The fact remains, Your
13  Honor, that we are at a critical juncture now.  This Ad Hoc
14  Committee and its members stand ready to work with the
15  constituents to try to resolve all issues and get to a
16  consensual plan, but the debtors have refused to deal with
17  us.  Finally, Your Honor, with respect to the need for an
18  official committee outweighing the potential cost for the
19  estate, it's clear, Your Honor, we think, that an official
20  committee isn't warranted to represent the interests of the
21  preferred securities and the equity holders.  The debtors
22  propose in their current non-consensual plan to wipe out
23  completely those interests, and there are other models out
24  there that would preserve value for those interests as we
25  previously discussed, Babcock & Wilcox and USG.  The debtors

1    tout their new plan, Your Honor, as their prime evidence that
2    they have met their fiduciary duties to all - to the entire
3    estate, including the preferred and equity security holders,
4    but clearly here, Your Honor, we, the equity secured and
5    preferred security holders have not been part of the process
6    and have been excluded by management.  In addition, Your
7    Honor, the debtors, notwithstanding the fact that they intend
8    to wipe out equity, are proposing in their new plan to pay
9    management at least $45 million in additional compensation on
10   the effective date while their equity and preferred
11   securities holders get nothing.  In conclusion, Your Honor -
12   Oh, with respect to the cost, I misspoke.  We believe, given
13   the need and the lack of adequate representation for all of
14   the equity security holders and the preferred security
15   holders that that need outweighs the cost for having an
16   official committee to represent all of those interests
17   supported in this case.  We note, Your Honor, that
18   substantial stakeholders in these cases have not objected to
19   this motion, namely the Ad Hoc Bondholder Group and other
20   bondholders and trade claimants and also the Official
21   Creditors Committee.  The debtors have pointed out that the
22   costs for this additional committee would be borne by the
23   creditors, if that's true, then the fact that those folks are
24   not objecting, I think, is very telling on this factor.
              THE COURT: And how many of the members of your
25

1  official committee are members of the committees that aren't
2  objecting?

3       MR. GRAY: I honestly don't know, Your Honor, what
4  their debt holdings are.  The debtors reported that there is
5  some crossover.  We now have, as mentioned at the outset of
6  my presentation on the exclusivity motion, that we now have
7  eleven members.  A couple of our members have dropped off of
8  our Committee.  We will be amending our rule 2019 statement
9  to reflect that and those two members that have dropped off
10 are JP Morgan and Lehman.  So, there may be some crossover,
11 but I can't answer your question in terms of what the nature
12 of that crossover is.  Regardless, Your Honor, the fact that
13 there are institutions, significant institutions that are
14 involved in the case, I don't think weights against the
15 adequate representation point.  An official committee would
16 owe fiduciary obligations to all of the shareholders whether
17 they're institutional holders or individual holders.  And so,
18 we as an Ad Hoc Committee don't have that obligation.  An
19 official committee would have that obligation and would be
20 required to take all of the interests into account in
21 connection with addressing case issues.  In addition or in
22 conclusion, Your Honor, we think that the circumstances of
23 this case cry out for the immediate appointment of an
24 official committee to represent the interests of the
25 preferred and the equity security holders.  We think that we

PENGAD • 1-800-631-6989

FORM FED-25

1   meet all of the factors as described, and we also note as the
2   United States Trustee noted in its objection to our motion
3   that the legislative history of 1102 contemplates that the
4   official committees would be the primary negotiating bodies
5   for the formulation of the plan of reorganization, and that's
6   what we're proposing here.  Thank you, Your Honor.
7           THE COURT: Mr. Pernick.
8           MR. PERNICK: Your Honor, I think I can help a
9   little bit with the numbers, and Mr. Gray's not far off, but
10  these numbers are public.  They're on the record in the
11  disclosure statement, so, I think they're easy to talk about.
12  The first number that's not which is in the record in the
13  estimation hearing just to give the Court and the parties
14  some prospective, you may recall or you may know that we had
15  a number of experts who testified at that hearing.  The
16  bank's expert, Mr. Dunbar, had the lowest estimate of
17  anybody, and that was approximately $2 billion.  So even in
18  the estimation hearing and on the appeal I would presume -
19  While I guess there's a theoretical chance of the Court
20  reversing and a total victory for the appellants, the chances
21  of him getting a number lowest in what the lowest expert
22  testified to seems to me to be pretty unrealistic.
23          THE COURT: I agree with that, but -
24          MR. PERNICK: With respect to assets and
25  liabilities, let me talk first about liabilities -

1    THE COURT: Pardon me -

2    MR. PERNICK: sorry.

3    THE COURT:  - so with the 2 billion, assuming that
4  the lowest estimate is accepted at $2 billion, then is equity
5  in the money?

6    MR. PERNICK: Well, it's hard - I'm only hesitating
7  because I have to calculate five years worth of interest for
8  all of the bond debt and the unsecured creditors who would be
9  entitled to receive that before equity would receive
10 anything.  So, I can certainly do that calculation.  I can't
11 do it right now, but I can have Mr. Post (phonetical) do it
12 and get that to the Court.  It seems close.  My guess is that
13 equity won't be in the money, but until I do that
14 calculation, I don't know.  I mean, for example, the bank
15 debt, the pre-petition amount is 1.467 billion and their
16 number with interest and fees at the settled number, not the
17 full amount that they were claiming, is 2.2 billion just for
18 the bank debt.  So there was about $700 million of interest
19 and fees that they were entitled to that we agreed to and
20 that doesn't count probably about 300 million more that they
21 compromised from what they were originally claiming they were
22 owed.  Now, I know we could have a discussion about whether
23 they would have eventually gotten it or not, but we did - the
24 resolution that's in the plan contemplates that settlement
25 just to give you perspective.  So that's about 2.2 billion.

1  The bond debt, just to round up a little bit, is 1.4 billion
2  plus interest, and so the interest number may well be even
3  just for the bond debt another 5, 6, $700 million. I don't
4  know exactly and I don't know if Mr. Rahl or Mr. Kruger
5  happen to have it, but we could calculate that. You also
6  have about $275 million of trade and unsecured debt, and then
7  right now you have a $7 billion asbestos number. Now this
8  is, by the way, all Owens Corning only because the equity
9  holders are not claiming that they have an equity interest in
10 the Fiberboard entities, so we pulled out when I talked to
11 you about distributable value, we pulled out the amount of
12 the Fiberboard trust which was about 1.4 billion. We're just
13 looking at OC apart from Fiberboard. On the asset side, what
14 you basically have in OC is about $1.1 billion in cash, about
15 a $5.2 billion total enterprise value, and about $200 million
16 of insurance recoveries and items like that. So, it's
17 approximately $6.5 billion on the asset side. His range of
18 5-9 to 6-7 was, I think, correct from the disclosure
19 statement. On the two other small points just that Mr. Gray
20 raised that the Official Committee is necessary so that
21 shareholders can participate, I think Your Honor's been in
22 enough cases in Chapter 11s to know, this is really about who
23 is going to pay fees and whether or not they're going to get
24 official status which may help them a little bit in arguing
25 before the Court or other items, but it's really about who's

going to pay the fees. These entities, and we disclosed only what was public from pleadings that they filed, is that five at that time of the thirteen members of their Committee were bank holders and/or bondholders, and when you look at the names of those entities, it's not just that there were five or thirteen, it's who they are. I mean, they're all more than capable and have demonstrated themselves to be more than capable of taking care of themselves let alone when they act together. It's Deutsche Banks' securities, Havre Distress Investment Master Fund, JP Morgan, Lehman Bros. and Plain Field Asset Management. So, I don't think a serious argument could be made that if you don't grant this motion, that they're not going to be able to effectively participate, and in fact, just as an example, Havre on its own is one of the appellants in the estimation hearing and in the estimation appeal. Your Honor, I think those are the two main points: the values and the ability to represent themselves. So unless the Court has any questions, I have nothing further in response although I think some other parties do.

MR. LOCKWOOD: Just a few quick points, Your Honor. With respect to the market price issue, there's been no evidence that there's anything other than people buying what amount to lottery tickets on the FAIR Act. It may well be that in an ordinary case where you haven't got a highly publicized federal statute that would wipe out $7 billion of

1    liability that market - one might assume that the market

2    value representing an informed market was a consensus of the

3    investors as to what the, quote, "equity", close quote, was

4    of the company. But here, it's quite clear that what you're

5    talking about, as Mr. Gray basically acknowledged, is a $6

6    billion reduction in what has been found to be and what this

7    Court must, I assume, until some higher court reverses it,

8    take to be a $7 billion liability here, and without regard to

9    whether Mr. Dunbar who Judge Fullam roundly rejected the

10    credibility and the methodology of, could come up with a

11    number that was $5 million lower, which if you scratched

12    around real hard, you might come up with a couple hundred

13    million dollars of equity to do that. The Third Circuit

14    would not only have to reverse Judge Fullam, they'd have to

15    say, notwithstanding that he was at the trial and determined

16    the credibility of the witnesses, that he was not only wrong

17    in his result, but that he had to have accepted as a matter

18    of clear and convincing evidence that Fred Dunbar's testimony

19    was so overwhelmingly correct that the lower court should

20    have accepted it at face value. That, I submit, is an

21    outcome that is just outside the realm of even remote

22    speculation. So what you've got here is a combination of

23    folks out there in the market betting on the possibility of

24    future legislation, like they bet on sporting events.

25    There's all kinds of things that you can bet on and pay - I

1  mean, you're talking $3 a share was the number that was in
2  the Equity Committee's motion. That's like buying a dollar
3  lottery ticket down at the gas station or something like
4  that. That's not any evidence that there's residual equity
5  value here. Mr. Gray also commented that there was no
6  objection for the bondholders to this Committee. Not only
7  were the bondholders riddled with conflicts of interest on
8  that subject, but there were objections from the ACC and the
9  Futures Rep. who until somebody says differently have $7
10 billion worth of claims. And so, I think it's a little bit
11 disingenuous to suggest that somehow or another the creditors
12 here all agree that it would be just terrific to have an
13 Equity Committee. As Mr. Pernick pointed out, the bottom
14 line here is, is this Court on the basis of the sort of
15 flimsy showing that's been made here going to grant official
16 status to a group of people whose only incentive, only
17 incentive if so granted that status would be to find out ways
18 to try and hold up the confirmation of this case because the
19 FAIR Act, if it doesn't get enacted in February, which as
20 Your Honor pointed out, would moot all this discussion or in
21 March or in April or at anytime prior to the confirmation and
22 consummation of this plan, is always there potentially to get
23 re-introduced by some subsequent Congress at some subsequent
24 time, and the equity committees whose only hope of getting
25 value out of this case is the passage of that statute will

1 | have total incentive at the expense of the debtor and all its
2 | creditors to come in here and try and use its status and the
3 | economic value that it's getting from the debtors to just
4 | delay, delay, throw up as many roadblocks as it possibly can,
5 | and I suggest to you, Your Honor, that that's hardly the kind
6 | of conduct that your Court, Your Honor would want to
7 | incentivize by creating an official committee under these
8 | circumstances.  Thank you.

9 | THE COURT: Anyone else?  Mr. Graulich?

10 | MR. GRAULICH: Your Honor, I don't want to say
11 | anything that would be in any way duplicative of the debtors
12 | or the ACC on this, and in fact - on this issue, and in fact,
13 | Your Honor, we filed an objection, and we're prepared to this
14 | relief, and we're prepared to stand on that objection.  I
15 | would just like to, just for a point of clarification make
16 | clear the fact that Credit Suisse was the objecting party or
17 | the main litigant in the estimation.  Based upon the timing
18 | we've been given from the Third Circuit, we have filed a
19 | notice of appeal, and, notwithstanding the plan, we have
20 | filed a brief in support of the appeal, but if all the
21 | parties would take a look at the letter that's attached as
22 | the final exhibit to the plan, assuming the plan's confirmed,
23 | the banks are prepared to withdraw this appeal and moreover,
24 | we're in the process now of trying to solicit support from
25 | the bank groups themselves to withdraw the appeal more

PENGAD • 1-800-631-6989

FORM FED-25

1 quickly. So, to the extent that this action turns on the
2 likely results of the appeal, the appeal is something that
3 the banks, based upon their proposed treatment under the
4 plan, is prepared to waive, you know, assuming that we get
5 the treatment that's the non-cram-down treatment under the
6 plan.

7 MR. KLAUDER: Good afternoon, Your Honor. David
8 Klauder for the United States Trustee's Office. I just
9 wanted to note a few things. A request was provided to our
10 office prior to this motion being brought. This is actually
11 the third - or that was the third such request in this case.
12 I believe this is the first time the issue of an Equity
13 Committee has been formerly brought before you, but we've
14 gone through the process three times, gone out, gotten
15 solicitation, gone through the issues, and we've denied that
16 request all three times. I wanted to make note of that.
17 Secondly, I agree wholeheartedly with what Mr. Pernick said,
18 that this isn't an issue of adequate representation. It's an
19 issue of who pays. The Equity Committee clearly wants the
20 estate to pay for their participation in these cases. These
21 are sophisticated institutional investors. They've come
22 together and certainly are going to be heard in this case.
23 They have the ability under 1109(b) to come together to be
24 heard as an Ad Hoc Committee, and they're doing such in this
25 case. Why is it then that the estate has to pay, and we

1    don't believe that the facts before the case support official

2    status.    Lastly, isn't the issue of the possibility of an

3    appeal the same speculation being as the FAIR Act?    I mean,

4    what we have, what is before us, the fact before us is a

5    District Court opinion of $7 billion.    To say it is appealed

6    and it could be a billion it could be 2 billion, it's the

7    same speculation.    What we know is that it's $7 billion, and

8    I think that is the point that should - that Your Honor

9    should be considering the most.

10           THE COURT: Well, I think I have to consider the

11   fact that it's $7 billion unless and until it's satisfied on

12   appeal.    It's a final judgment unless it's reversed.    So, I

13   have no discretion.    As far as I'm concerned that's the

14   number.

15           MR. KLAUDER: Your Honor, equity committees are not

16   mandated by statute.    It's a heavy burden to prove, and it

17   hasn't been proven here so we would request that you deny the

18   request for an equity committee.    Thank you.

19           THE COURT: Anyone else?    Mr. Gray, any final

20   comments?

21           MR. GRAY: I do have just one comment, Your Honor,

22   and that is that the Court should look at the issue of the

23   potential return to equity as an issue of whether the debtors

24   are hopelessly insolvent.    I don't believe that the debtors

25   are hopelessly insolvent.    There are several possibilities

1  out there that would put equity in the money and under the

2  standard, Your Honor, we believe that we meet that element of

3  the test for approval of an official equity committee under

4  1102(a)(2).

5          THE COURT: Well, it seems to me that the test is

6  not met.  There is no evidence before me that the debtor is

7  solvent at this point in time in any way.  I have no

8  authority to assume that the liabilities are going to be

9  anything less than $7 billion because the District Court's

10  told me that's what they are, and I am not an appellate court

11  to set aside District Court determinations.  So, as far as

12  I'm concerned, it's $7 billion.  If I add up all the numbers

13  that have been put on the record with respect to the asset

14  value of the debtor, they don't total $7 billion, and that's

15  not the debtor's only claim.  So, I don't see how at this

16  point equity is entitled to a distribution or will get a

17  distribution under any scenario, and at this point in time,

18  I, therefore, am denying this motion.  If the FAIR Act passes

19  and this case is still pending, if the $7 billion number is

20  set aside and the number is low enough that in fact equity

21  stands a chance at recovering funds, at that point I will

22  certainly hear the Equity Committee's motion and probably

23  have a much different reaction to it than I have now.  But as

24  of today, this motion is denied without prejudice.  There is

25  no basis for me to find that equity will receive a return of

1  any type in this case based on the asset value of the debtor.

2  So, it's denied for that reason without prejudice.   Mr.

3  Pernick, if you will submit an order, run it by Mr. Gray

4  first, please.

5           MR. PERNICK: Thank you, Your Honor.

6           THE COURT: He has another motion, I think.

7           MR. PERNICK: That's right, I was just actually

8  going to -

9           THE COURT: Okay.

10          MR. GRAY: Thank you.   Thank you, Your Honor, for

11  hearing us on the shareholder meeting motion.   By this

12  motion, the Ad Hoc Committee seeks either confirmation of the

13  Court that it may proceed in the Delaware Chancery Court to

14  prosecute an action seeking to compel Owens Corning to

15  conduct its annual shareholder meeting - an annual

16  shareholder meeting or to stay relief or alternatively stay

17  relief to do so.   Your Honor, Owens Corning is a Delaware

18  corporation and in accordance with Delaware law and with its

19  own bylaws is required to hold annual shareholder meetings

20  for the purpose of, among other things, electing directors.

21  Owens Corning failed for years to conduct an annual

22  shareholder meeting, and indeed, the terms of all ten of its

23  purported directors has expired years ago by the terms of the

24  organizational documents of Owens Corning.   The members of

25  the Ad Hoc Committee, Your Honor, seek to exercise their

# EXHIBIT "B"

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 168152 (Bankr.D.Del.), 22 Bankr.Ct.Dec. 1236
(Cite as: 1992 WL 168152 (Bankr.D.Del.))

Page 1

**H**

United States Bankruptcy Court, D. Delaware.
In re TRANS WORLD AIRLINES, INC., Debtor.
**Bankruptcy No. 92-115.**

March 20, 1992.

ORDER DENYING MOTIONS FOR SEPARATE
CREDITORS' COMMITTEES OR EXPANSION OF
THE
OFFICIAL UNSECURED CREDITORS'
COMMITTEE

HELEN S. BALICK, Bankruptcy Judge.

*1 THIS CAUSE has come to be heard on (i) the
Motion for an Order Directing the Appointment of an
Official Unsecured Senior Noteholders' Committee
or, in the Alternative, Expansion of the Official
Unsecured Creditors' Committee, (ii) the Motion by
Fleet National Bank for Order Directing the United
States Trustee to Appoint Fleet as a Member of the
Official Committee of Unsecured Creditors, and (iii)
the Motion of Shawmut Bank, N.A. for the
Appointment of an Official Committee of Senior
Secured Noteholders or, in the Alternative, to Enlarge
the Official Committee of Unsecured Creditors
(collectively, the "Motions").    The Court, having
heard the arguments of counsel at a hearing
conducted on March 13, 1992 upon due notice,
having reviewed and considered the Motions and the
exhibits thereto, and the responses and objections
filed to the Motions, including the objections of the
Debtor and Official Unsecured Creditors' Committee
(the "Official Committee") and the exhibits thereto,
and having considered fully and taken judicial notice
of relevant matters in the above-captioned
bankruptcy case, and being otherwise fully advised in
the premises, makes the following FINDINGS OF
FACT:

1. Adequate and sufficient notice of the Motions has
been provided to all persons entitled thereto under
Rules 2002 and 9019 of the Federal Rules of
Bankruptcy Procedure, and no further notice of the
Motions or the entry of this Order is necessary.

2. This matter constitutes a "core proceeding" within
the meaning of 28 U.S.C. § 157.

3. The Court has jurisdiction over the parties and the

subject matter hereto, and this Order shall be binding
upon them.

4. On January 31, 1992 (the "Petition Date"), Trans
World Airlines, Inc. (the "Debtor" or "TWA") filed a
voluntary petition for relief under Chapter 11 of Title
11 of the United States Code, 11 U.S.C. § § 101 et
seq. (the "Bankruptcy Code"). The Debtor continues
to possess its properties and operate and manage its
businesses as a debtor-in-possession pursuant to the
provisions of Sections 1107 and 1108 of the
Bankruptcy Code, 11 U.S.C. § § 1107-08.

5. On February 4, 1992, the United States Trustee
mailed notice of a meeting to form a committee of
unsecured creditors (the "Organizational Meeting") to
the 20 largest creditors listed on the Debtor's
schedules. On February 6, 1992, the United States
Trustee sent a second mailing when he learned that
the Debtor revised its list of 20 largest unsecured
creditors.

6. The Organizational Meeting was held at the
Radisson Hotel in Wilmington, Delaware on
February 12, 1992. All persons in attendance at the
Organizational Meeting who expressed an interest in
serving on an unsecured creditors' committee were
required to complete a questionnaire.    At the
Organizational Meeting, the United States Trustee
delivered certain remarks explaining the purpose
behind the Organizational Meeting. Thereafter, the
Debtor made a presentation to the assembled
creditors.    The creditors in attendance at the
Organizational Meeting were then given an
opportunity to ask questions of the Debtor.

*2 7. After exhausting all questions from the
creditors in attendance at the Organizational Meeting,
the United States Trustee and his staff retired to a
separate room to determine the composition of the
committee(s) to be appointed under 11 U.S.C. §
1102. In determining the composition of any
committee(s), the United States Trustee and his staff
considered the Debtor's filed list of 20 largest
creditors, all correspondence addressing committee
membership received by the Office of the United
States Trustee, and all completed questionnaires,
including all questionnaires completed by any of the
Movants.    The correspondence considered by the
United States Trustee included correspondence
directed to the United States Trustee prior to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                    Page 2
Not Reported in B.R., 1992 WL 168152 (Bankr.D.Del.), 22 Bankr.Ct.Dec. 1236
**(Cite as: 1992 WL 168152 (Bankr.D.Del.))**

Organizational Meeting by the Movants.

8. At the conclusion of its deliberations, the United States Trustee duly appointed the Official Committee consisting of the following members:    Elliott Associates, L.P., holders of TWA's 12% Junior Subordinated Debentures due 2001 and 2008 (collectively the "12% Debentures"), TWA's 16% and 17 1/4 % Senior Unsecured Notes (the "Senior Notes"), and TWA's 15% Senior Secured Notes (the "Senior Secured Notes"); AVSA S.A.R.L., suppliers of aircraft and related equipment to TWA; Independent Federation of Flight Attendants, representatives of certain of TWA's employees; Mabon Securities Corp., holders of the Senior Notes; Manufacturers Hanover Trust Company, indenture trustee for the 12% Debentures; Rolls-Royce, Inc., suppliers to TWA of aero engine spare parts and related products and support services; and United Equities Company, holders of the 12% Debentures, the Senior Notes, and the Senior Secured Notes.

The Court, having heard the arguments of counsel at a hearing conducted on March 13, 1992 upon due notice, having reviewed and considered the Motions and the exhibits thereto and the responses and objections filed to the Motions, including the objections of the Debtor and Official Committee and all exhibits thereto, makes the following CONCLUSIONS OF LAW:

A. The appointment of a single creditors' committee is the normal and statutorily prescribed method for assuring the representation of all unsecured creditors in a Chapter 11 case. 11 U.S.C. § 1102. The creation of an additional creditors' committee pursuant to Section 1102(a) of the Bankruptcy Code requires the examination of two elements: (1) an affirmative showing by the movants of "necessity" in order (2) to assure "adequate representation" of all unsecured creditors. 11 U.S.C. § 1102(a)(2); In re Sharon Steel Corp., 100 B.R. 767, 776 (Bankr.W.D.Pa.1989).

B. A bankruptcy court may not expand an already constituted committee of unsecured creditors under Section 1102 of the Bankruptcy Code unless it is demonstrated that the United States Trustee abused its discretion in appointing the committee. In re Columbia Gas Systems, Inc., 133 B.R. 174, 176 (Bankr.D.Del.1991). In this regard, the decision of the United States Trustee is entitled to deference. Id. at 175.

*3 C. The reconciliation of differing interests of creditors within a single committee is the norm, and the appointment of a separate committee is an extraordinary remedy. In re Sharon Steel Corp. 100 B.R. at 778. Separate committees impose additional administrative expenses on the debtor's estate which adversely affects the debtor's ability to reorganize. Id.; In re Orfa Corp. of Philadelphia, 121 B.R. 295, 299 (Bankr.E.D.Pa.1990). Official committees are not designed to provide a speaker's platform for a particular creditor. In re Drexel Burnham Lambert Group Inc., 118 B.R. 209, 212 (Bankr.S.D.N.Y.1990).

D. Under Section 1102 of the Bankruptcy Code, adequate representation exists as long as diversified interests of various creditor groups are represented on and have participated in the committee constituted by the United States Trustee. In re Sharon Steel Corp., 100 B.R. at 777-78.

E. In this case, the United States Trustee did not abuse its discretion in the appointment of the Official Committee. To the contrary, the United States Trustee has done a remarkable job in this case in its appointment of the Official Committee. The notice of the Organizational Meeting, the conduct of the Organizational Meeting, the United States Trustee's deliberations at the Organizational Meeting, and the United States Trustee's appointment of the Official Committee demonstrate that the United States Trustee properly exercised its discretion in the appointment of the Official Committee.

F. The Official Committee is properly balanced. The Official Committee represents holders of the 12% Debentures, the Senior Notes, and the Senior Secured Notes. The Official Committee also represents the Debtor's trade creditors and labor interests. Any additions to the Official Committee would adversely affect the balance of the Official Committee.

G. The Official Committee adequately represents all of the Debtor's unsecured creditors within the meaning of Section 1102(a)(2) of the Bankruptcy Code. The creation of additional committees pursuant to Section 1102(a)(2) of the Bankruptcy Code would create significant problems in this case, and would needlessly burden the Debtor's estate with substantial additional administrative expenses.

H. The Court is without authority to appoint ex officio members to creditors' committees constituted under Section 1102 of the Bankruptcy Code.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 168152 (Bankr.D.Del.), 22 Bankr.Ct.Dec. 1236
**(Cite as: 1992 WL 168152 (Bankr.D.Del.))**

Page 3

WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

(1) The Official Committee adequately represents the interests of all of the Debtor's unsecured creditors; including the Movants, in accordance with Section 1102 of the Bankruptcy Code.

(2) The United States Trustee did not abuse its discretion in the appointment of the Official Committee.

(3) The Motions are denied in all respects and in their entirety.

Not Reported in B.R., 1992 WL 168152 (Bankr.D.Del.), 22 Bankr.Ct.Dec. 1236

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "C"

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: 1996 WL 363806 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
In re EDISON BROTHERS STORES, INC., et al.,
Debtors.
Jonathan VICTOR, Richard Polak, and Martin Katz,
Appellants,
v.
EDISON BROTHERS STORES, INC., et al.,
Appellees.
**No. CIV.A. 96-177-SLR.**

June 27, 1996.

Laura Davis Jones, and Joel A. Waite, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Harvey R. Miller, and Richard P. Krasnow, of Weil, Gotshal & Manges LLP, New York, New York, and D.J. Baker, of Weil, Gotshal & Manges LLP, Houston, Texas, for appellees/debtors.

Jeffrey C. Wisler, of Williams, Hershman & Wisler, of Wilmington, Delaware, and Peter D. Wolfson, Carole Neville, John A. Bicks, and Pamela Cohen, of Pryor, Cashman, Sherman & Flynn, New York, New York, for appellants.

Thomas L. Ambro, and Deborah E. Spivack, of Richards, Layton & Finger, Wilmington, Delaware, and David S. Kurtz, Timothy R. Pohl, and Sean D. Malloy, of Jones, Day, Reavis & Pogue, Chicago, Illinois, for the Official Committee of Unsecured Creditors of Edison Brothers Stores, Inc.

E. Gordon Robinson, and Susan R. Sherrill, of U.S. Securities and Exchange Commission, Atlanta Georgia, and Ellen W. Slights, Assistant United States Attorney, Wilmington, Delaware, for U.S. Securities and Exchange Commission.

*MEMORANDUM OPINION*

SUE L. ROBINSON, District Judge

I. INTRODUCTION AND BACKGROUND

*1 Pending before the court is a motion filed by appellee, the Official Committee of Unsecured Creditors (hereinafter the "Creditors' Committee"), for an order dismissing the appeal of Joseph Harrosh,

Jonathan Victor, Richard Polak and Martin Katz (hereinafter the "appellants"), all of whom are non-insider public shareholders of Edison Brothers Stores, Inc. and 65 subsidiaries (hereinafter the "debtors") which filed chapter 11 petitions in this district's bankruptcy court in November 1995. [FN1] By letters dated November 9 and November 22, 1995, appellants wrote to the United States Trustee requesting that an official equity committee be appointed pursuant to 11 U.S.C. § 1102(a). [FN2] On December 7, 1995, the United States Trustee declined appellants' request.

> FN1. As of the Petition Date, approximately 22,000,000 shares of the debtors' common stock were outstanding. Those shares are widely held by more than 4,000 record holders, and a substantially larger number of beneficial holders.

> FN2. Section 1102(a) of the Bankruptcy Code provides in relevant part that:
> (1) As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.
> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee. (Emphasis added)

On January 12, 1996, appellants filed a motion with the bankruptcy court requesting the appointment of an official committee of equity security holders. The California Public Employees Retirement System (holding approximately 150,000 shares of the debtors' common stock) and the Securities and Exchange Commission ("SEC") supported the motion. The debtors, the United States Trustee and the Creditors' Committee opposed the motion.

Hearings on the motion were held by the bankruptcy court on February 29 and March 20, 1996.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: 1996 WL 363806 (D.Del.))**

Page 2

Appellants asserted to the court that (1) the debtors were not insolvent, (2) the debtors' public shares were widely held, (3) the debtors' chapter 11 cases were complex, and (4) insiders of the debtors could not adequately represent the interest of public shareholders in the chapter 11 cases for conflict of interest reasons.    The opponents to the motion argued that the debtors' current and former management could and would provide adequate representation for the debtors' public shareholders, as a result of their ownership of approximately 35% of the debtors' outstanding common shares.    The bankruptcy court declined to appoint an equity committee, stating during the course of the hearing the following, *inter alia:*

* "I'm going to deny without prejudice obviously, because as this case progresses I think there may be an appropriate time for a committee of equity holders...."

* "[I]f somebody wants to come on with evidence to suggest that [the interests of insider shareholders are not aligned with those of non-insider shareholders,] I'd be glad to entertain it...."

* [I]f the petitioning shareholders reach a point where they think that additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so...."

* "I think that based upon a different posture six months from now [the request to appoint an equity committee] may be an appropriate application...."

(D.I.  16,  # 15 at 101, 103, 114, 114-115, respectively)

Appellants thereafter filed a timely appeal to this court.    In response to the appeal, the Creditors' Committee filed the pending motion to dismiss the appeal for want of subject matter jurisdiction.

## II. DISCUSSION

**\*2** As with many bankruptcy cases, it is a difficult task in the case at bar to divine legal principles when dealing with an equitable process revolving around a discretionary matter.  Clearly the establishment of an official equity committee pursuant to 11 U.S.C. § 1102(a) is a discretionary matter, the resolution of which is fact-driven and, therefore, not amenable to any bright line tests.  And while the bankruptcy court in this case has expressed its willingness to revisit its order if facts warrant, the court has conclusively determined that, on the present record, the appointment of an equity committee is not necessary to assure adequate representation of non-insider equity security holders.

To establish that review of the bankruptcy court's decision is appropriate at the present time, appellants must show that the decision is either a final order, an interlocutory order appealable under 28 U.S.C. § 158(a)(3), or a collateral order.

## A. Final Orders

This court has jurisdiction to hear appeals "from final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a)(1).  Finality is viewed flexibly in the bankruptcy context. *See, e.g., In re Trans World Airlines, Inc.,* 182 B.R. 102, 105 (D.Del.1995) ("In bankruptcy cases, the courts accord finality a somewhat 'flexible pragmatic definition' ") (*citing In re Columbia Gas System, Inc.,* 146 B.R. 106, 110 (D.Del.1992), *aff'd,* 50 F.3d 233 (3d Cir.1995)); *In re Columbia Gas System, Inc.,* 182 B.R. 397 (D.Del.1995); *In re Buckhead America Corp.,* 180 B.R. 83, 84 (D.Del.1995).  The Third Circuit has explained the rationale for viewing finality under a less rigorous standard in the bankruptcy area as follows:

Bankruptcy cases frequently involve protracted proceedings with many parties participating.    To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.

*In re Amatex Corp.,* 755 F.2d 1034, 1039 (3d Cir.1985).  In the Third Circuit, courts typically look to a number of factors to determine if an order is a final order: 1) the impact of the bankruptcy court's order upon the assets of the bankruptcy estate; 2) the necessity for further fact-finding on remand to the bankruptcy court; 3) the preclusive effect of the district court's decision on the merits of subsequent litigation;    and 4) the furtherance of judicial economy. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.,* 920 F.2d 1127, 1131 (3d Cir.1990).

Appellants do not offer specific arguments that the factors identified in *Allegheny* weigh in favor of finding finality under the circumstances at bar. Instead, appellants essentially argue the merits of the dispute, i.e., finality should be found (and the order reversed) so that "the debtors' thousands of public shareholders [will not be excluded] from effective participation in the reorganization process including the restructuring of the debtors' business operations, the formulation of the business plan, and the negotiation of a plan of reorganization." (D.I. 15 at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: 1996 WL 363806 (D.Del.))**

Page 3

8) With none of the factors even arguably applying, however, and with the only case law directly on point holding contrary to appellants' position, [FN3] the court concludes that the order in dispute is not final for purposes of an appeal of right pursuant to 28 U.S.C. § 158(a)(1).

> FN3. The United States Court of Appeals for the Second Circuit held in *In re Johns-Manville Corp.*, 824 F.2d 176, 179-180 (2d Cir.1987) that "[o]rders denying shareholder requests for official committee status" are not final for purposes of appeal because they "do not resolve particular disputes within the overall bankruptcy case; they simply affect the committee structure within which various disputes in the reorganization proceeding will be considered."

B. Interlocutory Orders

*3 Section 158(a)(3) of Title 28 of the United States Code gives this court jurisdiction to hear appeals, with leave of court, from interlocutory orders and decrees. In deciding whether an interlocutory order is appealable in the bankruptcy context, courts have typically borrowed the standard found in 28 U.S.C. § 1292(b), which governs whether an appeal of an interlocutory order of a district court to a court of appeals is warranted. *In re Delaware and Hudson Ry. Co.*, 96 B.R. 469, 472-73 (D.Del.), *aff'd*, 884 F.2d 1383 (3d Cir.1989). Although the concept of finality is accorded some measure of flexibility in the context of § 158(a)(1) appeals, apparently the same standard does not apply in the context of § 158(a)(3) interlocutory appeals. Thus, an appellant must establish that "exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment." *Id.* at 473. Also, under § 1292(b), an interlocutory appeal will be granted only when the order at issue (1) involves a controlling question of law as to which there is (2) substantial ground for difference of opinion and (3) when an immediate appeal from the order may materially advance the ultimate termination of the litigation. *Id.*

The court declines to characterize the dispute at bar as presenting "exceptional circumstances" warranting leave to appeal under § 158(a)(3). Although one might arguably characterize the issue of when it is appropriate to establish an official equity committee as a "controlling question of law," nevertheless the court is not convinced that an immediate appeal in this case will materially advance

the ultimate termination of the litigation (as opposed to materially advancing the rights of appellants, as they argue).

C. Collateral Orders

The final basis for appellate jurisdiction is the collateral order doctrine. In general, the collateral order doctrine applies to the class of prejudgment orders which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430 (1985) (*quoting Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). For the collateral order doctrine to apply, an order must satisfy three conditions: 1) it must "conclusively determine the disputed question;" [FN4] 2) it must "resolve an important issue completely separate from the merits of the action;" and 3) it must "be effectively unreviewable on appeal from a final judgment." *Richardson-Merrell*, 472 U.S. at 431.

> FN4. Both in their opening and reply briefs, the Creditors' Committee focuses solely on this first condition that must be satisfied if the collateral order doctrine is to apply. The court nevertheless has reviewed the other two conditions.

As noted above, the bankruptcy court has conclusively determined that, under the facts of record, it is not necessary to appoint an official equity committee to assure adequate representation in the reorganization process to non-insider equity shareholders. [FN5] The issue of whether non-insider public shareholders are adequately represented in the reorganization process is an important issue (as attested to by the interest in these proceedings by the Securities and Exchange Commission) completely separate from the merits of the reorganization. Finally, all parties to this dispute have acknowledged that, at some point in the proceedings, the opportunity to effectively participate in the reorganization will be lost, thereby mooting the question of official committee status. To decline review of this kind of order in the reorganization context will most certainly engage the court and the parties in a guessing game of when such an issue has been developed enough for review without being mooted by the passage of time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: 1996 WL 363806 (D.Del.))**

> FN5. The use of the "without prejudice"
> language is not persuasive in this context,
> since a change of facts is generally grounds
> for revisiting a matter.

III. CONCLUSION

*4 Although the court is cognizant of the long-standing Congressional policy against piecemeal appeals which underlies the final judgment rule, the court is satisfied that the issue of whether an equity committee should be appointed under the facts of record has been determined in such a fashion that appellate review is warranted under the collateral order doctrine without waiting for any further factual development. Therefore, the motion to dismiss filed by the Creditors' Committee is denied.

An order shall issue.

Not Reported in F.Supp., 1996 WL 363806 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "D"

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1208519 (S.D.N.Y.)
**(Cite as: 2005 WL 1208519 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: WORLDCOM, INC., et al., Debtors.
**No. 02-13533 (AJG), M-47 (LTS).**

May 19, 2005.

*MEMORANDUM ORDER*

SWAIN, J.

*1 Putative class action plaintiffs C.G. Young & Associates, Terry Fleming Insurance Agency, Roberta S. Peak, Keith and Beverly Kammeraad, Financial Dream Team, and Executive Base Network (collectively, the "*Young* Plaintiffs") move for leave to file an interlocutory appeal seeking review of the portions of the March 17, 2005, Order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") staying all proceedings on their claims filed in the Bankruptcy Court pending referral of their claims to the Federal Communications Commission ("FCC").

The *Young* Plaintiffs, as well as two other plaintiffs, filed putative class action claims against WorldCom, Inc. and certain of its direct and indirect subsidiaries (collectively, "WorldCom") alleging that plaintiffs continued to be billed by WorldCom after plaintiffs contacted WorldCom to request that their local and long distance telephone services be disconnected. WorldCom moved to dismiss the *Young* Plaintiffs' claims on several grounds, including that the claims are preempted by FCC and California Public Utilities Commission ("CPUC") orders that required WorldCom to continue billing plaintiffs under the circumstances that were present, and that the *Young* Plaintiffs' claims are barred by the filed-tariff doctrine. The Bankruptcy Court, in a Memorandum Decision and Order Regarding Debtors' Motion to Dismiss the Claims of the C.G. Young Plaintiffs, Claim Nos. 16157 through 16164, dated February 15, 2005, found that certain issues raised on the motion to dismiss were better resolved in the first instance by

the appropriate federal and state regulatory agencies pursuant to the doctrine of primary jurisdiction. The Bankruptcy Court ordered that the litigation be stayed pending referral of those issues to the FCC and CPUC. [FN1]

> FN1. The *Young* Plaintiffs are only requesting leave to appeal the portion of the Bankruptcy's Court order staying their claims pending referral to the FCC.

The *Young* Plaintiffs argue that leave to file an appeal of the Bankruptcy Court's interlocutory order should be granted under the collateral order doctrine, as well as pursuant to 28 U.S.C. § § 158(a)(3) and 1292(b). For the following reasons, Plaintiffs' motion is denied.

"An interlocutory order may be appealed pursuant to the collateral order doctrine ... where the decision would (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action[ ], and (3) be effectively unreviewable on appeal from a final judgment." *In re: 127 John Street Assocs.,* No. M-47 (SHS), 93-B-46171 (CB), 2005 WL 911488, at *5 (S.D.N.Y. Apr. 18, 2005) (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546-47 (1949)). "A decision is not reviewable as a collateral order unless it satisfies all three requirements." *Id.*

The Court finds that in the instant case the third requirement has not been satisfied. Although the Bankruptcy Court's decision to refer the *Young* Plaintiffs' claims to the FCC does delay their ability to have the issues addressed in court, it does not preclude the *Young* Plaintiffs from returning to court to further litigate any issues that are still in dispute after the FCC makes its determination. Further, the *Young* Plaintiffs have not shown that initial resolution of the issues by the FCC would be so much more costly or otherwise burdensome than resolution by the Bankruptcy Court so as to render future litigation in court incapable of undoing any effects of the interlocutory order referring the claims to the FCC. Accordingly, the Court finds that the Bankruptcy Court's decision to stay the action and refer the *Young* Plaintiffs' claims to the FCC is not "effectively unreviewable," and that, therefore, the collateral order doctrine is inapplicable. The Court need not address the other two collateral order doctrine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1208519 (S.D.N.Y.)
**(Cite as: 2005 WL 1208519 (S.D.N.Y.))**

factors.

**\*2** A district court can grant leave to appeal from an interlocutory order of a bankruptcy court pursuant to 28 U.S.C. § 158(a)(3). Courts have applied the standards set forth in 28 U.S.C. § 1292(b), which governs the appealability of interlocutory district court orders, in deciding whether to grant such leave. *In re Alexander,* 248 B.R. 478, 483 (S.D.N.Y.2000). Under section 1292(b), for an interlocutory appeal to be granted, the order being appealed from must "(1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion" and it must also be shown that "(3) an immediate appeal would materially advance the ultimate termination of the litigation." *In re: 127 John Street Assocs.,* 2005 WL 911488 at *6. A question of law is considered " 'controlling' if reversal of the order would terminate the action, or if 'determination of the issue on appeal would materially affect the outcome of the litigation." ' *Id.* (quoting *North Fork Bank v. Abelson,* 207 B.R. 382, 389-90 (E.D.N .Y.1997)).

The Court finds that the interlocutory order at issue does not involve a controlling issue of law, and that an immediate appeal would not materially advance the resolution of the litigation. The controlling issue in this litigation is the nature of WorldCom's obligation to disconnect telephone service upon being notified by a client that he wishes his service to be terminated. The Bankruptcy Court's interlocutory order staying the action pending referral of the *Young* Plaintiffs' claims to the FCC pursuant to the primary jurisdiction doctrine does not directly touch upon that issue. Reversal of the interlocutory order would not terminate the action and there is no reason to believe that determination of the primary jurisdiction issue on appeal would materially affect the outcome of the litigation. In addition, given that the Bankruptcy Court lacks the FCC's special expertise with respect to the issues that have been referred to the FCC, the Court is not persuaded that an immediate appeal of the Bankruptcy Court's order staying the action pending clarification from the FCC would advance the ultimate termination of the litigation.

Accordingly, for the aforementioned reasons, the *Young* Plaintiffs' motion for leave to file an interlocutory appeal is denied.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1208519 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2582258 (Trial Motion, Memorandum and Affidavit) Brief of Appellant the State of California Ex Rel. Alan M. Grayson (Aug. 01, 2005)

• 2004 WL 353878 (Trial Filing) Third and Final Report of Dick Thornburgh, Bankruptcy Court Examiner (Jan. 26, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "E"

LEXSEE

**In re UNITED PAN-EUROPE COMMUNICATIONS N.V., Debtor. EUROPE MOVIECO PARTNERS LIMITED, Appellant, - against - UNITED PAN-EUROPE COMMUNICATIONS N.V., Debtor-Appellee.**

**CHAPTER 11, 02-16020 (BRL), M-47 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 1297**

**January 30, 2003, Decided**
**January 31, 2003, Filed**

**DISPOSITION:** Appellant's motion for expedited treatment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pursuant to Fed. R. Bankr. P. 8011 and 8019, appellant creditor moved for an expedited determination of its appeal from an order of the United State Bankruptcy Court for the Southern District of New York permitting appellee debtor to reject an agreement between the two parties.

**OVERVIEW:** After filing bankruptcy in The Netherlands, the debtor filed a voluntary Chapter 11 petition in the United States. It filed to reject the agreement pursuant to 11 U.S.C.S. § 365. The creditor objected that extending § 365 to permit rejection of a contract between a Dutch company and an English company that was performed entirely overseas was contrary to the laws of the debtor's homeland and ran afoul of well-founded principles of international comity and the presumption against extra-territoriality. The creditor failed to show sufficient considerations to justify an expedited appeal. Potential monetary loss did not amount to irreparable harm especially since the creditor alleged that the debtor had been in breach of its payment obligations for almost a year. The only potential irreparable harm cited was the conclusory allegation that reputational harm would ensue if the agreement was rejected, and the creditor failed to show how that would be affected by rejection of the agreement. Given the important public policy issues regarding international comity and extra-territoriality, due time had to be given to briefing the arguments and the court's consideration of the arguments.

**OUTCOME:** The creditor's motion was denied.

**CORE TERMS:** irreparable harm, expedited, emergency, expedite, reputational, broadcast, important public, monetary award, good cause, extra-territorial, conclusory, reputation, normally, suspend, movant, comity, Broadcasting Act, principal place of business, plan of reorganization, disclosure statement, movie channel, subscribers, briefing, license, holders, cable

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN1] Fed. R. Bankr. P. 8019 permits a district court to suspend or modify the normal rules and procedures governing appeals from a bankruptcy court decision and expedite the determination of an appeal.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN2] See Fed. R. Bankr. P. 8019.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN3] Courts invoke the power given them by Fed. R. Bankr. P. 8019 if there are unusual time considerations or if unfairness to the litigants would otherwise result.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN4] Fed. R. Bankr. P. 8011 provides that whenever a movant requests expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would normally be required for the district court or bankruptcy appellate panel to receive and consider a response, the word Emergency shall precede the

Page 1

title of the motion. By the plain language of the provision, Rule 8011 appears to apply only to a court's determination of whether an Emergency motion court should be heard on an expedited basis.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN5] Fed. R. Bankr. P. 8019's requirement of showing good cause means a showing of irreparable harm, as explicitly required in Fed. R. Bankr. P. 8011.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN6] In the context of a Fed. Bankr. R. 8019 motion, monetary loss alone will generally not amount to irreparable harm. Such harm is injury for which a monetary award cannot be adequate compensation.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN7] Conclusory statements of irreparable harm, without more, do not suffice to grant relief under Fed. R. Bankr. P. 8019.

**COUNSEL:** [*1] DEWEY BALLANTINE, Attorneys for Appellant, New York, NY, By: STUART HIRSHFIELD, ESQ., DIANNE COFFINO, ESQ., Of Counsel.

WHITE & CASE, Attorneys for Debtor-Appellee, New York, NY, By: J. CHRISTOPHER SHORE, ESQ., HOWARD S. BELTZER, ESQ., Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.,**

Appellant Europe Movieco Partners Limited ("Movieco") has moved on an emergency basis pursuant to Rules 8011 and 8019 of the Federal Rules of Bankruptcy Procedure for an expedited determination of Movieco's appeal from an Order of the United State Bankruptcy Court for the Southern District of New York entered on January 8, 2003 (the "Rejection Order"), permitting the debtor, United Pan-Europe Communications, N.V. ("UPC"), to reject an agreement between Movieco and UPC.

For the following reasons, that motion is denied.

**Parties**

UPC is a holding company organized under the laws of The Netherlands, with its statutory seat and principal place of business in Amsterdam, Holland. UPC has no business operations or employees in the United States. UPC's principal assets consist of its direct and indirect interests in approximately 200 operating subsidiaries, [*2] which own and operate broadband communication networks that provide telephone, cable and internet services to residential and commercial businesses in eleven countries in Europe.

Movieco is a limited liability company organized under the laws of England, with its principal place of business in London, England. Movieco possesses a broadcast license issued by the Independent Television Commission of the United Kingdom pursuant to Part 1 of the Broadcasting Act of 1990, as amended by the Broadcasting Act of 1996. Movieco operates and broadcasts two movie channels, Cinenova and Cinenova 2, from England via satellite uplink for reception by subscribers in Benelux countries. Movieco is regulated by British television authorities.

**The Agreement**

UPC and Movieco entered into a Cable Affiliation Agreement (the "Agreement") on December 21, 1999. Under the Agreement, Movieco licensed to UPC, for a period of seven years, the right and the obligation to receive and distribute the Cinenova movie channel to UPC's subscribers on its cable systems in The Netherlands and Flemish-speaking Belgium. In consideration for this license, UPC is required to pay a certain monthly fee to Movieco. [*3] UPC has been in breach of its payment obligations under the Agreement since February 2002.

**The Dual Insolvency Proceedings**

On December 3, 2002, UPC filed a petition with the District Court of Amsterdam (Rechtbank) (the "Dutch Bankruptcy Court"), requesting that it grant UPC a suspension of payments or moratorium under Dutch bankruptcy law. With its petition, UPC filed a proposed plan of compulsory composition under the Dutch Faillissementswet ("Dutch Bankruptcy Code").

Also on December 3, 2002, UPC filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. With its petition, UPC filed a proposed plan of reorganization and an accompanying disclosure statement. On or about December 23, 2002, UPC filed an amended plan of reorganization (the "Amended Plan") and a related amended disclosure statement. The Amended Plan provides that holders of "rejection claims" will be provided the treatment accorded holders of pre-petition general unsecured claims and, thus, will be satisfied through the distribution of a pro rata share of equity in New UPC. Confirmation of

the Amended Plan is scheduled to be heard on February 20, 2003.

### [*4] Rejection Order

Also on December 3, 2002, UPC filed a motion to reject the Agreement under section 365 of the U.S. Bankruptcy Code (the "Rejection Motion"). Movieco objected to the motion on the grounds that extending section 365 of the Bankruptcy Code to permit rejection of a contract between a Dutch company and an English company that is performed entirely overseas is contrary to the laws of the debtor's homeland and ran afoul of well-founded principles of international comity and the presumption against extra-territoriality. Movieco requested that the Bankruptcy Court abstain from hearing the Rejection Motion in deference to Dutch law and the proceedings pending before the Dutch Bankruptcy Court.

The Bankruptcy Court heard oral arguments on January 7, 2003. Concluding that no conflict existed between Dutch insolvency law and the U.S. Bankruptcy Code and that, in any event, the appropriate foreign tribunal would determine the preemptive effect, if any, of the Amended Plan, the Bankruptcy Court granted the Rejection Motion, authorizing rejection of the Agreement as of March 1, 2003.

The Rejection Order was entered on the Bankruptcy Court's docket on January 8, 2003. On January 16, 2003, Movieco [*5] filed a timely Notice of Appeal.

In pleadings served on UPC on January 24, 2003, Movieco has applied for an injunction requiring UPC to perform the agreement on various grounds, including the alleged unavailability of voluntary termination under Dutch law and the purported violation of Dutch competition laws.

On January 24, 2003, Movieco made the instant motion. Movieco included in its motion a proposed schedule for briefing and argument of its appeal that would result in the first brief filed on February 3, 2003 and argument held on February 23, 2002. Oral argument was held on the instant motion on January 29, 2003, at which time the motion was considered fully submitted.

### DISCUSSION

Bankruptcy Rule 8019 [HN1] permits a district court to suspend or modify the normal rules and procedures governing appeals from a bankruptcy court decision and expedite the determination of an appeal. Fed. R. Bankr. P. 8019 [HN2] ("In the interest of expediting decision or for other cause, the district court or the bankruptcy appellate panel may suspend the requirements or provisions of the rules in Part VIII, except Rules 8001, 8002 and 8013 and may order proceedings in accordance

with the direction. [*6] "); In re Island Helicopters, Inc., 211 B.R. 453, No. 97 Civ. 4584, 1997 WL 466973, at *4 (E.D.N.Y. Aug. 13, 1997) (permitting expedited appeal); In re Mego Int'l Inc., 30 B.R. 479, 479-80 (S.D.N.Y. 1983) (opinion issued on expedited appeal); 10 Collier on Bankruptcy P 8019.01 (15th ed. 2002) ("The primary purpose of Federal Rule of Bankruptcy Procedure 8019 is to give the district courts . . . the power to expedite the consideration of cases that are 'of primary concern to the public or to the litigants.'") (citing Original Advisory Committee Note to Rule 2 of the Federal Rules of Appellate Procedure, from which Rule 8019 is drawn).

[HN3] "Courts will invoke the power given them by Rule 8019 if there are unusual time considerations or if unfairness to the litigants would otherwise result." 10 Collier on Bankruptcy P 8019.01; see also Groendyke Transp. Inc. v. Davis, 406 F.2d 1158, 1162 (5th Cir. 1969) (permitting expedited disposition because important public policy issues were involved and appellant's position was clearly correct as a matter of law); In re Finley, 135 B.R. 456, 458 (S.D.N.Y. 1992) (relying on specific detailed allegations [*7] that the debtor's plan could not be implemented until all appeals were resolved, the court agreed to prompt resolution of appeal). For the purposes of determining this motion and in the absence of any discussion by the parties of the legislative history of Rule 8019 to the contrary, the "good cause" required by Rule 8019 will be equated to the requirement of "irreparable harm" required of emergency motions by Rule 8011. n1

> n1 UPC has cited to a number of cases explicitly brought pursuant only to Fed. R. Bankr. P. 8011(d) for the proposition that the law of this Circuit requires that Movieco show "irreparable harm" to expedite its appeal. E.g., In re Dairy Mart Convenience Stores, Inc., 272 B.R. 66, 70 (S.D.N.Y. 2002) ("The appellant must show by affidavit that, to avoid irreparable harm, relief is needed in less time than would normally be required."); In re Delco Dev. Mid-Island Ltd., 1990 U.S. Dist. LEXIS 18291, No. 90 Civ. 3914, 1990 WL 263495, at *1 (E.D.N.Y. Nov. 29, 1990) (movant must "demonstrate[] that expedited consideration is necessary to avoid irreparable harm").

> Rule 8011 [HN4] provides that "whenever a movant requests expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would normally be required for the district court or bankruptcy appellate panel to receive and consider a response, the word 'Emergency' shall precede the title of the

motion." By the plain language of the provision, Rule 8011 appears to apply only to a court's determination of whether an "Emergency motion" -- such as the one before this court should be heard on an expedited basis. Thus, Movieco would have had to submit, and label as an "Emergency," its appeal, in order for the requirement of "irreparable harm" to apply. Of course, it does not make any sense that a party could file an "Emergency motion" seeking permission for an expedited appeal, instead of directly filing their appeal, and thus avoid the higher showing of irreparable harm. Thus, the Court will read [HN5] Rule 8019's requirement of showing "good cause" to mean a showing of irreparable harm, as explicitly required in Rule 8011.

[*8]

Based on the papers and on the arguments presented at a hearing on January 29, 2003, the Court holds that Movieco has failed to present sufficient considerations to justify an expedited schedule.

Movieco points to the fast approaching March 1, 2003 date set by the Bankruptcy Court, at which time UPC can reject the Agreement to show that time is of the essence. Movieco claims that in the absence of an expedited appeal to address whether Section 365 applies to the Agreement (and thus whether any rejection by UPC of the Agreement would be excused under U.S. Bankruptcy law), it would suffer economic and reputational harm if UPC rejected the Agreement and ceased broadcast of Movieco's movie channel. Further, Movieco argues that it stands to lose a substantial source of revenue if the Agreement is rejected, as more than 50 percent of Movieco's revenues are derived from payments UPC is obligated to make under the Agreement.

As an initial matter, according to Movieco's Head of Legal Affairs, UPC has been in breach of its payment obligations to Movieco since February 2002. In light of the ongoing nature of UPC's nonpayment, it is difficult to discern a compelling need to prevent UPC from [*9] rejecting the Agreement. In any case, the harm complained of appears to be almost entirely economic in nature, and one for which a legal remedy would exist should Movieco be successful in arguing that Section 365 does not apply in this situation and should Movieco further be successful in its arguments in an extra-territorial court that UPC should not be allowed to reject the Agreement. E.g., In re Dairy Mart, 272 B.R. at 71 n.3 [HN6] ("Monetary loss alone will generally not amount to irreparable harm . . . .") (citing Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 34 (2d Cir. 1991)); Everest Capital Inv. Ltd. v. Editek, Inc.,

1996 U.S. Dist. LEXIS 17793, 1996 WL 695794, at *3 (S.D.N.Y. Dec. 4, 1996) ("Irreparable harm is injury for which a monetary award cannot be adequate compensation") (citing Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996)(internal citations omitted)).

The only potential "irreparable harm" cited is the conclusory allegation that "reputational harm" will ensue if the Agreement is rejected. There are no specific allegations as to what Movieco's current reputation is in the Benelux countries and [*10] how that reputation would be affected by the rejection of the Agreement. Nor has Movieco alleged that it could not in any case obtain a contract with another corporation that would provide similar services as UPC had done -- and perhaps lead to a better payment history. In light of these conclusory allegations, Movieco has failed to show irreparable harm. E.g., In re Texaco, Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) (holding that [HN7] conclusory statements of irreparable harm, without more, do not suffice to grant relief); In re Penn-Dixie Indus., Inc., 6 B.R. 832, 837 (Bankr. S.D.N.Y. 1980) (denying emergency relief because "there had been no demonstration by plaintiffs of any real injury whatsoever that would result from a denial of the relief sought"). In any case, because Movieco fails to establish what sort of reputational harm would occur, it is impossible to judge whether that too would be compensable with an eventual monetary award.

Movieco also points out that its appeal will raise important public policy issues regarding international comity and the extra-territorial reach of section 365 of the U.S. Bankruptcy Code. Movieco has failed [*11] to explain, however, why these public policy considerations merit an expedited appeal. Indeed, given the weighty nature of the issues involved, due time and consideration should be given to their briefing and argument by the parties and the measuring thereof by this Court.

Because Movieco has failed to establish the existence of irreparable harm, the motion for expedited treatment must be denied.

### Conclusion

For the foregoing reasons, Movieco's motion is denied.

It is so ordered.

**New York, NY**

**January 30, 2003**

**ROBERT W. SWEET**

**U.S.D.J.**

# EXHIBIT "F"

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: 1996 WL 534853 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
In re **EDISON BROTHERS** STORES, INC., et al.,
Debtors.
Jonathan VICTOR, Richard Polak, and Martin Katz,
Appellants,
v.
**EDISON BROTHERS** STORES, Appellees.
No. 95-1354 (PJW), Civ.A. No. 96-177-SLR.

Sept. 17, 1996.

Laura Davis Jones, Esquire, and Joel A. Waite, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware. Of counsel: Harvey R. Miller, Esquire, and Richard P. Krasnow, Esquire, of Weil, Gotshal & Manges LLP, New York, New York, and D. J. Baker, Esquire, of Weil, Gotshal & Manges LLP, Houston, Texas, attorneys for appellees/debtors.

Jeffery C. Wisler, Esquire, of Williams, Hershman & Wisler, of Wilmington, Delaware. Of counsel: Peter D. Wolfson, Esquire, Carole Neville, Esquire, John A. Bicks, Esquire, and Pamela Cohen, Esquire, of Pryor, Cashman, Sherman & Flynn, New York, New York, attorneys for appellants.

Thomas L. Ambro, Esquire, and Deborah E. Spivack, Esquire, of Richards, Layton & Finger, Wilmington, Delaware. Of counsel: David S. Kurtz, Esquire, Timothy R. Pohl, Esquire, and Sean D. Malloy, Esquire, of Jones, Day, Reavis & Pogue, Chicago, Illinois, attorneys for the Official Committee of Unsecured Creditors of Edison Brothers Stores, Inc.

Of Counsel: E. Gordon Robinson, Esquire, and Susan R. Sherrill, Esquire of U.S. Securities and Exchange Commission, Atlanta Georgia, and Ellen W. Slights, Esquire, Assistant United States Attorney, Wilmington, Delaware, attorneys for U.S. Securities and Exchange Commission.

*MEMORANDUM OPINION*

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 This case comes before this court as an appeal from an order of the Bankruptcy Court for the District of Delaware (the "bankruptcy court") denying the appointment of an official committee for equity security holders. The appellants in this case, Joseph Harrosh [FN1], Jonathan Victor, Richard Polak and Martin Katz, are all non-insider public shareholders of Edison Brothers Stores, Inc. and sixty-five (65) subsidiaries ("debtors"). The debtors filed chapter 11 petitions in this district's bankruptcy court on November 3, 1995. On March 29, 1996, the bankruptcy court issued the order denying without prejudice the appointment of an official committee of equity security holders. (D.I. 16, Ex. 18) Subsequently, appellants filed an appeal in this court.

For the reasons that follow, the bankruptcy court's order denying the appointment of an official committee for equity security holders will be affirmed.

II. JURISDICTION

To establish jurisdiction this court must find that the decision of the bankruptcy court is either a final order, an interlocutory order appealable under 28 U.S.C. § 158(a)(3), or a collateral order. On June 27, 1996, this court determined that the issue of whether an equity committee should be appointed warrants appellate review under the collateral order doctrine. (D.I. 29.); *see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949).*

III. BACKGROUND

Chapter 11 petitions were filed by the debtors on November 3, 1995 in this district's bankruptcy court. [FN2] By letters dated November 9 and November 22, 1995, appellants wrote to the United States Trustee requesting that an official equity committee be appointed pursuant to 11 U.S.C. § 1102(a). [FN3] On December 7, 1995, the United States Trustee declined appellants' request.

On January 12, 1996, appellants filed a motion with the bankruptcy court requesting the appointment of an official committee of equity security holders. (D.I. 16, Ex. 3) The California Public Employees Retirement System (holding approximately 150,000 shares of the debtors' common stock) and the

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: 1996 WL 534853 (D.Del.))**

Page 2

Securities and Exchange Commission ("SEC") supported the motion. (D.I. 16, Ex. 4, 5, 9, 10, 11, 12, and 13) The debtors, the United States Trustee, and the Official Creditors' Committee opposed the motion. (D.I. 16, Ex. 6, 7, and 8)

The bankruptcy court held hearings on February 29 and March 20, 1996. (D.I. 16, Ex. 14, and 15) Appellants asserted to the court that (1) the debtors were not insolvent, (2) the debtors' public shares were widely held, (3) the debtors' chapter 11 cases were complex, and (4) insiders of the debtors could not adequately represent the interest of public shareholders in the chapter 11 cases for conflict of interest reasons. (D.I. 16, Ex. 15 at 101) The appellants did not assert any specific facts regarding the alleged conflict of interest between insider shareholders and public shareholders. (D.I. 16, Ex. 15 at 103)

The opponents to the motion argued that the debtors' current and former management could and would provide adequate representation for the debtors' public shareholders, as a result of their ownership of approximately 35% of the debtors' outstanding common shares. The bankruptcy court declined to appoint an equity committee, stating during the course of the hearing the following, *inter alia:*

*2 * "I'm going to deny without prejudice obviously, because as this case progresses I think there may be an appropriate time for a committee of equity holders...."

* "[I]f somebody wants to come on with evidence to suggest that [the interests of insider shareholders are not aligned with those of non-insider shareholders,] I'd be glad to entertain it...."

* [I]f the petitioning shareholders reach a point where they think that additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so...."

* I think that based upon a different posture six months from now [the request to appoint an equity committee] may be an appropriate application...."
(D.I. 16, Ex. 15 at 101, 103, 114, 114-115)

Appellants thereafter filed a timely appeal to this court. The SEC filed a brief in support of appellants' appeal. The debtors, the Official Creditors' Committee, and the United States Trustee filed briefs in opposition to the appeal.

IV. STANDARD OF REVIEW

The findings of fact of a bankruptcy court are reversible only if clearly erroneous. Fed. Rules Bankr. Rule 8013; *Chemetron Corp. v. Jones, et al., 72 F.3d 341, 345 (3d Cir. 1995), cert. denied,* 116 S.Ct. 1424 (1996), (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-102 (3d Cir. 1981)). A bankruptcy court's choice, interpretation, and application of the underlying rule of law is subject to plenary review. *Chemetron Corp. v. Jones,* 72 F.2d at 345. In reviewing mixed questions of law and fact the district court must apply the appropriate standard to each component. *See Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056, 1063 (3d Cir. 1992). This rule also applies to reviewing an ultimate finding of fact. [FN4] A mixed question of law and fact is found whenever a legal precept is applied to the sum of the facts of a case. *Meridian Bank v. Alten,* 958 F.2d 1226, 1229 (3d Cir. 1992).

Since the bankruptcy court had to first find facts on which to base its determination that an equity committee was not "necessary to assure adequate representation," this court will review the bankruptcy court's determination as an ultimate finding of fact. 11 U.S.C. § 1102(a)(2). Thus, the court will apply the clearly erroneous standard to the bankruptcy court's initial findings of facts and apply plenary review with respect to the court's application of § 1102(a)(2).

V. DISCUSSION

1. Bankruptcy Court's Findings of Fact

The bankruptcy court made the following findings of fact: (1) there are numerous public shareholders, (2) the case is complex because the company is large, (3) the debtor is not hopelessly insolvent. (D.I. 16, Ex. 15 at 25, 101, 110) While finding that the case is complex because of the size of the company, the bankruptcy court noted that the capital structure is not complex. [FN5] (D.I. 16, Ex. 15 at 110) The bankruptcy court also found that insider shareholders constitute 35 percent of equity. (D.I. 16, Ex. 15 at 102-103) The bankruptcy court declined to find that there was an inherent conflict of loyalty between insider shareholders and non-insiders. (D.I. 16, Ex. 15 at 105) The bankruptcy court asked the appellants' counsel for evidence so that it could make a fact finding as to whether there are conflicts of interest between insider and non-insider shareholders. (D.I. 16, Ex. 14 at 136-137; Ex. 15 at 103, 114) Appellants did not supply any facts suggesting that insider shareholders were not aligned with non-insider shareholders.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
(Cite as: 1996 WL 534853 (D.Del.))

Page 3

*3 Under the clearly erroneous standard, the court must accept the bankruptcy court's findings of fact "unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." _Fellheimer, Eichen & Braverman v. Charter Technologies, Inc.,_ 57 F.3d 1215, 1223 (quoting _Hoots v. Pennsylvania,_ 703 F.2d 722, 725 (3rd Cir. 1983)). The facts found by the bankruptcy court are not in dispute. Specifically, the parties do not dispute that insider shareholders constitute 35 percent of equity, that there are numerous shareholders, and this case is complex due to the size of the company. The parties also stipulated to the fact that, based on public information, the debtors did not appear hopelessly insolvent. (D.I. 16, Ex. 15 at 2-7, 80) Finally, the parties did not question the bankruptcy court's finding that the debtor's capital structure is not complex. Based on a review of the factual record, the court finds significant evidentiary support for the bankruptcy court's findings of fact. Consequently, the court concludes that the bankruptcy court's findings of fact are not clearly erroneous.

### 2. Legal Standard Under 11 U.S.C. § 1102(a)(2)

Section 1102(a)(2) of the Bankruptcy Code gives the bankruptcy court discretion to appoint an equity committee when it is necessary to assure adequate representation. Section 1102(a)(2), in part, states that the "court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." (Emphasis added) Since the statute explicitly provides the bankruptcy court with discretion in this matter, this court will review the bankruptcy court's decision for abuse of discretion. _See In re Vertientes, Ltd.,_ 845 F.2d 57, 58-59 (3d Cir. 1988). As there is no statutory test for adequacy of representation, it must be determined by the facts of the case. _In re Johns-Manville Corp.,_ 68 B.R. 155, 158 (S.D.N.Y. 1986), _appeal dismissed,_ 824 F.2d 176 (2d Cir. 1989), (quoting _In re Beker Indus. Corp.,_ 55 B.R. 945, 948 (S.D.N.Y. 1985)).

General guidelines have developed to assist the court in determining whether there is a need for additional committees. Specifically, courts have considered (1) the number of shareholders, (2) the complexity of the case, and (3) whether the cost of the additional committee outweighs the concern for adequate representation. _In re Wang Lab., Inc.,_ 149 B.R. 1 (Bankr. D. Mass. 1992) (citing tripartite test of _In re_

_Johns-Manville Corp.,_ 68 B.R. 155 (S.D.N.Y. 1986)). However, these factors are simply guidelines for the court to consider and "every case must be judged on its own facts." _In re Wang Lab., Inc.,_ 149 B.R. at 2. Consequently, as this court stated earlier, "the establishment of an equity committee pursuant to 11 U.S.C. § 1102(a) is a discretionary matter, the resolution of which is fact driven and, therefore, not amenable to any bright line tests." (D.I. 29 at 3)

*4 The Securities and Exchange Commission (SEC), in support of the appellants, asserts that Congress intended that the official committee be one of the principal shareholder protections of the Bankruptcy Code. The SEC cites legislative history to show that Congress recognized the practical conflicts of management in a large public company bankruptcy case. Thus, the SEC argues, § 1102(a) should be construed to protect shareholders when there are conflicts between management and shareholders.

The court notes that the congressional intent behind enacting chapter 11 of the Bankruptcy Code was "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors." S.Rep. No. 989, 95th Cong. 2d Sess. 10 (1978), _reprinted in_ 1978 U.S.C.C.A.N. 5787, 5796. The Senate Report emphasized: "As public investors are likely to be junior or subordinated creditors or debtholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional debtors who will have their own best interest to look after." _Id._

Based on the legislative history, it is clear that Congress recognized the vulnerability of public shareholders in reorganization proceedings and intended to protect them with legislation. Despite this recognition, Congress declined to provide for the mandatory appointment of equity committees in § 1102, instead leaving the appointment decision within the discretion of bankruptcy courts based on a case-by-case determination.

### 3. Adequacy of Representation Under Section 1102(a)(2).

The appellants argue that an equity committee is needed because there are "inherent" conflicts of loyalty which render insider shareholders "legally incapable" of representing the interests of public shareholders. (D.I.34 at 17, 21) Appellants point to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: 1996 WL 534853 (D.Del.))**

Page 4

the fact that, in a bankruptcy context, the directors owe a fiduciary duty to not only the shareholders, but also to creditors. (D.I. 34 at 17) Based on this assertion, appellants argue that the "[d]ebtors' management in this case or any other bankruptcy case, as a matter of law, cannot exclusively advocate for the interests of the shareholders, particularly as against creditors." (D.I. 34 at 17) (emphasis added).

While appellants may be correct in their observation that management cannot exclusively advocate for the interests of the shareholders, the statutory focus of § 1102(a)(2) is not whether shareholders are "exclusively" represented, but whether they are "adequately" represented. Until Congress recognizes that inherent conflicts of interest exist between management and public shareholders in the bankruptcy context that warrant the mandatory appointment of an equity committee, the statutory test remains "adequacy of representation" to be determined on the facts of each case. *In re Johns-Manville Corp.,* 68 B.R. at 158. Appellants have the initial burden of developing a factual record to demonstrate the need for adequate representation. *Id.* at 157.

**\*5** The bankruptcy court determined that an equity committee was not needed because management held a 35 percent equity interest, the debtor's capital structure was not complex, and there were no facts to suggest management was not aligned with non-insider shareholders. The bankruptcy court characterized management's 35 percent equity interests as a "substantial" interest, which is "just as interested in maintaining value as is the smallest public investor." (D.I. 16, Ex. 15 at 101, 102) The court refused to find management's loyalties to both creditors and shareholders relevant without specific facts. During the hearings, the court stated that "if the petitioning shareholders reach a point where they think additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so." (D.I. 16, Ex. 15 at 114) Appellants also argue that management's self-interest makes it incapable of adequately representing non-insider shareholders. (D.I. 34 at 24) The bankruptcy court stated it was "pure speculation" that management would not protect its 35 percent equity interest. *Id.* Appellants did not provide any evidence to the contrary.

The bankruptcy court also noted that, for the purposes of determining whether shareholders are adequately represented, the complexity of capital structure is more relevant than the complexity of the debtor's business affairs. (D.I. 16, Ex. 25) The bankruptcy court reasoned that there was less need to appoint an equity committee in this case because there were not any different levels of debt or different classes of equity. (D.I. 16, Ex. 25) Based on the bankruptcy court's application of the facts to the law, the court concludes that the bankruptcy court did not abuse its discretion in finding that an equity committee was not necessary to assure adequate representation of shareholder interests.

## VI. CONCLUSION

For the foregoing reasons, the court will affirm the order of the bankruptcy court denying appellants' motion to direct the appointment of an equity committee. An order consistent with this memorandum opinion shall issue.

> FN1. After this appeal was filed, Joseph Harrosh sold his shares of Edison Brothers Stores. (Opening Br. of Appellants at 2, fn.1)

> FN2. As of the petition date, approximately 22,000,000 shares of debtors' common stock were outstanding. Those shares are widely held by more than 4,000 record holders and a substantial number of beneficial holders. (D.I. 16, Ex. 2)

> FN3. Section 1102(a) of the Bankruptcy Code provides in relevant part that:
> (1) As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.
> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee. (Emphasis added)

> FN4. The Third Circuit has distinguished three different kinds of facts used in the review of judicial findings: (1) concept-basic facts, (2) inferred facts, and (3) ultimate facts. *Universal Minerals, Inc. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: 1996 WL 534853 (D.Del.))**

> *C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir. 1981). Basic facts are "historical and narrative events elicited at trial, admitted by stipulation, or not denied, where required." *Id.* Inferred facts are drawn from basic facts only to the extent that "logic and human experience indicate a probability that certain consequences can and do follow from the basic facts." *Id.* Finally, ultimate facts are conclusions of law or "at least a determination of a mixed question of law and fact." *Id.*

> FN5. The bankruptcy court stated: "This is a big, big case, but in terms of capital structure I think it's a plain vanilla." (D.I. 16, #15 at 110)

Not Reported in F.Supp., 1996 WL 534853 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "G"

LEXSEE

**FEDERAL DEPOSIT INSURANCE CORPORATION Statutory Successor to RESOLUTION TRUST CORPORATION In Its Capacity As Receiver For Atlantic Financial Savings, F.A. v. PARKWAY EXECUTIVE OFFICE CENTER; FEDERAL DEPOSIT INSURANCE CORPORATION Statutory Successor to RESOLUTION TRUST CORPORATION In Its Capacity As Receiver For Atlantic Financial Savings, F.A. v. RICHARD L. EVANS and HELENE EVANS**

**CIVIL ACTION NO. 96-121, CIVIL ACTION NO. 96-122**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1997 U.S. Dist. LEXIS 14939**

**September 22, 1997, Decided
September 24, 1997, Filed**

**DISPOSITION:** [*1] Motion for Partial Reconsideration or in the alternative for Certification of Interlocutory Appeal denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant promisees filed a motion for partial reconsideration of the court's opinion and order, insofar as the order granted the summary judgment motion filed by plaintiff Federal Deposit Insurance Corporation (FDIC) on the promisees' limitations defense. In the alternative, the promisees filed a motion for certification of interlocutory appeal, under 28 U.S.C.S. § 1292 et seq., to request that the court certify the limitations question.

**OVERVIEW:** The promisees filed their motion to reconsider, or certify, their limitations defense. The court denied the motion. It found that the FDIC, as a governmental agency, was entitled, under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C.S. § 1821 et seq., to the longer of either a six-year limitations period, or the applicable period under state law. The FDIC timely filed its complaint. The court would not consider new arguments in a motion to reconsider. However, the promisees' position was untenable that the leap year calculation within the six-year period made the FDIC's action untimely. The certification of an interlocutory appeal was inappropriate because the promisees failed to satisfy any of the three required factors prior to certification of an order for interlocutory appeal. Granting the summary judgment motion was not dispositive, and a contrary result would not

cause a reversal of judgement after a final hearing. The FDIC was entitled to the FIRREA's six-year limitations period. An immediate appeal would only delay the termination of this litigation that was ready for trial. The court's order was not appealable.

**OUTCOME:** The court denied the promisees' motion for partial reconsideration, or, in the alternative, for certification of interlocutory appeal.

**CORE TERMS:** six-year, reconsideration, statute of limitations, difference of opinion, interlocutory appeal, immediate appeal, leap year, termination, question of law, state law, certification, certify, statute of limitations defense, governmental agency, applicable period, final hearing, three hundred, discovery, unambiguously, anniversary, materially, piecemeal, leap-year, reversal, assignee, accrual

**LexisNexis(R) Headnotes**

*Banking Law > Federal Acts > Financial Institutions Reform, Recovery & Enforcement Act*
[HN1] The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C.S. § 1821 et seq., clearly and unambiguously provides the Federal Deposit Insurance Corporation, as a governmental agency, with the longer of a six-year period from the date of accrual of the claim, or the applicable period under state law. 12 U.S.C.S. § 1821(d)(14)(A), (B). Since the FIRREA is clear on its face, the court does not look beyond the language of the statute.

***Civil Procedure > Relief From Judgment > Motions to Alter & Amend***

[HN2] The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration. A motion for reconsideration is not an opportunity for a party to present previously available evidence or new arguments.

***Banking Law > Federal Acts > Financial Institutions Reform, Recovery & Enforcement Act***

[HN3] The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C.S. § 1821 et seq., provides for a six-year period of limitation. 12 U.S.C.S. § 1821(d)(14)(A). Of necessity, any six-year period includes a leap-year. Congress' silence as to the definition of a year in this context supports the view that by choosing six-years and not 2,190 days as the period of limitation, Congress intended to provide a naturally-occurring six-year period, one that must include a leap year.

***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***

[HN4] 28 U.S.C.S. § 1292(b) provides that in order for a district court to permit a party to seek an immediate appeal of an interlocutory order, the order shall involve a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from the order may materially advance the ultimate termination of the litigation. The trial court has discretion in the certification decision; however, certification is appropriate only in exceptional circumstances. The party seeking certification has the burden of showing that exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of a final judgment.

***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***

[HN5] The United States Court of Appeals for the Third Circuit instructs that before an order can be certified for interlocutory appeal, all three factors that are identified in 28 U.S.C.S. § 1292(b) shall be satisfied. The statute's three requirements are as follows: (1) The order from which the appeal is taken shall involve a controlling question of law; (2) there shall be substantial grounds for a difference of opinion concerning the issue; and (3) an immediate appeal may materially advance the ultimate

termination of the litigation. In the United States Court of Appeals for the Third Circuit, a controlling issue of law is one that results in a reversal of a judgment after final hearing. To determine if an issue presents a controlling question of law, the critical focus is on whether a different resolution of the issue eliminates the need for trial. Where discovery is complete and the case is ready for trial an interlocutory appeal can hardly advance the ultimate termination of the litigation.

**COUNSEL:** For FEDERAL DEPOSIT INSURANCE CORPORATION, PLAINTIFF (96-CV-121, 96-CV-122): MILES H. SHORE, SAUL, EWING, REMICK & SAUL, PHILA, PA USA.

For PARKWAY EXECUTIVE OFFICE CENTER, DEFENDANT (96-CV-121): MILES H. SHORE, SAUL, EWING, REMICK & SAUL, JEFFREY A. LESS, BAZELON & LESS, PHILA, PA USA.

For RICHARD L. EVANS, HELENE EVANS, DEFENDANTS (96-CV-122): MILES H. SHORE, SAUL, EWING, REMICK & SAUL, JEFFREY A. LESS, BAZELON & LESS, PHILA, PA USA.

For PARKWAY EXECUTIVE OFFICE CENTER, MOVANT (96-CV-122): JEFFREY A. LESS, BAZELON & LESS, PHILA, PA USA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

### MEMORANDUM

On September 2, 1997, Defendants filed a Motion for Partial Reconsideration or in the alternative for Certification of Interlocutory Appeal, pursuant to Federal Rule of Civil Procedure 59(e) and 28 U.S.C.A. § 1292(b) (West 1993), respectively. Defendants seek reconsideration of the Court's Opinion and Order entered on August 18, 1997, insofar as it granted Plaintiff FDIC's Motion for Summary Judgment with regard to Defendants' statute of limitations defense. [*2] In the alternative, Defendants request that the Court certify the statute of limitations question for interlocutory appeal. For the following reasons, I will deny the Motion.

#### I. Motion for Reconsideration

Defendants' Motion contains two arguments.

First, Defendants cite Cadle Co. v. 1007 Joint Venture, 82 F.3d 102 (5th Cir. 1996), in support of their primary argument that the six-year limitations period con-

tained in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C.A. § 1821(d)(14)(A) (West 1989) ("FIRREA") should not apply in this case. Although Cadle Co. was not referred to in the Court's Opinion partially granting Plaintiff's Summary Judgment Motion, I did consider the arguments therein and concluded the following: Cadle Co. involved a claim made by an assignee of the FDIC. At the time of assignment, the cause of action had not yet accrued. Indeed, the assignee held a performing note. Therefore, the court in Cadle Co. found that the shorter state law statute of limitations applied. However, in the instant case, the claimant is the FDIC. [HN1] FIRREA clearly and unambiguously provides the FDIC, as a governmental agency, [*3] with the longer of a six-year period from the date of accrual of the claim, or the applicable period under state law. 12 U.S.C.A. § 1821(d)(14)(A), (B). Since FIRREA is clear on its face, I need not look beyond the language of the statute to reject the Cadle Co. rationale as such.

Second, Defendants argue that even if the six-year statute of limitations applies, the FDIC's claims were filed one day late because one of the six years was a leap year. I am precluded from acting on this argument. [HN2] "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985) (citations omitted), cert. denied, 476 U.S. 1171, 106 S. Ct. 2895, 90 L. Ed. 2d 982 (1986). A motion for reconsideration is not an opportunity for a party to present previously available evidence or new arguments. See Corrigan v. Methodist Hospital, 885 F. Supp. 127, 127 (E.D.Pa. 1995). As such, I will not act on Defendants' "leap year" argument, presented here for the [*4] first time.

Although I need not reach Defendants' leap-year argument, I do state that Defendants' position is untenable. [HN3] FIRREA provides for a "six year period" of limitation. 12 U.S.C.A. § 1821(d)(14)(A). Of necessity, any six-year period will include a leap-year. Congress' silence as to the definition of a year in this context only supports the Court's view that by choosing six-years and not 2,190 days as the period of limitation, Congress intended to provide a naturally-occurring six-year period, one that must include a leap year.

Defendants posit that under Pennsylvania law, a "year" means a "calendar year." 1 Pa. C.S.A. § 1991 (Purdon 1995). However, the same statutory section continues, "unless the context clearly indicates otherwise." Id. I believe that "Congress clearly indicated otherwise" when it decided to provide governmental agencies a "six-year period," rather than a specific number of days, to commence a lawsuit. Similarly, under Pennsylvania law, when the legislature uses the phrase "a period of [] years" they "clearly intended to mean a quantity of time, i.e., 24 calendar months running from anniversary to anniversary." See Fox Chapel Area School District [*5] v. Dunlap, 53 Pa. Commw. 479, 417 A.2d 1329, 1330 (Cmwlth. Ct. Pa. 1980); see also LaRosa v. Cove Haven, Inc., 840 F. Supp. 319, 321 (M.D.Pa. 1993) (finding that "[a] year is a period consisting of either three hundred sixty-five (365) days, in the common sense, but also three hundred sixty-six (366) days when that same statutory period includes a leap year").

## II. Certification of Interlocutory Appeal

In the alternative, Defendants request that I certify the statute of limitations question for interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b). I shall deny the Defendants' alternative request.

[HN4] 28 U.S.C.A. § 1292(b) provides that in order for a district court to permit a party to seek an immediate appeal of an interlocutory order, the order must "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation..." 28 U.S.C.A. § 1292(b). The trial court has discretion in the certification decision; however, certification is appropriate only in "exceptional" circumstances. See Piazza v. Major League Baseball, [*6] 836 F. Supp. 269, 270 (E.D.Pa. 1992). The party seeking certification has the burden of showing that "exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of a final judgment." See Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1112 (E.D.Pa. 1992); see also Link v. Mercedes-Benz of N. Am., 550 F.2d 860, 863 (3d Cir. 1977) ("We cannot sanction an erosion of the prohibition against piecemeal appellate review.")

[HN5] The United States Court of Appeals for the Third Circuit instructs that before an order can be certified for interlocutory appeal, all three factors identified in 28 U.S.C.A. § 1292(b) must be satisfied. See Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974) (finding that "the district judge must certify that the order satisfies the three criteria"). The statute's three requirements are as follows: (1) the order from which the appeal is taken must involve a controlling question of law; (2) there must be substantial grounds for a difference of opinion concerning the issue; and (3) an immediate appeal may materially advance the ultimate termination [*7] of the litigation. See Orson Inc. v. Miramax Film Corporation, 867 F. Supp. 319 (E.D.Pa. 1994) (citation omitted).

## A. Controlling Question of Law

In the Third Circuit, a controlling issue of law is one that "would result in a reversal of a judgment after final hearing." Piazza, 836 F. Supp. at 270 (citing Katz, 496 F.2d at 755). To determine if an issue presents a "controlling question of law," the critical focus is on whether a different resolution of the issue would eliminate the need for trial. See Giansante v. Allan Kanner & Associates, P.C., 1994 U.S. Dist. LEXIS 16022, No. 94-1770, 1994 WL 630209, at *2 (E.D.Pa. Nov. 3, 1994) (citing Katz, 496 F.2d at 755). In this case, the granting of the Motion for Summary Judgment as to the statute of limitations defense is not dispositive. The availability of the defense does not affect the triability of the case and contrary resolution of the issue would not result in a "reversal of judgment after final hearing."

## B. Substantial Grounds for Difference of Opinion

There has been no showing of conflicting precedent on the applicability of FIRREA's six year limitations period. As discussed above, FIRREA clearly and unambiguously provides [*8] the FDIC, as a governmental agency, with the longer of a six-year period from the date of accrual of the claim, or the applicable period under state law. 12 U.S.C.A. § 1821(d)(14)(A), (B). Defendants have not put forth any precedent to the contrary. Therefore, I find that there is no substantial ground for a difference of opinion.

## C. Materially Advance the Ultimate Termination of the Litigation

After reviewing the issues involved in the litigation, I find that an immediate appeal will only delay the ultimate termination of this litigation. Discovery in this case is complete. The trial is scheduled for November 25, 1997. "Where discovery is complete and the case is ready for trial an interlocutory appeal can hardly advance the ultimate termination of the litigation." See Rottmund, 813 F. Supp. at 1112 (citing Caldwell v. Seaboard Coastline Railroad, 435 F. Supp. 310, 312 (W.D.N.C. 1977)).

For the foregoing reasons, I will deny the Motion for Partial Reconsideration or in the alternative for Certification of Interlocutory Appeal.

An appropriate Order follows.

## ORDER

**AND NOW**, this 22nd day of September, 1997, upon consideration of Defendants' Motion for Partial [*9] Reconsideration or in the alternative for Certification of Interlocutory Appeal, pursuant to Federal Rule of Civil Procedure 59(e) and 28 U.S.C.A. § 1292(b) respectively, (Doc. No. 38) and Plaintiff's Response thereto, (Doc. No 40) it is **HEREBY ORDERED** that the Motion is **DENIED**.

BY THE COURT

John R. Padova, J.

# EXHIBIT "H"

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1240672 (E.D.Pa.)
**(Cite as: 2004 WL 1240672 (E.D.Pa.))**

# H

## Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
M. Diane KOKEN, Insurance Commissioner of the
Commonwealth of PA, et al.
Plaintiff,
v.
VIAD CORP. Defendant.
**No. Civ.A.03-5975.**

Filed Oct. 29, 2003.
May 11, 2004.

represented by <u>Brian J. Slipakoff</u>, Wolff Block Schorr & Solis-Cohen LLP, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, <u>Joseph C. Crawford</u>, Wolff Block Schorr & Solis-Cohen, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, <u>Larry H. Spector</u>, Wolff Block Schorr & Solis-Cohen LLP, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for <u>M. Diane Koken</u>, Insurance Commissioner of the Commonwealth of Pennsylvania, in Her Official Capacity as Liquidator of Reliance Insurance Company, Plaintiff.

represented by <u>George M. Vinci, Jr.</u>, Spector Gadon & Rosen, PC, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, <u>Tina L. Colman</u>, Spector Gadon & Rosen, PC, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for Viad Corp., Defendant.

## MEMORANDUM AND ORDER

BRODY, J.

*1 Presently before the court is plaintiff's motion requesting that I amend the order of March 1, 2004, an order that declines to remand the case to state court so as to permit an interlocutory appeal pursuant to <u>28 U.S.C. § 1292(b)</u>. I deny the motion for certification for interlocutory appeal.

Before certifying a question to the Court of Appeals, a district court must determine: (1) that the certified order involves a controlling question of law; (2) that

there is substantial ground for difference of opinion with respect to that question, and (3) that immediate appeal may materially advance the ultimate termination of the litigation. See <u>28 U.S.C. § 1292(b)</u>. A court will only grant an interlocutory appeal if all of three requirements under <u>§ 1292(b)</u> are sufficiently established. <u>Douris v. Schweiker, 229 F.Supp.2d 391, 412 (E.D.Pa.2002)</u>. The decision to certify an order for appeal under <u>§ 1292(b)</u> lies within the sound discretion of the trial court. <u>Fox v. Horn</u>, 2000 U.S. Dist. LEXIS 3106, at *3 (E.D.Pa. Mar. 13, 2000). Certification is only appropriate in "exceptional" cases. <u>Thornbury Noble, Ltd. v. Thornbury Twp.</u>, 2002 U.S. Dist. LEXIS 4698, at *60 (E.D.Pa. Mar. 20, 2002) (citing <u>Piazza v. Major League Baseball, 836 F.Supp. 269, 270 (E.D.Pa. Oct. 14, 1993)</u>. A district court should be mindful of the strong policy against piecemeal appeals when exercising its discretion. <u>Orson, Inc. v. Miramax Film Corp., 867 F.Supp. 319, 321 (E.D.Pa.1994)</u>.

The Third Circuit has defined a controlling issue of law as one that "would result in a reversal of a judgment after final hearing." <u>Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir.1974)</u>. When determining whether an issue presents a controlling question of law, the emphasis is on whether a different resolution of the issue would eliminate the need for trial. <u>FDIC v. Parkway Exec. Office Ctr.</u>, 1997 U.S. Dist. LEXIS 14939, at *7 (E.D.Pa. Sep. 24, 1997). After reviewing the parties' submissions and studying the issues involved in this litigation, I cannot conclude that the immediate appeal of my decision declining to remand this case would eliminate the need for a trial. An appeal of my order would simply determine which court, state or federal, would hear the case. Because the first requirement of <u>28 U.S.C. § 1292(b)</u> has not been met, it is inappropriate to amend the March 1, 2004 Memorandum and Order to include a certification permitting an interlocutory appeal. I therefore deny the plaintiff's motion.

### ORDER

AND NOW, this *11th* day of April, 2004, IT IS ORDERED that plaintiff's Motion for Interlocutory Appeal (docket # 14) is DENIED.

Not Reported in F.Supp.2d, 2004 WL 1240672 (E.D.Pa.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1240672 (E.D.Pa.)
**(Cite as: 2004 WL 1240672 (E.D.Pa.))**

Page 2

### Motions, Pleadings and Filings (Back to top)

• 2004 WL 1494835 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Certification of Interlocutory Appeal Under 28 U.S.C. § 1292 (b) (Apr. 14, 2004)

• 2004 WL 1494825 (Trial Motion, Memorandum and Affidavit) Memorandum and Order (Mar. 01, 2004)

• 2003 WL 23640194 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Motion for Remand to the Commonwealth Court of Pennsylvania (Dec. 30, 2003)

• 2003 WL 23638947 (Trial Pleading) Order (Dec. 15, 2003)

• 2003 WL 23638946 (Trial Pleading) Answer of Defendant, Viad Corp, to Plaintiff's Complaint with Affirmative Defenses (Dec. 05, 2003)

• 2:03cv05975 (Docket) (Oct. 29, 2003)

• 2003 WL 23640195 (Trial Motion, Memorandum and Affidavit) Response of Defendant Viad Corporation in Opposition to Plaintiff's Motion for Certification of Interlocutory Appeal Under 28 U.S.C. § 1292(b) (2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "I"

LEXSEE

## In re: G-I HOLDINGS, INC. f/k/a GAF CORPORATION, et al. Debtor.

### Civil No. 05-4630 (WGB), Bankr. Case Nos. 01-30135 (RG), 01-38790 (RG) (Jointly Administered)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

### 2005 U.S. Dist. LEXIS 31896

**December 7, 2005, Decided**
**December 9, 2005, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**PRIOR HISTORY:** In re G-1 Holdings, Inc., 323 B.R. 583, 2005 Bankr. LEXIS 525 (Bankr. D.N.J., 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor moved to appeal the bankruptcy court's order which denied debtor's application for an order establishing a method to liquidate individual asbestos claims. The legal representative of present and future holders of asbestos-related demands (legal representative), was joined by the official committee of asbestos claimants (committee), and moved to dismiss debtor's appeal on the basis that the bankruptcy court's order was not final.

**OVERVIEW:** Debtor was the successor to a building materials company that produced asbestos products. Both the company and debtor had paid over $ 750 million to asbestos plaintiffs. Debtor remained liable for approximately 150,000 asbestos lawsuits that had been filed and for unknown numbers of asbestos claims that would be filed in the future. The bankruptcy court did not estimate the actual value of any claims against debtor or allow or disallow any asbestos claims. In fact, the bankruptcy court left open certain aspects of the proper estimation procedure, including the methodology to estimate asbestos liability in the aggregate. The bankruptcy court's order did not impact the assets of the bankrupt estate, as debtor claimed. The bankruptcy court merely refused to adopt debtor's proposed method for estimating asbestos claims. The bankruptcy court did not hold that the over 150,000 claims currently filed against debtor would be tried by a jury. Therefore, an appeal of the bankruptcy court's order determining the viability of a particular estimation method had no preclusive effect on the actual merits of the estimation proceeding. Thus, the bankruptcy court's order was not final.

**OUTCOME:** The court granted the legal representative's and the committee's motion to dismiss debtor's appeal.

**CORE TERMS:** asbestos, estimation, estimate, claimants, jury trial, interlocutory order, bankrupt estate, methodology, judicial economy, aggregate, interlocutory, fact-finding, reclamation, difference of opinion, preclusive effect, leave to appeal, personal injury, estimating, adjudicate, hear, finality, question of law, first instance, liquidate, supplier, withdraw, right to jury trial, liquidation, appointment, matrix

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN1] District courts may hear both final and interlocutory orders from the bankruptcy courts under 28 U.S.C.S. § 158(a) of the Bankruptcy Code.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN2] See 28 U.S.C.S. § 158(a).

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN3] The U.S. Court of Appeals for the Third Circuit has consistently considered finality in a more pragmatic and less technical way in bankruptcy cases than in other cases. Due to the unique nature of bankruptcy cases, the Third Circuit has often permitted review of orders, which would have been considered interlocutory in other situations. The Third Circuit has recognized that by permitting parties to appeal discrete issues in bankruptcy proceedings, the court may save resources that would be wasted by requiring the completion of the proceedings before allowing an appeal. The Third Circuit has noted, however, that review in the bankruptcy context is not without limitations and has expressed a general reluctance to adopt an expansive interpretation of finality.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN4] The U.S. Court of Appeals for the Third Circuit has directed district courts to consider four factors in determining whether an order of the bankruptcy court is final. These factors are (i) the impact on the assets of the estate; (2) the preclusive effect of a decision on the merits; (3) the need for additional fact-finding on remand; and (4) whether the interests of judicial economy will be furthered. Of these four factors, the impact on the assets of the bankrupt estate is considered most important.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN5] The fact-finding element for determining finality for purposes of appeal from a bankruptcy court is satisfied where a decision by the U.S. Court of Appeals for the Third Circuit would preclude the necessity of further activity by the fact-finding tribunal and would obliterate the need for more litigation.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN6] Under 28 U.S.C.S. § 158(a), a district court has jurisdiction to hear appeals with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judge under 28 U.S.C.S. § 157 of this title. Although the statute does not set forth a standard for determining when the district court should grant leave to hear an interlocutory appeal, courts construing the provision have adopted the approach set forth in 28 U.S.C.S. § 1292(b), which provides the standard that district courts use to determine when interlocutory appeals should be certified to the court of appeals. Based on that standard, appeals of interlocutory orders are permitted when there are substantial grounds for a difference of opinion as to a controlling question of law and where an immediate appeal from the order may materially advance the ultimate termination of the litigation.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN7] The absence of any one of the elements for appeal renders an interlocutory order inappropriate for 28 U.S.C.S. § 1292(b). Additionally, a court will entertain an appeal under 28 U.S.C.S. § 1292(b) only when an appellant has shown that exceptional circumstances justify departure from the basic policy of postponing review until after the entry of final judgment. Ultimately, the party seeking certification has the burden of proving that certification is warranted.

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN8] For finality purposes in bankruptcy, the mere fact that an appeal would present a question of first impression is not, of itself, sufficient to show that the question is one on which there is a substantial ground for difference of opinion.

*Bankruptcy Law > Practice & Proceedings > Appeals*

[HN9] For purposes of determining finality, a controlling question of law is, at the very least, every order which would be reversible error on final appeal. Any question of law that is serious to the conduct of the litigation, either practically or legally has been found to be controlling.

*Bankruptcy Law > Practice & Proceedings*
[HN10] In general, the bankruptcy court has discretion to determine the appropriate method of claim estimation in light of the particular circumstances of the bankruptcy case before it.

**COUNSEL:** SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC, By: David R. Gross, Esq., Nancy A. Washington, Esq., Whitney R. Chelnik, Esq., Newark, New Jersey; KEATING, MUETHING & KLEKAMP, P.L.L., By: Kevin E. Irwin, Esq., Michael L. Scheier, Esq., Douglas Hensley, Esq., Cincinnati, Ohio, for the Legal Representative of Present and Future Holders of Asbestos-Related Demands.

LOWENSTEIN SANDLER, PC, By: John K. Sherwood, Esq., Rose E. Ramsay, Esq., Roseland, New Jersey; CAPLIN & DRYSDALE, CHARTERED, By: Elihu Inselbuch, Esq., New York, New York; By: Trevor W. Swett, Esq., Peter Van N. Lockwood, Esq., Washington, DC, for the Official Committee of Asbestos Claimants.

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP, By: Dennis J. O'Grady, Esq., Morristown, New Jersey.

WEIL, GOTSHAL & MANGES LLP, By: Martin J. Bienenstock, Esq., Kathryn L. Turner, Esq., Ralph I. Miller, Esq., Debra L. Goldstein, Esq., John B. Kinchen, Esq., New York, New York, for Plaintiffs and Counter-Defendants.

For G-I HOLDINGS INC., Appellant: DENNIS JOSEPH O'GRADY, RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP, MORRISTOWN, NJ.

For OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS, Appellee: KENNETH [*2] A. ROSEN, LOWENSTEIN SANDLER PC, ROSELAND, NJ.

For LEGAL REPRESENTATIVE OF PRESENT AMD FUTURE HOLDERS OF ASBESTOS-RELATED DEMANDS, Appellee: DAVID R. GROSS, NANCY A. WASHINGTON, SAIBER, SCHLESINGER, SATZ, & GOLDSTEIN, LLC, NEWARK, NJ.

For BANK OF NEW YORK, Appellee: WILLIAM S. KATCHEN, DUANE, MORRIS, & HECKSCHER, LLP, NEWARK, NJ.

**JUDGES:** BASSLER, SENIOR DISTRICT JUDGE.

**OPINIONBY:** WILLIAM G. BASSLER

**OPINION:**

**OPINION**

**BASSLER, SENIOR DISTRICT JUDGE:**

Debtor, G-I Holdings Inc. ("G-I"), moved to appeal the Bankruptcy Court's July 14, 2005 order ("July 14 Order") denying G-I's application for an order pursuant to 11 U.S.C. § 502(c) establishing a method to liquidate individual asbestos claims. The Legal Representative of Present and Future Holders of Asbestos-Related Demands ("Legal Representative"), being joined by the Official Committee of Asbestos Claimants ("Committee"), now moves to dismiss G-I's appeal on the basis that the Bankruptcy Court's July 14 Order was not final. The Legal Representative and Committee further submit that G-I's appeal should not be converted into a notice of motion for leave to appeal an interlocutory order.

### I. BACKGROUND [*3]

*A. General History*

G-I, the successor to GAF Corporation ("GAF"), filed for chapter 11 bankruptcy on January 5, 2001 and continues to operate as a debtor in possession. GAF was a building materials company that produced asbestos products. An affiliate of G-I, ACI, also commenced a chapter 11 case, and the two cases are being administered jointly.

GAF has been named in 500,000 asbestos claims and both GAF and G-I have paid over $ 750 million to asbestos plaintiffs over the past seven years. G-I remains liable for approximately 150,000 asbestos lawsuits that have been filed and for unknown numbers of asbestos claims that will be filed in the future. In fact, G-I claims that it was forced to file for bankruptcy due to an increase in both the number of asbestos claims filed against it and the settlement amounts demanded by asbestos claimants.

Building Materials Corporation of America ("BMCA"), a leading manufacturer of roofing and building products, is an indirect subsidiary of G-I and is also the primary operating subsidiary and principal asset of G-I. Established in 1994, BMCA received substantially all assets of GAF's products business and expressly assumed $ 204 million of [*4] asbestos liability with G-I indemnifying BMCA against additional asbestos liability. In re G-I Holdings, Inc., 323 B.R. 583, 588 (Bankr D.N.J. 2005) (citing G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.), 313 B.R. 612, 621 (Bankr. D.N.J. 2004)). No asbestos claims were filed against BMCA until G-I was in danger of filing for bankruptcy. Claimants then began naming BMCA as a defendant according to theories of successor liability and alter ego liability.

Shortly after G-I filed for chapter 11 bankruptcy protection, the United States trustee appointed the Committee to represent present asbestos claimants or individuals exposed to G-I's asbestos products pre-petition who had manifested an asbestos related injury prior to plan confirmation on January 18, 2001. On October 10, 2001, C. Judson Hamlin was appointed by the Bankruptcy Court as the Legal Representative to protect the interests of those individuals currently unknown to the parties that have not yet manifested an asbestos-related injury but may hold future claims.

*B. May 13 Order Denying Motions to Withdraw Reference*

On May 23, 2002 the Committee filed a motion in this Court for partial withdrawal of reference [*5] as to G-I's application for estimation of claims under 11 U.S.C. § 502(c). Subsequently, G-I filed its Estimation Motion on June 19, 2002. n1 The Legal Representative filed its own motion to withdraw reference of G-I's application for an estimation on August 9, 2002. On May 13, 2003, the Court denied the motions to withdraw the reference on the basis that "judicial economy is . . . better served by having the Bankruptcy Court retain jurisdiction of the estimation process." Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings Inc.), 295 B.R. 211, 218-220. The Court reasoned that given the Bankruptcy Court's understanding of the facts and issues in the case and the knowledge of the chapter 11 reorganization process the Bankruptcy Court should "attempt the estimation proceeding in the first instance. " Id. (emphasis added).

n1 The parties strongly differ as to the characterization of the motion filed by G-I Holdings. While G-I Holdings submits that its motion seeks claims estimation pursuant to § 502(c) of the Bankruptcy Code, the Committee and Legal Representative assert that the motion is an improper attempt to liquidate, rather than estimate, claims under the Code. Nevertheless, for purposes of clarity the Court will refer to the present motion as the Estimation Motion.

[*6]

*C. The Bankruptcy Court's July 14 Decision*

After G-I filed its Estimation Motion on June 19, 2002, the Committee and the Legal Representative filed their objections to the motion on August 30, 2002 and September 2002, respectively. The Committee also filed a competing motion on May 23, 2002. While G-I's motion proposed a novel method of estimating individual personal injury claims, the Committee sought an order from the Bankruptcy Court approving a process that would estimate G-I's asbestos liability in the aggregate. G-I proposed a detailed and intricate scheme whereby all asbestos personal injury claims asserted against its estate would be liquidated through the application of a medical matrix, which G-I developed. 323 B.R. at 590. In addition, a Claims Liquidation Committee ("CLC") would be charged with the responsibility of administering the claims procedures established by G-I. The Committee objected on the basis that the medical matrix and claims liquidation procedures actually amount to an improper liquidation of all personal injury claims for the purpose of determining actual distributions to persons whose claims are allowed. As a result, the Committee and [*7] Legal Representative submit that G-I's "liquidation-by-estimation scheme" would violate asbestos claimants' rights because it would de-

termine final values for individual claims, for purposes of distribution under the reorganization plan, without affording claimants any right to a jury trial. 323 B.R at 600. G-I concedes that the asbestos claimants would not receive a jury trial under its plan.

The Bankruptcy Court agreed with the Committee and the Legal Representative, and ruled that the claims held by the asbestos claimants are "legal in nature," and therefore, carry with it the Seventh Amendment's guarantee of a right to a jury trial. 323 B.R. at 606 (citing Granfinanciera v. Nordberg, 492 U.S. 33, 55, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989)). Additionally, the Bankruptcy Court held that G-I's motion further violated 28 U.S.C. § 1411, which provided that neither title 11 nor chapter 87 of title 28 should affect a jury trial right. The Bankruptcy Court also ruled that the appointment of the CLC to determine individual claims violated clear statutory mandates. 323 B.R. at 607, 614-16 (citing 28 U.S.C. § 157 and [*8] Fed.R.Bankr. P. 9031)). The Bankruptcy Court instead granted the Committee's motion to estimate G-I's asbestos liability in the aggregate, but rejected its request to set up a trust under § 524(g). More importantly to the current motion, the Bankruptcy Court did not estimate the actual value of any claims against G-I or allow or disallow any asbestos claims. In fact, the Court left open certain aspects of the proper estimation procedure, including the methodology to estimate asbestos liability in the aggregate.

G-I filed a notice of appeal pursuant to Bankruptcy Rule 8002(a) on July 25, 2005 purporting to appeal to this Court under 28 U.S.C. § 158(a) from the portion of the July 14 Order denying G-I's Estimation Motion. In the Bankruptcy Court, G-I argued that the lack of a right to jury trial does not affect the viability of the medical matrix and the claims liquidation procedures because asbestos-related personal injury claimants have no constitutional or statutory right to a jury trial in the context of a bankruptcy proceeding. 323 B.R. at 601. The Legal Representative, joined by the Committee, move to dismiss [*9] the appeal on the basis that the Court does not have subject matter jurisdiction under 28 U.S.C. § 158 because the Bankruptcy Court decision is not final and G-I has not satisfied the requirements necessary for leave to appeal an interlocutory order.

## II. JURISDICTION

[HN1] District courts may hear both final and interlocutory orders from the bankruptcy courts under section 158(a) of the Bankruptcy Code. In re Brown, 803 F.2d 120 (3d Cir. 1986). Section 158(a) provides in part:

[HN2] The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

Therefore, the Court must first determine whether the Bankruptcy Court's July 14 Order was final, and if not, the Court must decide whether it should grant G-I leave to appeal the Bankruptcy Court's interlocutory order.

The Court finds that the Bankruptcy Court's July 14 Order is not final and refuses to grant [*10] leave for G-I to appeal the Bankruptcy Court's interlocutory order. Therefore, the Court does not have subject matter jurisdiction to hear G-I's appeal. The Legal Representative's and Committee's motion to dismiss the appeal is granted.

## III. ANALYSIS

### A. Finality of the Bankruptcy Court's July 14 Order

[HN3] The Court of Appeals for the Third Circuit has consistently considered finality in a more pragmatic and less technical way in bankruptcy cases than in other cases. In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir. 1985). Due to the unique nature of bankruptcy cases, the Third Circuit has often permitted review of orders, which would have been considered interlocutory in other situations. See e.g., In re Brown, 803 F.2d 120, 122 (3d Cir. 1986). The Court of Appeals for the Third Circuit recognized that by permitting parties to appeal discrete issues in bankruptcy proceedings, the Court may save resources that would be wasted by requiring the completion of the proceedings before allowing an appeal. The Third Circuit has noted, however, that review in the bankruptcy context is not without limitations and [*11] has expressed a "general reluctance to adopt an expansive interpretation of finality." Id. (dismissing appeal of district court ruling which was not final where the district court's order did not affect distribution of the debtor's assets or relationship amongst the creditors).

[HN4] The Third Circuit Court of Appeals has directed district courts to consider four factors in determining whether an order of the bankruptcy court is final. Dal-Tile Int'l v. Color Tile, 203 B.R. 554, 556 (D. Del. 1996). These factors are (i) the impact on the assets of the estate; (2) the preclusive effect of a decision on the merits; (3) the need for additional fact-finding on remand; and (4) whether the interests of judicial economy will be furthered. Id. Of these four factors, the impact on the assets of the bankrupt estate is considered most important. Id.

Even before analyzing these four factors, the Court finds of significant import its May 13 ruling denying the motions to withdraw reference on the basis that judicial economy is better served by allowing the Bankruptcy Court to conduct the estimation proceeding in the first instance. The Court notes its initial [*12] reluctance to hear an appeal at this stage of the proceedings fearing that it will be called to referee every determination of the Bankruptcy Court. Had the Court wished to take on this role, it could have withdrawn the reference from the beginning of these proceedings.

### Impact on Bankrupt Estate

The Bankruptcy Court's July 14 Order does not impact the assets of the bankrupt estate, as G-I contends. The Bankruptcy Court merely refused to adopt G-I's proposed method for estimating asbestos claims. G-I suggests that by denying its method of liquidating asbestos claims on the basis that this method violates asbestos claimants right to a jury trial, n2 the Bankruptcy Court effectively ruled that the over 150,000 asbestos claimants are absolutely entitled to a trial by jury, which would extend "for years at hundreds of millions of dollars of expense." G-I Memorandum of Law ("G-I Mem.") at 15. Based on this far-reaching conclusion G-I claims that the impact of the Bankruptcy Court's ruling on a chapter 11 plan for G-I's bankrupt estate would be "magnitudinous."

> n2 Although G-I focuses on the Bankruptcy Court's right to jury trial determination, the Court considered other factors when denying G-I's motion proposing a method to liquidate asbestos claims. The Court notes that the Bankruptcy Court also denied the motion on the basis that several procedural deficiencies existed with G-I's proposal. 323 B.R. at 600. The Bankruptcy Court further ruled that the appointment of the CLC to determine individual claims violated clear statutory mandates. Id. at 607, 614-16.

[*13]

G-I's conclusion overstates the Bankruptcy Court's ruling. The Bankruptcy Court did not hold that the over 150,000 claims currently filed against G-I would be tried by a jury. The Bankruptcy Court noted that, "the parties agree that neither a debtor nor its personal injury claimants have a right to jury trial in an estimation proceeding conducted under § 502(c) of the Bankruptcy Code." 323 B.R. at 600. Since the Bankruptcy Court, in actuality, ruled that an estimation of G-I's asbestos liability should be conducted in the aggregate, the right to a jury trial was not triggered and no effect on the bankrupt estate has occurred. If, however, the Bankruptcy Court had established the methodology to be used to estimate asbestos claims and estimated the value of G-I's asbestos liability, then its ruling would have affected the bankrupt estate. See e.g., In re Armstrong, 292 B.R. 678, 685 (10th Cir. 2003) (deeming final and appealable bankruptcy court order estimating value of creditor's claim for purposes of voting on trustee's plan of reorganization). n3

> n3 G-I cites In re Armstrong and several other cases with similar holdings. As discussed above, these cases are inapposite to this case because no estimation of the value of the asbestos claims has been made. G-I Mem. at 12-13.

[*14]

The Bankruptcy Court itself noted that deciding to conduct the estimation proceeding in the aggregate still does not resolve every difficult issue. In re GI Holdings, Inc., 323 B.R. at 624. In addition, the Court stated that "once the precise estimation procedure and methodology are determined, and prior to the estimation hearing" two additional issues may need to be resolved: "1) whether a statutory cap can be placed on damages under § 502(c) and 2) whether the estimation of claims should be based upon G-I Holdings overall claims-resolution or if it should be based upon the average value of federal tort claims asserted against GAF settled or tried from 1997 through 1999." Id. at n.42.

Dal-Tile Intl., Inc. is instructive. 203 B.R. at 554. In that case, suppliers sought the reclamation of goods allegedly delivered to the debtor pre-petition. The Bankruptcy Court granted the debtor's motion to deny reclamation. One supplier appealed the decision claiming that the Bankruptcy Court erred when it summarily denied the supplier the right to

physically reclaim its goods without granting it a corresponding administrative expense claim or a replacement [*15] loan. Id. at 556. The District Court for the District of Delaware held that the Bankruptcy Court's order was not final because the order merely established a procedure for determining the validity and value of a supplier's reclamation claim and did not actually adjudicate the merits of any reclamation claim. Id. Similarly, the Bankruptcy Court here has yet to even establish the methodology for estimating the value of the asbestos claims, let alone, adjudicate the merits of any asbestos claims. n4 By refusing to approve G-I's proposed estimation method and granting the Committee's motion to estimate G-I's asbestos liability in the aggregate, the Court has taken only its first step in the estimation process, causing no effect on the bankrupt estate.

> n4 G-I correctly notes that the district court in Dal Tal Intl. Inc. ruled that the Bankruptcy Court's order was not final because it was procedural in nature since reversal of the Bankruptcy Court's order would not preclude the Bankruptcy Court from denying the creditor's physical reclamation of its supplies, but could only preclude the Court from denying this right without granting a contemporaneous administrative claim or lien. G-I is incorrect, however, in its contention that this fact distinguishes that case from the present one because at issue here is the right to a jury trial. G-I Mem. at 14-15. First, as stated earlier, the right to a jury trial was not the only basis for the Bankruptcy Court's decision. See supra at 10, n.2. The Bankruptcy Court ruled that procedural deficiencies in G-I's proposal further warranted its determination. 323 B.R. at 616. Furthermore, like the Dal Tile Intl., Inc. case, if this Court reversed the Bankruptcy Court's decision, the method used to estimate claims is within the Bankruptcy Court's sound discretion, and upon remand, the Bankruptcy Court still could decide that even though G-I's proposal does not violate the constitutional and statutory rights of asbestos claimants to a jury trial, G-I's proposal is not the best way to estimate the claims.

[*16]

### Preclusive Effect of the Decision

An appeal of the Bankruptcy Court's July 14 Order will not have a preclusive effect on further litigation regarding the estimation proceeding. As stated above, the Bankruptcy Court's July 14 Order did not establish an estimation methodology, did not estimate the value of any claims and did not adjudicate the merits of any asbestos claims. Therefore, an appeal of the Bankruptcy Court's order determining the viability of a particular estimation method, has no preclusive effect on the actual merits of the estimation proceeding. Dal Tile Intl. Inc., 203 B.R. at 557 (holding that "because the Bankruptcy Court did not adjudicate the merits of Dal-Tile's reclamation claim, the Reclamation Order does not preclusively resolve the validity, priority, or value of this claim"); Cf. In re Blastein, 192 F.3d 88 (finding that there was no question that an appellate court decision would have a preclusive effect where the appeal concerned whether debtor fraudulently transferred income to his wife and an appeal could result in an increase of the bankrupt estate). An appeal now would only allow G-I's proposed estimation [*17] method to be reconsidered by the Bankruptcy Court and is not preclusive on any further litigation in the matter.

### Need for Further Fact-Finding

Further fact-finding would still be necessary if the Court made a decision on appeal. In Southeastern Sprinkler Co., v. Meyertech Corp., 831 F.2d 410, 414 (3d Cir. 1987), the Third Circuit held that [HN5] the fact-finding element for determining finality is satisfied where the Third Circuit's decision would "preclude the necessity of further activity by the fact-finding tribunal [and] will obliterate the need for more litigation." In contrast, a decision by this Court would not preclude the need for the Bankruptcy Court to conduct further fact-finding to determine the appropriate methodology to estimate the value of G-I's asbestos liability.

Even if the Court ruled that G-I's proposal did not violate asbestos claimants constitutional and statutory rights to a trial by jury or that the appointment of the CLC did not violate clear statutory mandates, the Bankruptcy Court would still have to determine the proper method of estimation, estimate G-I's asbestos liability and adjudicate the validity of claims. This process [*18] would require further fact-finding on remand. In addition, the Bankruptcy Court expressly left for future resolution the "mechanics" of the estimation it will conduct in this case, 323 B.R. at 626, inviting the opportunity for the parties to submit briefs setting forth the details of the methodology and evidence they believe the Bankruptcy Court should use when it estimates G-I's aggregate asbestos liability. Accordingly, an appeal would not eliminate additional work for the Bankruptcy Court.

***Interests of Judicial Economy***

The interests of judicial economy would not be furthered, if this Court has to take on an appeal every time the Bankruptcy Court makes any determination regarding the estimation proceeding. Doing so would clog up the docket of the Court and would undermine the Court's ruling denying the Committee's and Legal Representative's motions to withdraw the reference on all estimation claims. The Court specifically stated in making that ruling that the interest of judicial economy warranted allowing the Bankruptcy Court to determine the estimation proceedings in the first instance. 295 B.R. 211, 220. By first instance the Court was [*19] not referring to the very first decision of the Bankruptcy Court, but was intending to allow the Bankruptcy Court to make the initial determination regarding the estimation proceedings. At this stage of the case, the Bankruptcy Court has only taken a preliminary step in making this determination.

G-I argues that the Court should hear G-I's appeal because judicial economy is not served by making G-I begin the arduous task of litigating its over 150,000 pending claims. The Court already has discussed the unreasonableness of this contention. See supra at 10-11. G-I also contends that if the jury trial decision is wrong, but is not reversed until after the confirmation of a plan, the entire plan formulation will have to be repeated. The Court recognizes this possibility, but is not as concerned with this potential outcome at this stage of the process as it is with the possibility of numerous piecemeal appeals inundating this Court's docket. The Bankruptcy Court is not close to the confirmation of a plan at this stage of the estimation proceedings and the Court does not believe that reviewing the Bankruptcy Court's July 14 Order would advance the interest of judicial economy.

Because [*20] the Bankruptcy Court's July 14 Order fails to satisfy any of the four factors considered in a determination of finality, the Court finds that the July 14 Order is not final. Consequently, the Court must next determine whether it should grant leave to appeal the Bankruptcy Court's interlocutory order.

*B. Leave to Appeal an Interlocutory Order*

[HN6] Under 28 U.S.C. § 158(a), a district court has jurisdiction to hear appeals "with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judge under section 157 of this title." Although the statute does not set forth a standard for determining when the district court should grant leave to hear an interlocutory appeal, courts construing the provision have adopted the approach set forth in 28 U.S.C. § 1292(b), which provides the standard that district courts use to determine when interlocutory appeals should be certified to the court of appeals. Based on that standard, appeals of interlocutory orders are permitted when there are substantial grounds for a difference of opinion as to a controlling question of law [*21] and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. In re Bertoli, 58 B.R. 992, 995 (D.N.J. 1986).

[HN7] The absence of any one of these elements renders an interlocutory order inappropriate for § 1292(b). Ahrenholz v. Board of Trustees, 219 F.3d 674, 676 (7th Cir. 2000). Additionally, a court will entertain an appeal under section 1292(b) only when an appellant has shown that exceptional circumstances justify departure from the basic policy of postponing review until after the entry of final judgment. Dal Tile Intl., Inc., 203 B.R. at 557. Ultimately, the party seeking certification has the burden of proving that certification is warranted. Orson v. Miramax Film Corp., 867 F.Supp. 319 (E.D. Pa. 1994) (citing Piazza v. Major League Baseball, 836 F.Supp. 269, 271 (E.D. Pa. 1993)). G-I does not meet that burden.

First, G-I has failed to establish that substantial grounds for a difference of opinion exists by arguing merely that no case law exists regarding the interplay between 28 U.S.C. § 1411 and [*22] 28 U.S.C. § 157(b)(2)(B). The Court is persuaded, however, by the cases from courts in the Third Circuit cited by the Legal Representative holding that the fact that an issue is one of first impression alone does not create a substantial ground for a difference of opinion. Legal Representative Reply Memorandum ("Leg. Rep. Reply Mem.") at 13, n.12 (citing In re Sharps Run Assoc., 157 B.R. 766, 779 n.6 (D.N.J. 1993) [HN8] ("The mere fact that the appeal would present a question of first impression is not, of itself, sufficient to show that the question is one on which there is a substantial ground for difference of opinion.")). Since G-I presents no argument, other than the absence of case law, to support, its position, the substantial grounds for a difference of opinion element has not been met.

Second, the Court is not convinced that a controlling question of law is involved. The Third Circuit has held that [HN9] a controlling question of law is, at the very least, every order which would be reversible error on final appeal. Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974), cert. denied, 419 U.S. 885 (1974). [*23] The Katz

Court further stated that any question of law that is "serious to the conduct of the litigation, either practically or legally" has been found to be controlling. Id.

[HN10] In general, the bankruptcy court has discretion to determine the appropriate method of claim estimation in light of the particular circumstances of the bankruptcy case before it. In re Thomson McKinnon Sec., Inc., 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992) ("In estimating [a] claim, the bankruptcy court should use whatever method is best suited for the circumstances) (citation omitted). Even if the Court were to determine that G-I's proposal is viable and does not suffer the deficiencies found by the Bankruptcy Court, the Bankruptcy Court nevertheless has the discretion to determine what estimation method is best suited for the case. Therefore, the Bankruptcy Court's denial of G-I's novel proposal likely would not constitute reversible error on final appeal. The Court also does not find that the Bankruptcy Court's July 14 Order denying G-I's proposal is serious to the conduct of the litigation. The Bankruptcy Court has determined only what process shall be used to estimate G-I's asbestos [*24] liability but must still develop an estimation methodology and take further steps to conclude the estimation proceedings. Therefore, the question of whether the Bankruptcy Court erred by denying G-I's method to liquidate asbestos claims is not controlling.

Third, as discussed above, this appeal would not materially advance the litigation of this case, but would only serve to delay the Bankruptcy Court's progress finalizing the estimation proceeding. See supra at 16. Judicial economy is not served by this Court serving as the referee to every decision made by the Bankruptcy Court.

Lastly, G-I has not shown any exceptional circumstances justifying the departure from the basic policy of postponing review until after the entry of final judgment. Consequently, the Court will not grant leave to appeal the Bankruptcy Court's interlocutory order dated July 14, 2005 and grants the Legal Representative's and Committee's motion to dismiss the appeal.

### IV. CONCLUSION

For the reasons stated in this Opinion, this Court grants the motion to dismiss the appeal.

An appropriate Order accompanies this Opinion.

/s/ William G. Bassler

WILLIAM G. BASSLER, U.S.S.D.J.

Dated: December 7, 2005 [*25]

### ORDER

This matter having come before the Court on motion of the Legal Representative of Present and Future Asbestos Holders of Asbestos Related Demands ("Legal Representative"), joined by the Official Committee of Asbestos Claimants ("Committee"), to dismiss G-I Holdings, Inc.'s ("G-I") appeal of the portion of the Bankruptcy Court's July 14, 2005 order denying G-I's method of liquidating asbestos claims; and

The Court having considered the submissions of the parties; and

The Court having held oral argument on December 5, 2005; and

For the reasons set forth in the Court's Opinion issued this day; and

For good cause shown;

It is on this 7th day of December, 2005 ORDERED that the Legal Representative's and Committee's motion is **granted.**

/s/ William G. Bassler

WILLIAM G. BASSLER, U.S.S.D.J.

# EXHIBIT "J"

**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| OWENS CORNING, *et al.*, | : | Case Nos. 00-3837 (JKF) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | **Related to Docket No. 16495** |
| | : | **Hearing Date: January 30, 2006** |

## OBJECTION OF DEBTORS TO MOTION OF AD HOC COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS FOR THE APPOINTMENT OF AN OFFICIAL PREFERRED AND EQUITY SECURITY HOLDERS COMMITTEE

Owens Corning and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively with Owens Corning, the "Debtors"),[1] by and through their undersigned attorneys, hereby object to the Motion of *Ad Hoc* Committee of Preferred and Equity Security Holders for the Appointment of an Official Preferred and Equity Security Holders Committee (the "Motion"). For the reasons set forth herein, the Debtors respectfully request that the Motion be denied.

### PRELIMINARY STATEMENT

The Motion represents a fourth request by shareholders for the appointment of an official equity committee in these cases. Two prior requests, in 2003 and 2004, were made by a group of shareholders through letters to the Office of the United States Trustee. Despite such requests, an

---

[1]  The Debtors are: Owens Corning, CDC Corporation, Engineered Yarns America, Inc., Falcon Foam Corporation, Integrex, Fibreboard Corporation, Exterior Systems, Inc., Integrex Ventures LLC, Integrex Professional Services LLC, Integrex Supply Claim Solutions LLC, Integrex Testing Systems LLC, Homexperts LLC, Jefferson Holdings, Inc., Owens-Corning Fiberglas Technology Inc., Owens Corning HT, Inc., Owens-Corning Overseas Holdings, Inc., Owens Corning Remodeling Systems, LLC and Soltech, Inc.

DKT. NO. 16697

DT. FILED 1|13|06

874454.6 1/13/06

equity committee was not appointed.[2] A third request was made by the *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee")[3] in a letter to the Office of the United States Trustee in November 2005. After careful consideration, the *Ad Hoc* Committee's request was denied. In each instance, the United States Trustee's decision not to appoint an equity committee was in accordance with the discretionary authority given to the United States Trustee under 11 U.S.C. § 1102(a)(1).

The current request for the appointment of an official equity committee is based on unsupported assertions previously rejected by the Office of the United States Trustee: (i) that shareholders have a legitimate economic interest in these cases based upon the current trading value of preferred and equity securities; and (ii) that an official equity committee is necessary so that shareholders can participate in the plan process. Neither of these assertions is correct and neither supports the appointment of an official equity committee in these cases. More importantly, neither represents what the Debtors believe is the actual (albeit unstated) purpose of the Motion, which is to obstruct the Debtors' reorganization efforts to extract value for shareholders. The unfortunate reality of these cases is that sufficient assets are not available to satisfy the claims of Owens Corning's creditors, let alone to make a distribution to shareholders.

Case law is clear that the appointment of official equity committees should be the "rare exception." In re Northwestern Corp., 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004) (attached as Exhibit B); In re Williams Communications Group, Inc., 281 B.R. 216, 223 (Bankr.

---

[2]    Copies of the two prior requests and the Debtors' responses thereto are attached collectively as Exhibit A.

[3]    According to the Motion, the members of the *Ad Hoc* Committee are: Catalyst Investment Management Co., LLC; Clinton Group, Inc.; Deutsche Bank Securities Inc.; GSO Capital Partners LP; Hain Capital Group, LLC; Harbert Distressed Investment Master Fund, Ltd.; Harvest Management, LLC; JP Morgan; Lehman Brothers; Plainfield Asset Management LLC; Taconic Capital Advisors LLC; Tudor Investment Corporation and Venor Capital Management LP. Publicly filed court documents reflect that at least five of the thirteen members of the *Ad Hoc* Committee (and/or their affiliates) are also bank debt holders and/or bondholders.

S.D.N.Y. 2002). Under the facts and circumstances of these cases, the *Ad Hoc* Committee

cannot satisfy its heavy burden of establishing an entitlement or need for the appointment of an

official equity committee. For these reasons, and for those set forth below, the Motion should be

denied.

## APPLICABLE LAW

The appointment of creditors and equity holders' committees is governed by section

1102(a)(1) of the Bankruptcy Code, which provides in relevant part as follows:

> . . . as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

11 U.S.C. § 1102(a)(1) (emphasis added).

The Bankruptcy Code also provides that a bankruptcy court may consider whether the

appointment of additional creditors committees or of an equity committee is appropriate:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.

11 U.S.C. § 1102(a)(2) (emphasis added).

Whether or not equity security holders have "adequate representation" must be

determined by the facts of each case. In re Edison Bros. Stores, Inc., 1996 WL 534853, at *3 (D.

Del. Sept. 17,1996) (attached as Exhibit C) (citing In re Johns-Manville Corp., 68 B.R. 155, 159

(S.D.N.Y. 1986)); In re Northwestern Corp., 2004 WL 1077913, at *2; In re Williams, 281 B.R.

at 220.

In making this determination and, more specifically, in determining whether the

appointment of an equity committee is warranted, courts have identified a variety of factors to be

considered: (i) whether a debtor is solvent; (ii) whether the interests of shareholders are not otherwise adequately represented; (iii) the size and complexity of the case; (iv) whether the stock is widely held and actively traded; (v) whether the request for formation of an equity committee is timely; and (vi) whether the costs of such appointment outweigh the benefits. See, e.g., In re Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996); In re Emons Indus. Inc., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985); In re Edison Bros., 1996 WL 534853, at*3; In re Johns-Manville, 68 B.R. at 159; In re Williams, 281 B.R. at 216. As explained by the court in In re Kalvar, "[n]o one factor is dispositive, and the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case." In re Kalvar, 195 B.R. at 600-601. Nevertheless, certain courts emphasize two of these factors above all others:

> [equity] committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.

In re Williams, 281 B.R. at 223; see also In re Northwestern Corp., 2004 WL 1077913, at *2.

## ARGUMENT

### A.    Solvency/Substantial Likelihood of Meaningful Distribution

Equity security holders simply have no reasonable likelihood of a distribution in these cases under the current facts and circumstances. In fact, the financial reality is that, despite the willingness of certain investors to make speculative investments in Owens Corning's stock, there is no reasonable prospect for any recovery by equity. Aside from the various inter-creditor

issues that have plagued these cases, Owens Corning's bottom-line economics are relatively simple. Owens Corning[4] owes the following pre-petition principal amounts to its creditors: (i) bank debt -- approximately $1.467 billion (exclusive of interest); (ii) bond debt -- approximately $1.389 billion; (iii) trade and other general unsecured debt -- in excess of $275 million; (iv) asbestos liabilities -- $7.0 billion (as determined by Judge Fullam); and (v) other subordinated debt -- approximately $275 million. In the aggregate, Owens Corning has over $10 billion of pre-petition debt, exclusive of intercompany claims and the more than *five years'* of interest that would be payable to all creditors before equity holders could receive any distribution. The principal amounts of these liabilities have been a matter of public record (in numerous SEC and court filings) for a number of years in these cases, although they have been refined somewhat as the cases have progressed.

No plausible analysis under current facts and circumstances could reasonably lead to a valuation of Owens Corning's assets in excess of the liabilities outlined above. Clearly, the amount of liabilities in these cases greatly exceeds the value of Owens Corning's assets. Absent favorable asbestos legislation,[5] this is the unfortunate reality of these cases.

The so-called market capitalization cited by the *Ad Hoc* Committee as an indication that equity is "in the money" is based entirely on speculation concerning favorable asbestos legislation. Notwithstanding the *Ad Hoc* Committee's self-serving assertions to the contrary, the likelihood that asbestos legislation will be enacted is wholly speculative, as would be the substance of any such legislation. This Court has repeatedly stated that proposed asbestos

---

[4]    These numbers are for Owens Corning only and are exclusive of Fibreboard and its subsidiaries' separate assets and liabilities.

[5]    Owens Corning by no means intends to assert that the passage of asbestos legislation will automatically result in value for equity. The impact of any legislation can be evaluated only if and when such legislation is actually enacted into law.

legislation should have no impact in these cases unless and until actually enacted. In the words

of this Court at the June 4, 2003 hearing in response to comments regarding a prior asbestos-

related bill, "[u]ntil it's law, it's not relevant." See June 4, 2003 Hearing Transcript, at p. 51. The

Court reiterated this view in comments specifically directed to counsel for the *Ad Hoc*

Committee at the hearing held in these cases on November 14, 2005 when the *Ad Hoc*

Committee attempted to raise objections to the Debtors' request to extend the exclusivity periods:

> COURT: . . . the equity is out of the money. There's not going to
> be an equity committee from my point of view in this case. I don't
> see one. I don't see the need for it.
>
> MR. STARK: Well, Your Honor, I think that my stockholders
> would like to be heard in this case. They'd like to have a view.
> They have a view with respect to exclusivity. Your Honor, we do
> not – We did hear with some degree of humor what Mr. Pernick's
> proffer and argument was. I heard creditor a lot. I never heard
> stockholder.
>
> COURT: Well, tell me how they're in the money. As soon as you
> can show me how this is a solvent entity or plural entities whose
> assets are not going to be essentially entirely devoted to paying its
> creditors, then maybe I'm willing to hear it. Until then, telling me
> that there's 55 million shares trading at $3 per share that gives me a
> market cap of $300 million or $700 million with a $7 billion
> liability just to one group, tells me you're out of the money.

See November 14, 2005 Hearing Transcript, at p. 54.

   Obviously, if asbestos legislation is enacted, the economic landscape of these cases may

be altered, provided that such legislation is not successfully challenged (or stayed) on

constitutional or other grounds and depending on the timing of such enactment. Clearly, the

Debtors will examine the terms of any asbestos legislation that is enacted and take appropriate

action on behalf of the Debtors' estates. Likewise, equity holders will have an opportunity, if and

when those events occur, to renew a request for the appointment of an official equity committee.

The *Ad Hoc* Committee points to other asbestos related bankruptcy cases in support of its request for the appointment of an official equity committee. The appointment of official equity committees in certain other asbestos bankruptcy cases does not dictate the appointment of an equity committee here. In most of these cases (other than USG), equity committees were appointed at or near the beginning of the case, based on unique facts or representations that, at such time, justified the appointment. In USG, prior to filing bankruptcy, the debtors had undergone a restructuring in which they isolated their asbestos liability in certain subsidiaries. Not surprisingly, a central issue in USG is a dispute over the restructuring, largely between equity and asbestos creditors. In W.R. Grace, the debtor alleged at the outset of the case that it was solvent, based on its assertion of asbestos liability. Owens Corning is clearly distinguishable from these cases. Here, based on judicially determined asbestos liability and other known claims, there is no reasonable prospect for any distribution to security holders.[6] Consistent with prior filings in the public record since at least January 2003, the Fifth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession (the "Fifth Plan") and the related Disclosure Statement ("Disclosure Statement"), filed on December 31, 2005, reflects this economic reality; equity is "out of the money" as Owens Corning's asbestos claimants, bondholders and general unsecured creditors will not be paid in full under the Plan.

---

[6]     The cases cited by the *Ad Hoc* Committee for the proposition that prospective value may be relevant in determining whether equity holders have an economic interest in a debtor's estate have no relevance to the issue of whether an equity committee should be appointed here. These cases do not support the proposition that prospective value for purposes of ascertaining the right to appointment of an equity committee may be based on speculation in the market on the content and likelihood of enactment of future legislation. Rather, these cases have merely noted that business projections, as opposed to mere current performance, is relevant to valuing a business in the Chapter 11 confirmation process.

## B. Adequate Representation

The *Ad Hoc* Committee contends that an official equity committee is necessary so that shareholders can adequately participate in the plan process. The Debtors disagree. As the court in Williams stated, the party seeking the appointment of a committee must prove a present and identifiable need for representation that cannot otherwise be addressed by individual representation. In re Williams, 281 B.R. at 223. The *Ad Hoc* Committee cannot meet this burden.

Interestingly, a review of the publicly filed court documents reflects that at least five of the thirteen members of the *Ad Hoc* Committee (and/or their affiliates) are also bank debt holders and/or bondholders).[7] An *in camera* or other confidential review by the Court of the 2019 Statements and the confidential exhibits thereto filed by Stroock & Stroock & Lavan LLP for certain Bondholders, Credit Suisse, Cayman Branch, f/k/a Credit Suisse First Boston, as agent for the Bank Group, and Brown Rudnick Berlack Israels LLP on behalf of the *Ad Hoc* Committee would reveal whether other members of the *Ad Hoc* Committee also hold bank and/or bond debt. As this Court is well aware, the Bank Debt Holders and the Bondholders have been very active in these cases, and these dual or triple holder members of the *Ad Hoc* Committee presumably are also actively participating in these cases; to the extent they are not, they clearly have the opportunity to do so.

In any event, the members of the *Ad Hoc* Committee are sophisticated entities and investment funds that, according to the Motion, hold almost 20% of the outstanding common stock of Owens Corning and approximately 62.5% of all the outstanding shares of convertible monthly income preferred securities (the "MIPS") issued by a non-debtor affiliate of Owen

---

[7] These *Ad Hoc* Committee members are: Deutsche Bank Securities Inc., Harbert Distressed Investment Master Fund, Ltd., JP Morgan, Lehman Brothers, and Plainfield Asset Management LLC.

Corning.[8]  See Motion ¶ 6.  The members of the *Ad Hoc* Committee are not "disparate public investors" and have substantial individual resources, which they have been utilizing already in these cases.[9]  Consequently, the members of the *Ad Hoc* Committee are fully capable of protecting their own individual interests as equity holders without the appointment of an official equity committee.  This fact is evidenced by the *Ad Hoc* Committee's engagement of well-qualified professionals to represent its interests and the active participation of their professionals in these cases.  Under these circumstances no official equity committee is required to permit shareholders to participate in these cases.

## C.    Size and Complexity of the Case

These cases are certainly both large and complex.  However, these cases are not larger or more complex than similar reorganization cases where the appointment of an equity committee was denied.  See In re Johns Manville, 68 B.R. at 164 ("adequate representation" of shareholders can occur without appointment of a special committee despite the extreme complexity of a case); In re Williams, 281 B.R. at 233 (appointment of equity committee denied despite the complexity of the case).  The size and complexity of the Debtors' cases does not, in and of itself, justify the appointment of an official equity committee.

---

[8]    The MIPS are nothing more than membership interests in a non-debtor entity, Owens-Corning Capital L.L.C. ("OC Capital").  Although OC Capital holds certain subordinated debentures of Owens Corning, holders of MIPS do not.  Absent conversion of the MIPS into Owens Corning common stock, MIPS holders have no cognizable interest in Owens Corning.  Accordingly, even if the Court were to appoint an equity committee for Owens Corning, MIPS holders should not be eligible to participate.

[9]    For example, in addition to serving on the *Ad Hoc* Committee, Harbert Distressed Investment Master Fund, Ltd. ("Harbert") appealed Judge Fullam's decision estimating Owens Corning's asbestos liabilities and filed its opening brief on January 11, 2006.  Harbert is represented by Brown Rudnick Berlack Israels LLP and Connolly Bove Lodge & Hutz LLP in that litigation.  Harbert is also represented by Stroock & Stroock & Lavan LLP in connection with issues arising under the Interim and Final Orders Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code (A) Limiting Certain Transfers of Equity Securities of the Debtors and (B) Approving Related Notice Procedures.  See Docket Nos. 14736 and 16652.  In addition to serving on the *Ad Hoc* Committee, JP Morgan, Lehman Brothers, and Deutsche Bank (and/or their affiliates) are members of the Bank Group and are represented by Weil, Gotshal & Manges LLP, Kramer Levin Naftalis & Frankel LLP and Landis Rath & Cobb LLP.

## D.    Publicly Traded and Widely Held Nature of the Equity Securities

Although Owens Corning's common stock is widely held and publicly traded, the members of the *Ad Hoc* Committee hold in the aggregate approximately 20% of such stock, which constitutes a substantial concentration of Owens Corning's equity. In addition, members of the *Ad Hoc* Committee also hold almost two-thirds of the MIPS. The holders of such large blocks of the Debtors' common stock and MIPS have adequately represented themselves and likely will continue to do so.[10]  See In re Kalvar Microfilm, 195 B.R. at 601 (shareholder with over 30% of debtor's preferred stock determined to have "a substantial stake" and able "to represent its own interests in future matters in this case"). In any event, even though there is a large number of Owens Corning shareholders, "not every case with ... a large number [of shareholders] will require an official equity committee.... Indeed, if Congress' intent was otherwise, it would have mandated the appointment of equity committees instead of leaving it within the discretion of the [United States Trustee] and the Court." In re Williams, 281 BR at 223 (citing In re Johns-Manville, 68 B.R. at 160).

## E.    Timeliness of Motion

The timing of the filing of the Motion, five years after the bankruptcy filing, three years after the filing of the Debtors' initial plan (which, like all plans filed by the Debtors, provided for no recovery by equity holders), and on the eve of the Debtors' filing of the Fifth Plan, further justifies denial of the Motion.  See In re Kalvar Microfilm, 195 B.R. at 601 (declining to appoint equity committee where plan was already submitted and only remaining purpose for appointment of committee would be for purpose of objecting to plan confirmation). Indeed, the timing of the

---

[10]    The Successor Trustee for the Preferred Securities appeared in these cases in May 2003 when it objected to the Disclosure Statement. Eagle RockCapital Management, LLC, a holder of Preferred Securities, joined in that objection.  See Docket Nos. 8525 and 8528, respectively.

filing of the Motion makes clear that the goal of the *Ad Hoc* Committee is one of obstruction. Put simply, the *Ad Hoc* Committee seeks to delay confirmation of any plan of reorganization that does not provide some unwarranted economic benefit on account of equity. Given the economics of these cases, as described above, such improper motivation does not support the appointment of an official equity committee.

F.    **Cost of an Equity Committee**

The Debtors' estates have incurred significant expenses as a result of the bankruptcy process and the employment of numerous professionals engaged to represent the various constituencies in the cases. Appointment of an official equity committee would impose yet another layer of professional expenses in these bankruptcy proceedings for no justifiable reason. Given the economics of these cases, the cost of an equity committee's involvement would be borne entirely by unsecured creditors, as any potential creditor recovery would only be reduced by further administrative expenses.

Viewed in this light, it is impossible to identify any benefit to be derived from the appointment of an official equity committee. Besides burdening the Debtors' estates with additional fees and expenses, the appointment of an official equity committee would unnecessarily complicate these cases, with no corresponding benefit to any party with a cognizable economic interest.

The *Ad Hoc* Committee asserts that concerns of cost are outweighed by the need for adequate representation and may be constrained by statutory safeguards governing compensation and by the anticipated short duration of the committee's existence. See Motion ¶ 24. In making this argument, the *Ad Hoc* Committee disregards case law that has emphasized the "cost" factor in evaluating these types of requests. See In re Sharon Steel Corp., 100 B.R. 767, 778 (Bankr.

11

W.D. Pa. 1989) (separate committees impose additional administrative expenses on the debtor's estate which adversely affect the debtor's ability to reorganize – request for separate committee denied); In re Public Service Co. of N.H., 89 B.R. 1014, 1020 (Bankr. D. N.H. 1988) (court must consider cost in determining whether to appoint a separate committee – request for separate committee denied); In re Baldwin-United Corp., 45 B.R. 375, 376 (Bankr. S.D. Ohio 1983) (appointment of separate committee denied due to astronomical cost to bankruptcy estate). The additional costs that would result from the appointment of an official equity committee, far outweigh the benefits to be derived.

## MANAGEMENT'S EXERCISE OF FIDUCIARY DUTIES

Finally, the *Ad Hoc* Committee asserts that the appointment of an official equity committee is necessary because the Debtors' management purportedly has abrogated its duties to shareholders. In support of this allegation, the *Ad Hoc* Committee erroneously argues, *inter alia*, that the Debtors have made a "mad rush to exit Chapter 11" and "are aggressively pushing this plan" so that the plan can be confirmed and consummated in advance of the enactment of asbestos legislation and, as a result, "ensure that asbestos-related claimants keep the windfall." Motion at ¶ 10. This is simply untrue. The Debtors' management has pursued a consistent effort over the last several years to bring these cases to resolution and, in accordance with this Court's directive, has not allowed the pendancy of asbestos legislation to delay or hinder its progress in these cases. Indeed, the Debtors' initial plan was filed prior to the introduction of the Fairness in Asbestos Injury Resolution Act of 2003 and certainly prior to the asbestos legislation currently pending in Congress.

In fact, the Debtors' management has acted in good faith and has met its fiduciary duties to all parties and demonstrated leadership by advancing the plan process to obtain resolution of

major contested issues. This Court has at several times in these cases stated such a view on the record, including the November 14, 2005 hearing. "The debtor has done everything that a debtor ought to do to try to move these cases to conclusion." See November 14, 2005 Hearing Transcript, at p. 47. Similarly, at the December 1, 2003 hearing, in response to the request for the appointment of a trustee, this Court stated: "I do disagree that the debtor is not acting in a fiduciary capacity. I think the debtor has been very diligent in attempting to get the parties together to settle." See December 1, 2003 Hearing Transcript, at p. 97-98. The most recent evidence of this diligence is management's filing of the Fifth Plan and Disclosure Statement on December 31, 2005 in accordance with the Court's directive, with the Asbestos Claimants' Committee and the Futures Representative as co-proponents, and with the support of the steering committee of the Bank Holders.

Further, many of the *Ad Hoc* Committee's irresponsible allegations of breach of fiduciary duty are based on motions previously filed for the appointment of an examiner and trustee. Such motions have not been prosecuted, and are to be dismissed. See Disclosure Statement, at Appendix K (Docket No. 16569).

The record of these cases confirms that the Debtors have managed and conducted these cases at all times in strict accordance with all fiduciary duties. The *Ad Hoc* Committee's allegations otherwise are patently false.

## CONCLUSION

For the reasons set forth above, the Debtors respectfully submit that the Court should

deny the Motion.

Dated: January 13, 2006

SAUL EWING LLP

By:_____

Norman W. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Domenic E. Pacitti (No. 3989)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6800

Adam H. Isenberg
Jeffrey C. Hampton
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7777

Co-Counsel for Owens Corning, *et al.*,
Debtors and Debtors-in-Possession


SIDLEY AUSTIN LLP
Larry J. Nyhan
James F. Conlan
Jeffrey C. Steen
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Guy S. Neal
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Co-Counsel for Owens Corning, *et al.*,
Debtors and Debtors-in-Possession

**Exhibits to**
**Objection of Debtors to Motion of Ad Hoc Committee of**
**Preferred and Equity Security Holders for the Appointment of an**
**Official Preferred and Equity Security Holders Committee**

Exhibit A    Copies of two prior requests for the appointment of an official equity committee and the Debtors' responses thereto.

Exhibit B    In re Northwestern Corporation, 2004 WL 1077913 (Bankr. D. Del.).

Exhibit C    In re Edison Bros. Stores, Inc., 1996 WL 534853, *3 (D. Del. 1996).

**EXHIBIT A**

Received 07/08/2003 09:44AM in 02:42 on line (15) for 3758 WORKSRV2 printed B0002683 on 07/08/2003 09:47AM * Pg 3/6
TO 4472814221N77570 P.03/06
JUL 08 2003  9:51 AM FR
07/07/2003 16:35 FAX 302 573 8497          US TRUSTEE

## SCHIFF HARDIN & WAITE

A Partnership including Professional Corporations

6600 Sears Tower, Chicago, Illinois 60606-6473
Telephone (312) 256-5500   Facsimile (312) 256-5600

Chicago
Washington
New York
Dublin
Lake Forest

June 24, 2003



VIA FACSIMILE AND MAIL

Frank J. Perch. III
Office of the United States Trustee
U. S. Department of Justice
844 King Street
Wilmington, Delaware 19801

Re:   REQUEST FOR APPOINTMENT OF
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
Owens Corning, et al. ("Debtors")
United States Bankruptcy Court
District of Delaware
Case Nos. 00-03837 (JKF), et al.

Dear Mr. Perch:

On behalf of the shareholders listed below ("Shareholders"),[1] we hereby request that you appoint an official committee of common shareholders (an "Equity Committee") of Owens Corning (together with its debtor affiliates, the "Debtors"), pursuant to section 1102(a)(1) of the Bankruptcy Code. The Shareholders are each willing to serve on an Equity Committee should one be appointed.

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on October 5, 2000. With their petitions, the Debtors commenced one of the largest bankruptcy cases ever filed in this district.

The case law suggests that an Equity Committee should be appointed under section 1102(a)(1) of the Bankruptcy Code if the following criteria are met:

(a)   the case is large and complex;

(b)   the stock is widely held and actively traded;

(c)   the interests of shareholders are not otherwise adequately represented;

(d)   the debtors are not hopelessly insolvent, such that the shareholders appear to have a real economic interest at stake; and

(e)   the time of the request is appropriate.

---

[1] The Shareholders are George H. Linck (24,400 shares), Martin Unger (5,000 shares) and Steven Sanders (20,000 shares).

Received 07/06/2003 09:44AM in 02:42 on line [15] for 3758 WORKSRV2 printed B0002883 on 07/08/2003  09:47AM  * Pg 4/6
JUL 08 2003   9:52 AM FR                    US TRUSTEE                              TO  4472814221877579 P.04/06
07/07/2003 10:55 FAX 302 573 8497

## SCHIFF HARDIN & WAITE

Frank J. Perch, III
June 24, 2003
Page 2

In re Johns-Manville Corporation, 68 B.R. 155 (S.D.N.Y. 1986); In Re Kaiyar Microfilm, 195 B.R. 599 (Bankr. D. Del. 1996) (reciting certain factors); In re Wang Laboratories, Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (equity committee appointed over objections of U.S. Trustee and unsecured creditors' committee even while had negative book equity of several hundred million dollars); In re Beker Industries Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1995) (equity committee appointed); In re Evans Products Company, 58 B.R. 572 (S.D. Fla. 1985) (Bankruptcy Court reversed for refusing to allow equity committee to retain financial advisors); In re Emons Industries, Inc., 50 B.R. 692 (Bankr. S.D.N.Y. 1985). In Re Exide Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of Debtor and Creditors Committee, see transcript of 9/23/02 hearing attached to mailed copy of this letter).

This case is at a relatively late stage, with a disclosure statement hearing scheduled for the end of August. However, recent legislative events may enable Owens Corning's true asbestos liability to be fairly quantified, putting common shareholders in the money. Specifically, the so-called Hatch Bill is in the committee markup stage and an all-out push to enact the bill has been promised by its sponsors. Just today, the Senate Judiciary Committee reportedly reached agreement on aspects of the bill and it is expected to go to a vote of the full Senate shortly. If the Hatch Bill becomes law, Owens Corning's asbestos liability would be fully satisfied by the payment of approximately 1.5% of its annual revenue, or approximately $70,000,000 per year, for five years and decreasing amounts for twenty-two years thereafter. See S.1125 at the website "Thomas.loc.gov." The present value of these payments is under $600,000,000, hundreds of millions of dollars less than the value of the recovery proposed for asbestos claimants under Owens Corning's plan of reorganization.[2] As set forth below, the Hatch Bill, if enacted in anything close to the form proposed, is likely to put equity holders in the money even with a strict application of the absolute priority rule. This new development, coupled with the satisfaction of the other criteria for appointment of an equity committee, suggests that one should be quickly appointed in this case.[3]

First, this case is clearly large and complex. These Debtors have annual sales of nearly $5,000,000,000. The level of complexity inherent in these cases is evident from a review of the 240 page disclosure statement ("DS") and plan of reorganization ("Plan") describing the extended history of these bankruptcy proceedings.

Second, the stock is widely held and actively traded. According to Owens Corning's Form 10-K for the year ended December 31, 2002 ("10-K"), there are 55,278,821 shares of Owens Corning's common stock outstanding, held by 6,929 holders. 10-K, page 1, 14. During the pendency of the bankruptcy, the stock traded at as high as $3.74 per share, for a market capitalization in excess of $200,000,000, and traded today on the over-the-counter bulletin board at up to $.80 per share, for market capitalization of over $40,000,000. Id. Clearly, the market believes that Owens Corning shareholders have a significant economic interest in this case.

_____

[2] That recovery is equal to 75% of reorganized Owens Corning's equity worth at least $1,500,000,000. DS 218 (total value of reorganized Debtors equity is $1.7 to 2.1 billion).

[3] Even if the Hatch Bill does not pass, a reasonable estimate of Owens Corning's asbestos liability, however accomplished, puts shareholders in the money.

Received 07/08/2003 09:44AM in 02:42 on line [15] for 375B WORKSRV2 printed 80002883 on 07/08/2003 09:47AM * Pg 5/6
JUL 08 2003  9:52 AM FR                                                    TO 4472#14221#77570 P.05/06
107/07/2003 16:56 FAX 302 573 6497        US TRUSTEE

# SCHIFF HARDIN & WAITE

Frank J. Perch, III
June 24, 2003
Page 3

Third, the interests of shareholders are not otherwise adequately represented. Exclusive of out-of-the money options, management owns well under 1% of outstanding common stock. 10-K, page 46, note 1.[4] Management's lack of incentive to protect the interests of shareholders is reflected by management's agreement with the asbestos claimants to a proposed plan which provides no recovery for shareholders.

The Debtors are not hopelessly insolvent and equity holders are entitled to substantial recovery, if the Debtors asbestos liabilities are reasonably estimated, whether via the Hatch Bill or otherwise. The Debtors' financial advisors estimate the enterprise value of the reorganized Debtors at $3.2 to $3.6 billion. DS at pages 218-219. This estimate explicitly excludes the value of Owens Corning's net operating losses; in this regard, please note that Owens Corning recorded a deferred income tax asset of $1,354,000,000 on its December 31, 2002 balance sheet. 10-K at page 61. Enterprise value typically does not include cash on hand (which amounted to $875,000,000 as of December 31, 2002 (10-K at page 61)), nor would an enterprise value estimate include the value of causes of action contained in the litigation trust to be created under the Plan (the Fibreboard fraudulent transfer action alone seeks damages of up to $515,000,000, DS at page 83). Finally, this estimate of enterprise value also does not appear to include $1,238,000,000 in the Fibreboard insurance settlement trust (DS at page 17), allocated to pay certain asbestos related liabilities. In short, it appears that Owens Corning may have $5,000,000,000 or more in business enterprise value, cash and other assets available to pay its creditors and administrative claims.

This leaves substantial value available for shareholders: Including administrative claims the Debtors' chapter 11 non-asbestos liabilities total between $3,500,000,000 and $4,000,000,000 according to the DS, at page (v). If asbestos legislation passes, the Debtors' asbestos liability will be capped at a present value of under $800,000,000. Even under a strict application of the absolute priority rule, Owens Corning is a solvent debtor when its asbestos liabilities are fairly quantified.

It is by no means necessary to delay this case in order to provide Owens Corning's common shareholders with fair representation. The DS hearing is scheduled for August, placing a confirmation hearing in November. This schedule would provide an Equity Committee (if appointed quickly) sufficient time to be heard. Moreover, on this schedule, the fate of the Hatch Bill, which is specifically targeted to relieve asbestos debtors, will have likely been decided by the time of the confirmation hearing. Under these circumstances, I believe it would be a regrettable miscarriage of justice if shareholders were unrepresented while this legislation is pending.

In summary, Owens Corning common shareholders are in the money if asbestos liabilities are settled at a reasonable level. The timing here is appropriate. It is certainly not too early in the case to appoint an equity committee. Neither is it too late, as asbestos legislation was first introduced at the end of May, two and a half years into the case, and this request comes promptly thereafter. An equity committee, if appointed quickly, will have the ability to be heard in a meaningful manner at a disclosure statement hearing (scheduled for late August) and at a plan confirmation hearing. For these reasons, we respectfully submit that an official committee of Owens Corning's common shareholders should be appointed without delay.

---

[4] Management owns 1.294 million shares, but this includes 939,943 options. 10-K at page 46 note 1.

Received 07/08/2003 09:44AM in 02:42 on line [15] for 3758 WORKSRV2 printed 80002883 on 07/08/2003 09:47AM • Pg 6/6
JUL 08 2003   9:52 AM FR                                    TO 4472#14221H77570 P.06/06
                                                                          ⌐006/006
07/07/2003 10:58 FAX 302 573 6497          US TRUSTEE

## SCHIFF HARDIN & WAITE

Frank J. Perch, III
June 24, 2003
Page 4

Thank you for your attention to this matter. If you have any questions, please call us.

Very truly yours,

Michael Yetnikoff

MY:nb
cc:    George H. Linck



Norman L. Pernick
Phone: 302-421-6824
npernick@saul.com
www.saul.com

July 11, 2003

<u>VIA E-MAIL AND U.S. MAIL</u>

Frank J. Perch, III, Esquire
Office of the United States Trustee
U.S. Department of Justice
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801

Re:    Owens Corning, *et al.*
       <u>Case No. 00-3837 (JKF)</u>

Dear Mr. Perch:

This letter constitutes the response of Owens Corning and its affiliated debtors and debtors-in-possession (the "Debtors") to the recent request by three shareholders (the "Shareholders") for the appointment of an official committee to represent equity security holders (an "equity committee") in the above-referenced cases. For the reasons set forth below, the Debtors request that the United States Trustee deny the Shareholders' request for the appointment of an equity committee.

The Shareholders' request hinges on an event that has not yet occurred, and may not occur. That is, unless and until the Fairness in Asbestos Resolution Act of 2003, Bill S. 1125 (the "Hatch Bill"), is enacted, the holders of equity in these cases have no prospect whatsoever for a recovery. Indeed, even if the legislation passes, there is no prospect for a recovery to holders of equity. The fact that this case is almost three years old and that no equity committee has been seriously pursued is demonstrative evidence of that fact. The likelihood of the passage of such legislation prior to the Debtors' confirmation is wholly speculative. In the words of Judge Fitzgerald at the June 4, 2003 hearing in response to comments regarding the Hatch Bill, "[u]ntil it's law, it's not relevant." Because the legislation has just come out of Committee on a close vote (10-8) and has not even been to the Senate floor or introduced in the House, the Shareholders' request for the appointment of an equity committee is, at best, premature.

In the event the Hatch Bill or similar legislation is enacted prior to confirmation, the Debtors will necessarily further negotiate with their various constituencies and revise the plan.

P.O. Box 1266 • Wilmington, DE 19899-1266 • Phone: (302) 421-6800 • Fax: (302) 421-6813
Courier Address: 222 Delaware Avenue, Suite 1200 • Wilmington, DE 19801-1611

BALTIMORE    CHESTERBROOK    HARRISBURG    NEW YORK    PHILADELPHIA    PRINCETON    WILMINGTON
A DELAWARE LIMITED LIABILITY PARTNERSHIP

481193.4

Frank J. Perch, III, Esquire
RE: Owens Corning, et al.
July 11, 2003
Page 2

Given the time that will be required to take such actions, there will be ample time for these equity holders to renew their request if they so desire, for the Office of the United States Trustee to consider the request and appoint a committee, if appropriate, and for that committee to meaningfully participate in the plan process. The Debtors strongly believe that any consideration of a request for the appointment of an equity committee should be deferred until such time as the Hatch Bill may be enacted. Such deferral will not prejudice the Shareholders, as they can simply renew their request if the legislation is passed prior to confirmation. On the other hand, if the Office of the United States Trustee were to appoint an equity committee at this stage and the Hatch Bill is never enacted, an equity committee would have been provided the opportunity to participate in these cases and have their fees and expenses paid for by the estates where they clearly had no right to any such relief.

Moreover, the financial reality of these cases is that the Debtors are hopelessly insolvent. As set forth in the Disclosure Statement With Respect to Second Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-in-Possession, the Debtors' liabilities vastly exceed the assets in the estates, even using numbers that are the most favorable to the Shareholders' position (such as quantifying the Debtors' asbestos liabilities at the amount of the Debtors' current asbestos reserve of $5.874 billion). Under no reasonable analysis can the assets in the Debtors' estates exceed the liabilities. The Shareholders' analysis, on the other hand, overstates the assets in the estates and grossly underestimates the asbestos liabilities by billions of dollars. Quantifying asbestos liabilities at $800 million based on legislation that has not been enacted is unfounded. Furthermore, the issue of estimated asbestos liabilities is currently being challenged by the Official Committee of Unsecured Creditors. Even if that $800 million dollar number is used, the Debtors still appear to be hopelessly insolvent when considering the bank, bond, and trade debt that would have to be paid (with interest) compared to the distributable value that would be available.[1]

Indeed, the market clearly recognizes the Debtors' insolvency. Based on the information most recently available to the Debtors, pre-petition bank and bond debt in these cases -- which would have to be paid in full, plus interest, for equity to be entitled to a recovery in these cases -- is trading, with information about the Hatch Bill freely available, at approximately 75% (bank) and 54% (bond) of their face value. By any measure, the Debtors are hopelessly insolvent, and the appointment of an equity committee is not warranted.

Unless and until such time as the Hatch Bill or similar legislation is enacted prior to confirmation, the Shareholders' request for the appointment of an equity committee is speculative and premature. Moreover, even if the Hatch Bill passes, it appears the Debtors are hopelessly insolvent and there is no prospect of any recovery to holders of equity. For these reasons, the Debtors respectfully submit that the Shareholders' request should be denied.

---

[1] We would be happy to provide the you with a more detailed analysis of the numbers if and when you feel it would be appropriate and relevant to your decision.

Frank J. Perch, III, Esquire
RE: Owens Corning, *et al.*
July 11, 2003
Page 3


     Thank you for the opportunity to respond to the Shareholders' request. I hope that the foregoing brief explanation of the Debtors' views on these matters is helpful. Please do not hesitate to contact me should you have any questions or if you would like to discuss these matters in greater detail.

Very truly yours,

/s/ Norman L. Pernick

Norman L. Pernick

NLP/tlc

cc:    Ralph Arditi, Esquire (Via E-Mail)
       D.J. Baker, Esquire (Via E-Mail)
       Stephen H. Case, Esquire (Via E-Mail)
       John W. Christy, Esquire (Via E-Mail)
       Michael Crames, Esquire (Via E-Mail)
       James Gibb, Esquire (Via E-Mail)
       Mr. Robert Kost (Via E-Mail)
       Stephen K. Krull, Esquire (Via E-Mail)
       Peter Van N. Lockwood, Esquire (Via E-Mail)
       Charles O. Monk, II, Esquire (Via E-Mail)
       Mr. Michael Thaman (Via E-Mail)

Received 06/15/2004 04:02PM in 02:00 o    ne (31 for 2228 WORKSRV2 printed B00F65F6    16/15/2004  04:05PM  * Pg 4/6
JUN-15-2004 TUE 04:14 PM US  ..USTEES                                    FAX NO. 30zu/36497                    P. 04/06



6600 SEARS TOWER
CHICAGO, ILLINOIS  60606
t 312.258.5500
f 312.258.5600
www.schiffhardin.com

June 10, 2004

<u>VIA FACSIMILE AND MAIL</u>

Frank J. Perch, III
Office of the United States Trustee
U. S. Department of Justice
844 King Street
Wilmington, Delaware 19801

Re:    REQUEST FOR APPOINTMENT OF
       OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
       Owens Corning, et al. ("Debtors")
       United States Bankruptcy Court
       District of Delaware
       <u>Case Nos. 00-03837 (JKF), et al.</u>

Dear Mr. Perch:

    On behalf of shareholders Frank Carrillo, George Linck and Steven Sanders, we reiterate our letter request made June 24, 2003 for appointment of an official committee of equity security holders in this case, pursuant to section 1102(a)(1) of the Bankruptcy Code. The basis for resubmitting this request, previously denied, is the recent announcement that the Debtors have reached agreement with certain members of the Official Committee of Unsecured Creditors ("UCC") on a plan of reorganization ("Term Sheet," Docket # 11781) which provides no distribution to shareholders. This agreement is expected to pave the way to a confirmation hearing before year end, and shareholders should be adequately represented at that hearing.

    The factors for appointment of an equity committee are satisfied here.

    First, these cases are large and complex. The level of complexity inherent in these cases is evident from a review of the filed disclosure statement ("DS") and plan of reorganization describing the extended history of these bankruptcy proceedings. There are nearly 12,000 docket entries.

    Second, the stock is widely held and actively traded. According to Owens Corning's Form 10-K for the year ended December 31, 2003 ("10-K"), there are over 55 million shares of common stock outstanding, held by nearly 7,000 holders. 10-K, page 1, 16. During the pendency of the bankruptcy, the stock traded at as high as $3.74 per share, for a market capitalization in excess of $200,000,000, and trades today on the over-the-counter bulletin board at approximately $.50 per share, for market capitalization of over $20,000,000, with an average daily volume of over 250,000 shares. Clearly, the market believes that Owens Corning shareholders have a significant economic interest in this case.

    Third, the interests of shareholders are not otherwise adequately represented. Excluding out of the money options, management owns only about 120,000 shares of common stock (10-K, page 56,

CHICAGO | WASHINGTON | NEW YORK | LAKE FOREST | ATLANTA | DUBLIN

OSDIHD B 2                                                      TVA 19:51 (HT  70/01/00

Received 06/15/2004 04:02PM (in 02:00 or... se (3) for 2228 WORKSRV2 printed 800F65F6 \ 6/15/2004 04:05PM * Pg 5/6
JUN-15-2004 TUE 04:15 PM US TRUSTEES                    FAX NO. 3025736497                        P. 05/06



Frank J. Perch, III
June 10, 2004
Page 2

note 1), a figure which is dwarfed by the value of the incentive stock that management would receive under a plan.

There have been no annual shareholder meetings for at least three years. Worse yet, the Debtors' management is laboring under accusations, leveled by the UCC in unusually strong terms, that they have breached their fiduciary duties. Specifically, management is accused of acting not as a neutral party mediating among constituencies, but rather as a bought and sold tool of the asbestos tort lawyers. See generally, Supplement to UCC Motion for Appointment of a Chapter 11 Trustee ("Trustee Motion"), Docket #11756. These accusations are supported by the Debtors' agreement to value its asbestos liabilities at a grossly inflated figure of $16 billion, in the absence of any evidence that its liability is even within an order of magnitude of that number. Clearly, the Debtors' management is in no position to represent shareholders here.

These Debtors are not hopelessly insolvent if their asbestos liabilities are reasonably quantified. The business is quite healthy; it generates substantial profit and cash flow. The Debtors' 2003 year to year performance improved by 27% over 2002 (10-K at 22), and they had over $1 billion in cash on hand at the end of 2003. 10-K at 72. The Debtors state in the Term Sheet that their enterprise value is $3.9 billion (which appears to be quite conservative). This figure is exclusive of cash, exclusive of $1.2 billion in assets in Fibreboard insurance settlement trust (DS at 17), and exclusive of "hundreds of millions of dollars" allegedly paid to asbestos lawyers by management in the months before bankruptcy. Trustee Motion at page 7. Given that non-asbestos debt to be satisfied under a plan is less than $3.3 billion (Term Sheet, page 1, "Fixed Values"), it appears that these Debtors can satisfy their legitimate asbestos claims and their debt, with something left over for shareholders.

In summary, Owens Corning common shareholders are in the money if asbestos liabilities are satisfied at a reasonable level, are completely unrepresented in the case, and are facing an impending confirmation hearing at which their holdings would be wiped out. An equity committee, if appointed quickly, will have the ability to be heard in a meaningful manner at that plan confirmation hearing, and to assert their reasonable claims to a portion of these estates based upon a legitimate estimate of asbestos liability. For these reasons, we respectfully submit that an official committee of Owens Corning's common shareholders should be appointed without delay.

Very truly yours,

Michael Yetnikoff

MY:nb
cc: Frank Carrilo
    George Linck
    Steven Sanders

i

90/10/90    THU 13:41 FAX
S. H CHICAGO



NORMAN L PERNICK
Phone: (302) 421-6874
Fax: (302) 421-5865
npernick@saul.com
www.saul.com

June 22, 2004

<u>VIA E-MAIL AND U.S. MAIL</u>

Frank J. Perch, III, Esquire
Office of the United States Trustee
U.S. Department of Justice
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801

        Re:    Owens Corning, *et al.*
               <u>Case No. 00-3837 (JKF)</u>

Dear Frank:

        This letter constitutes the response of Owens Corning and its affiliated debtors and debtors-in-possession (the "Debtors") to the recent request by three shareholders (the "Shareholders") for the appointment of an official committee to represent equity security holders (an "equity committee") in the above-referenced cases. We note that the Shareholders made a similar request last year, by letter dated June 24, 2003, and that such request was denied. For the reasons set forth below, the Debtors request that the United States Trustee once again deny the Shareholders' request for the appointment of an equity committee.

        The Shareholders' renewed request for the appointment of an equity committee is based on the recent agreement among the Debtors, the Official Committee of Asbestos Claimants, the Legal Representative for Future Claimants and the Designated Members of the Official Unsecured Creditors' Committee (the "Bondholders Agreement") regarding the terms of a plan of reorganization. Specifically, the Shareholders rely upon the fact that equity is to receive no distribution under the Bondholders Agreement as the grounds for the appointment of an equity committee.

        The Debtors do not believe that the Bondholders Agreement in any way changes the circumstances of this case vis-à-vis equity. As before, there is no reasonable scenario in which equity can receive a distribution in these cases absent new legislation, which has not occurred. There have been no developments in these cases since the Shareholders' previous request that

P.O. Box 1266 • Wilmington, DE 19899-1266 • Phone: (302) 421-6800 • Fax: (302) 421-6813
Courier Address: 222 Delaware Avenue, Suite 1200 • Wilmington, DE 19801-1611

BALTIMORE    CHESTERBROOK    HARRISBURG    PHILADELPHIA    PRINCETON    WASHINGTON    WILMINGTON

Frank J. Perch, III, Esquire
June 22, 2004
Page 2

would materially alter this analysis. As set forth in the Disclosure Statement With Respect to Fourth Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-in-Possession, and as we have stated previously, the Debtors' liabilities vastly exceed their assets, even using extremely aggressive (i.e., low) asbestos valuation figures. Although the amount of the Debtors' asbestos liabilities has not yet been determined (and indeed is being vigorously contested), the Debtors cannot imagine an outcome in which they would not be insolvent. This result would not be altered if the Debtors were to recover the potential avoidable transfers referenced by the Shareholders. In this regard, we note that many of the avoidance actions at issue, if successfully pursued, would result in the assertion of additional claims against the estate, and therefore would not necessarily benefit equity. We also note that unsecured creditors, as well as subordinated creditors, would be entitled to post-petition interest before equity could be entitled to any recovery -- an event that we believe is highly unlikely.[1]

The market clearly recognizes the Debtors' insolvency. Based on the information most recently available, pre-petition bank and bond/trade debt in these cases -- which would have to be paid in full, plus interest, for equity to be entitled to a recovery in these cases -- is trading at approximately 78% (bank) and 44% (bond/trade) of their face value. We also note that the Designated Members of the Official Unsecured Creditors Committee agreed to the terms of the Bondholders Agreement, which provides for a 38.5% distribution to unsecured creditors, subject to certain terms and conditions.

By any measure, the Debtors are hopelessly insolvent, and the appointment of an equity committee is not warranted.

Thank you for the opportunity to respond to the Shareholders' request. I hope that the foregoing brief explanation of the Debtors' views on these matters is helpful. Please do not hesitate to contact me, Kate Stickles (302-421-6873) or Adam Isenberg (215-972-8662) should you have any questions or if you would like to discuss these matters in greater detail.

Very truly yours,

Norman L. Pernick

NLP/tlc

cc:    Ralph Arditi, Esquire (Via E-Mail)
       D.J. Baker, Esquire (Via E-Mail)
       Stephen H. Case, Esquire (Via E-Mail)

---

[1]    We would be happy to provide the you with a more detailed analysis of the numbers if and when you feel it would be appropriate and relevant to your decision.

Frank J. Perch, III, Esquire
June 22, 2004
Page 3

John W. Christy, Esquire (Via E-Mail)
Michael Crames, Esquire (Via E-Mail)
James Gibb, Esquire (Via E-Mail)
Adam H. Isenberg, Esquire (Via E-Mail)
Mr. Robert Kost (Via E-Mail)
Stephen K. Krull, Esquire (Via E-Mail)
Peter Van N. Lockwood, Esquire (Via E-Mail)
Elihu Inselbuch, Esquire (Via E-Mail)
Charles O. Monk, II, Esquire (Via E-Mail)
J. Kate Stickles, Esquire (Via E-Mail)
Mr. Michael Thaman (Via E-Mail)
Michael Yetnikoff, Esquire (Via E-Mail)
J. Andrew Rahl, Jr., Esquire (Via E-Mail)
Edwin Harron, Esquire (Via E-Mail)
Kenneth Eckstein, Esquire (Via E-Mail)
Marla Eskin, Esquire (Via E-Mail)

**EXHIBIT B**

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bkrtcy.D.Del.)
(Cite as: Not Reported in B.R.)

**H**
Only the Westlaw citation is currently available.
United States Bankruptcy Court,D. Delaware.
In re: **NORTHWESTERN CORPORATION**,
Debtor.
No. 03-12872 (CGC).

**May 13, 2004.**

Scott D. Cousins, William E. Chipman, Jr., Charles Michael Terribile, Greenberg Traurig, LLP, Wilmington, DE, and Jess H. Austin, III, Karol K. Denniston, Paul, Hastings, Janofsky & Walker LLP, Atlanta, GA, for Debtors and Debtors-in-Possession. Richard S. Cobb, Megan N. Harper, Landis Rath & Cobb LLP, Wilmington, DE, and Lawrence C. Gottlieb, Eric Haber, John Morris, Kronish Lieb Weiner & Hellman LLP, New York, NY, for RCG Carpathia Master Fund, Ltd., Performance Capital and Smith Management LLC.
Neil B. Glassman, Charlene D. Davis, Erie M. Sutty, The Bayard Firm, Wilmington, DE, and Alan W. Kornberg, Ephraim I. Diamond, Talia Dil, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for the Official Committee of Unsecured Creditors Committee.
Mark S. Kenney, United States Office of the United States Trustee, District of Delaware, Wilmington, DE, Stephen E. Hermann, Richards, Layton & Finger, PA, Wilmington, DE, and Thomas Moers Mayer, Philip Bentley, Matthew J. Williams, Kramer Levin Naftalis & Frankel LLP, New York, NY, for Wilmington Trust Company as Indenture Trustee.

MEMORANDUM OPINION

CASE, Bankruptcy J.
*1 The two motions before the Court are (I) the Motion of RCG Carpathia Master Fund, Ltd. and Kellogg Capital Group LLC f/k/a Performance Capital (1) for Permission to Present Testimony and Submit Pre-Trial Statements in Connection With Their Motion for Appointment of Official Equity Security Holders Committee and (2) Requesting That the Court Schedule a Hearing (the "Evidence Motion") (Docket No. 1231); and (II) the Motion of RCG Carpathia Master Fund, Ltd., Performance Capital and Smith Management LLC (collectively the "Movants") for Appointment of Official Equity Security Holders Committee (the "Committee

Motion") (Docket No. 986). Upon consideration and review of all relevant pleadings; oral argument; and for the reasons set forth below, the Court denies both motions.

FACTS

On September 14, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

An Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee") was appointed by the Office of the United States Trustee, District of Delaware, on September 30, 2003.

On March 11, 2004, the Debtor filed its disclosure statement and plan of reorganization. A hearing on the adequacy of the disclosure statement is scheduled for May 17, 2004.

On March 24, 2004, RCG Carpathia Master Fund, Ltd., Kellogg Capital Group LLC f/k/a Performance Capital and Smith Management LLC filed a Motion to Appoint an Equity Security Holders Committee. Responses were filed by the Debtor, the Unsecured Creditors Committee, The United States Trustee, and Wilmington Trust Company as indenture trustee. The motion was originally scheduled to be heard at the regular omnibus hearing on April 8, 2004; it was continued by consent to May 17, 2004.

The Committee Motion was filed several months after the United States Trustee, on December 4, 2003, refused Movants' November 18, 2003 request to form a committee of equity security holders.

Two of the Movants [FN1] recently filed a Motion for Permission to Present Testimony and Submit Pre-Trial Statements in Connection With Their Motion for Appointment of Official Equity Security Holders Committee. The Evidence Motion was scheduled on special notice and a hearing was held on May 12, 2004.

FN1. Smith Capital LLC has not joined in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bkrtcy.D.Del.)
(Cite as: Not Reported in B.R.)

the request for an evidentiary hearing.

## DISCUSSION

The Movants' Committee Motion seeks an order appointing an equity security holders committee to represent the holders of common stock pursuant to Section 1102(a)(2) of the Bankruptcy Code. Section 1102(a)(2) states that

On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

*2 11 U.S.C. § 1102(a)(2). Such a determination is made on a case-by-case basis. See In re Williams Communications Group, Inc., 281 B.R. 216, 220 (Bankr.S.D.N.Y.2002). Among the facts the court should consider when making this determination are; the solvency of the debtors, timing, the number of shareholders, the complexity of the chapter 11 case, and whether the cost of an additional equity committee significantly outweighs the concern for adequate representation. Id. at 219. In addition, appointing an official equity committee "should be the rare exception" and an equity committeeshould not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

Id. at 223.

At the heart of the parties' dispute is the value of the Debtor's enterprise. Debtor, through its experts and with the support of the Unsecured Creditors Committee, asserts that the estate is hopelessly insolvent and that equity is approximately $700 million out of the money. Therefore, it urges, supported by the Unsecured Creditors Committee and the United States Trustee, that the Committee Motion be denied but agrees that if the Court is to consider it further, an evidentiary hearing is required. The Movants assert that the Debtor's valuation fails even a minimal test of reasonableness and state that their expert is of the view that there is at least $200 million in value for equity.

The real issue here is which party should bear the cost of a valuation battle-the estate or the Movants. The Movants argue that it is appropriate for the estate to fund the costs of protecting the interests of equity given the size and complexity of the case and the possibility that value exists for equity. The objectors point out that the Movants have every right to raise their arguments in the context of plan confirmation but that the estate should bear the upfront cost where a favorable outcome is so dubious. Further, if they are successful, the Movants may assert a claim for reimbursement of their fees and costs under Section 503(b)(3)(D) of the Bankruptcy Code.

Against this background, the initial question is whether an evidentiary hearing is appropriate. The Courts concludes not. Let us assume the best outcome for the Movants-that the testimony of Mr. Harris (their expert) is sufficiently compelling to create a credible argument that a higher value may be appropriate and the testimony of Lazard Freres, Debtor's expert, is sufficiently suspect to put the Debtor's valuation in doubt. Does that justify the appointment of a committee? The Court thinks not. All that would do is put the issue of value in play, not tip the scale to the extent that the valuation battle should be funded by the estate. Remember that there is a $700 million shortfall that needs to be overcome before there is any value for equity. [FN2] While not impossible, that is a steep hill to climb; indeed, the Court could eventually accept nearly 80% of the additional value urged by the Movants and equity would still be out of the money. This does not satisfy the "substantial likelihood that [equity] will receive a meaningful distribution" test set forth in In re Williams.

> FN2. Roughly speaking, Mr. Harris' valuation indicates another $200 million for equity in value beyond the $700 million gap.

*3 Under these circumstances, it is not in the best interests of the estate or its constituents to shift the cost of this valuation dispute from the Movants to the estate. As pointed out by Debtor's counsel, the Movants acquired their equity position post-petition, [FN3] understanding the risk they undertook. They can decrease the risk by recruiting other equity holders to be part of an unofficial committee, thereby spreading the upfront costs. In any event, if they are correct, they are protected by Section 503(b)(3)(D) of the Bankruptcy Code. Given the admittedly speculative nature of their position, this is a fair allocation of risk.

> FN3. Movants' counsel did not take issue

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bkrtcy.D.Del.)
(Cite as: Not Reported in B.R.)

with this statement at the hearing.

## CONCLUSION

For the foregoing reasons, the Evidence Motion (Docket No. 1231) is denied. Further, given the Court's conclusions on the Evidence Motion, the Committee Motion (Docket No. 986) is also denied. The May 17, 2004 hearing on the Committee Motion is vacated and the Debtor is directed to delete that item from the Notice of Agenda.

It is so ordered.

Bkrtcy.D.Del.,2004.
In re Northwestern Corp.
Not Reported in B.R., 2004 WL 1077913 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

P

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
In re **EDISON BROTHERS STORES**, INC., et al.,
Debtors.
Jonathan VICTOR, Richard Polak, and Martin Katz,
Appellants,
v.
**EDISON BROTHERS STORES**, Appellees.
No. 95-1354 (PJW), Civ.A. No. 96-177-SLR.

Sept. 17, 1996.

Laura Davis Jones, Esquire, and Joel A. Waite,
Esquire, of Young, Conaway, Stargatt & Taylor,
Wilmington, Delaware. Of counsel: Harvey R.
Miller, Esquire, and Richard P. Krasnow, Esquire, of
Weil, Gotshal & Manges LLP, New York, New
York, and D. J. Baker, Esquire, of Weil, Gotshal &
Manges LLP, Houston, Texas, attorneys for
appellees/debtors.
Jeffery C. Wisler, Esquire, of Williams, Hershman &
Wisler, of Wilmington, Delaware. Of counsel: Peter
D. Wolfson, Esquire, Carole Neville, Esquire, John
A. Bicks, Esquire, and Pamela Cohen, Esquire, of
Pryor, Cashman, Sherman & Flynn, New York, New
York, attorneys for appellants.
Thomas L. Ambro, Esquire, and Deborah E. Spivack,
Esquire, of Richards, Layton & Finger, Wilmington,
Delaware. Of counsel: David S. Kurtz, Esquire,
Timothy R. Pohl, Esquire, and Sean D. Malloy,
Esquire, of Jones, Day, Reavis & Pogue, Chicago,
Illinois, attorneys for the Official Committee of
Unsecured Creditors of Edison Brothers Stores, Inc.
Of Counsel: E. Gordon Robinson, Esquire, and Susan
R. Sherrill, Esquire of U.S. Securities and Exchange
Commission, Atlanta Georgia, and Ellen W. Slights,
Esquire, Assistant United States Attorney,
Wilmington, Delaware, attorneys for U.S. Securities
and Exchange Commission.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 This case comes before this court as an appeal
from an order of the Bankruptcy Court for the
District of Delaware (the "bankruptcy court")
denying the appointment of an official committee for
equity security holders. The appellants in this case,
Joseph Harrosh [FN1], Jonathan Victor, Richard Polak
and Martin Katz, are all non-insider public
shareholders of **Edison Brothers Stores**, Inc. and
sixty-five (65) subsidiaries ("debtors"). The debtors
filed chapter 11 petitions in this district's bankruptcy
court on November 3, 1995. On March 29, 1996, the
bankruptcy court issued the order denying without
prejudice the appointment of an official committee of
equity security holders. (D.I. 16, Ex. 18)
Subsequently, appellants filed an appeal in this court.

For the reasons that follow, the bankruptcy court's
order denying the appointment of an official
committee for equity security holders will be
affirmed.

II. JURISDICTION

To establish jurisdiction this court must find that the
decision of the bankruptcy court is either a final
order, an interlocutory order appealable under 28
U.S.C. § 158(a)(3), or a collateral order. On June 27,
1996, this court determined that the issue of whether
an equity committee should be appointed warrants
appellate review under the collateral order doctrine.
(D.I. 29.); see Cohen v. Beneficial Indus. Loan Corp.,
337 U.S. 541 (1949).

III. BACKGROUND

Chapter 11 petitions were filed by the debtors on
November 3, 1995 in this district's bankruptcy court.
[FN2] By letters dated November 9 and November 22,
1995, appellants wrote to the United States Trustee
requesting that an official equity committee be
appointed pursuant to 11 U.S.C. § 1102(a). [FN3] On
December 7, 1995, the United States Trustee declined
appellants' request.

On January 12, 1996, appellants filed a motion with
the bankruptcy court requesting the appointment of
an official committee of equity security holders. (D.I.
16, Ex. 3) The California Public Employees
Retirement System (holding approximately 150,000
shares of the debtors' common stock) and the
Securities and Exchange Commission ("SEC")
supported the motion. (D.I. 16, Ex. 4, 5, 9, 10, 11, 12,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
(Cite as: Not Reported in F.Supp.)

and 13) The debtors, the United States Trustee, and the Official Creditors' Committee opposed the motion. (D.I. 16, Ex. 6, 7, and 8)

The bankruptcy court held hearings on February 29 and March 20, 1996. (D.I. 16, Ex. 14, and 15) Appellants asserted to the court that (1) the debtors were not insolvent, (2) the debtors' public shares were widely held, (3) the debtors' chapter 11 cases were complex, and (4) insiders of the debtors could not adequately represent the interest of public shareholders in the chapter 11 cases for conflict of interest reasons. (D.I. 16, Ex. 15 at 101) The appellants did not assert any specific facts regarding the alleged conflict of interest between insider shareholders and public shareholders. (D.I. 16, Ex. 15 at 103)

The opponents to the motion argued that the debtors' current and former management could and would provide adequate representation for the debtors' public shareholders, as a result of their ownership of approximately 35% of the debtors' outstanding common shares. The bankruptcy court declined to appoint an equity committee, stating during the course of the hearing the following, *inter alia:*

*2 * "I'm going to deny without prejudice obviously, because as this case progresses I think there may be an appropriate time for a committee of equity holders...."

* "[I]f somebody wants to come on with evidence to suggest that [the interests of insider shareholders are not aligned with those of non-insider shareholders,] I'd be glad to entertain it...."

* [I]f the petitioning shareholders reach a point where they think that additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so...."

* I think that based upon a different posture six months from now [the request to appoint an equity committee] may be an appropriate application...."

(D.I. 16, Ex. 15 at 101, 103, 114, 114-115)

Appellants thereafter filed a timely appeal to this court. The SEC filed a brief in support of appellants' appeal. The debtors, the Official Creditors' Committee, and the United States Trustee filed briefs in opposition to the appeal.

## IV. STANDARD OF REVIEW

The findings of fact of a bankruptcy court are reversible only if clearly erroneous. Fed. Rules

Bankr. Rule 8013; *Chemetron Corp. v. Jones, et al., 72 F.3d 341, 345 (3d Cir. 1995), cert. denied, 116 S.Ct. 1424 (1996),* (citing *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-102 (3d Cir. 1981)).* A bankruptcy court's choice, interpretation, and application of the underlying rule of law is subject to plenary review. *Chemetron Corp. v. Jones, 72 F.2d at 345.* In reviewing mixed questions of law and fact the district court must apply the appropriate standard to each component. *See Moody v. Security Pac. Business Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992).* This rule also applies to reviewing an ultimate finding of fact. [FN4] A mixed question of law and fact is found whenever a legal precept is applied to the sum of the facts of a case. *Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir. 1992).*

Since the bankruptcy court had to first find facts on which to base its determination that an equity committee was not "necessary to assure adequate representation," this court will review the bankruptcy court's determination as an ultimate finding of fact. 11 U.S.C. § 1102(a)(2). Thus, the court will apply the clearly erroneous standard to the bankruptcy court's initial findings of facts and apply plenary review with respect to the court's application of § 1102(a)(2).

## V. DISCUSSION

### 1. Bankruptcy Court's Findings of Fact

The bankruptcy court made the following findings of fact: (1) there are numerous public shareholders, (2) the case is complex because the company is large, (3) the debtor is not hopelessly insolvent. (D.I. 16, Ex. 15 at 25, 101, 110) While finding that the case is complex because of the size of the company, the bankruptcy court noted that the capital structure is not complex. [FN5] (D.I. 16, Ex. 15 at 110) The bankruptcy court also found that insider shareholders constitute 35 percent of equity. (D.I. 16, Ex. 15 at 102-103) The bankruptcy court declined to find that there was an inherent conflict of loyalty between insider shareholders and non-insiders. (D.I. 16, Ex. 15 at 105) The bankruptcy court asked the appellants' counsel for evidence so that it could make a fact finding as to whether there are conflicts of interest between insider and non-insider shareholders. (D.I. 16, Ex. 14 at 136-137; Ex. 15 at 103, 114) Appellants did not supply any facts suggesting that insider shareholders were not aligned with non-insider shareholders.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

\*3 Under the clearly erroneous standard, the court must accept the bankruptcy court's findings of fact "unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Fellheimer, Fichen & Braverman v. Charter Technologies, Inc.,* 57 F.3d 1215, 1223 (quoting *Hoots v. Pennsylvania,* 703 F.2d 722, 725 (3rd Cir. 1983)). The facts found by the bankruptcy court are not in dispute. Specifically, the parties do not dispute that insider shareholders constitute 35 percent of equity, that there are numerous shareholders, and this case is complex due to the size of the company. The parties also stipulated to the fact that, based on public information, the debtors did not appear hopelessly insolvent. (D.I. 16, Ex. 15 at 2-7, 80) Finally, the parties did not question the bankruptcy court's finding that the debtor's capital structure is not complex. Based on a review of the factual record, the court finds significant evidentiary support for the bankruptcy court's findings of fact. Consequently, the court concludes that the bankruptcy court's findings of fact are not clearly erroneous.

## 2. Legal Standard Under 11 U.S.C. § 1102(a)(2)

Section 1102(a)(2) of the Bankruptcy Code gives the bankruptcy court discretion to appoint an equity committee when it is necessary to assure adequate representation. Section 1102(a)(2), in part, states that the "court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." (Emphasis added) Since the statute explicitly provides the bankruptcy court with discretion in this matter, this court will review the bankruptcy court's decision for abuse of discretion. *See In re Vertientes, Ltd.,* 845 F.2d 57, 58-59 (3d Cir. 1988). As there is no statutory test for adequacy of representation, it must be determined by the facts of the case. *In re Johns-Manville Corp.,* 68 B.R. 155, 158 (S.D.N.Y. 1986), *appeal dismissed,* 824 F.2d 176 (2d Cir. 1989), (quoting *In re Beker Indus. Corp.,* 55 B.R. 945, 948 (S.D.N.Y. 1985)).

General guidelines have developed to assist the court in determining whether there is a need for additional committees. Specifically, courts have considered (1) the number of shareholders, (2) the complexity of the case, and (3) whether the cost of the additional committee outweighs the concern for adequate

representation. *In re Wang Lab., Inc.,* 149 B.R. 1 (Bankr. D. Mass. 1992) (citing tripartite test of *In re Johns-Manville Corp.,* 68 B.R. 155 (S.D.N.Y. 1986)). However, these factors are simply guidelines for the court to consider and "every case must be judged on its own facts." *In re Wang Lab., Inc.,* 149 B.R. at 2. Consequently, as this court stated earlier, "the establishment of an equity committee pursuant to 11 U.S.C. § 1102(a) is a discretionary matter, the resolution of which is fact driven and, therefore, not amenable to any bright line tests." (D.I. 29 at 3)

\*4 The Securities and Exchange Commission (SEC), in support of the appellants, asserts that Congress intended that the official committee be one of the principal shareholder protections of the Bankruptcy Code. The SEC cites legislative history to show that Congress recognized the practical conflicts of management in a large public company bankruptcy case. Thus, the SEC argues, § 1102(a) should be construed to protect shareholders when there are conflicts between management and shareholders.

The court notes that the congressional intent behind enacting chapter 11 of the Bankruptcy Code was "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors." S.Rep. No. 989, 95th Cong. 2d Sess. 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5796. The Senate Report emphasized: "As public investors are likely to be junior or subordinated creditors or debtholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional debtors who will have their own best interest to look after." *Id.*

Based on the legislative history, it is clear that Congress recognized the vulnerability of public shareholders in reorganization proceedings and intended to protect them with legislation. Despite this recognition, Congress declined to provide for the mandatory appointment of equity committees in § 1102, instead leaving the appointment decision within the discretion of bankruptcy courts based on a case-by-case determination.

## 3. Adequacy of Representation Under Section 1102(a)(2).

The appellants argue that an equity committee is needed because there are "inherent" conflicts of

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
(Cite as: Not Reported in F.Supp.)

loyalty which render insider shareholders "legally incapable" of representing the interests of public shareholders. (D.I.34 at 17, 21) Appellants point to the fact that, in a bankruptcy context, the directors owe a fiduciary duty to not only the shareholders, but also to creditors. (D.I. 34 at 17) Based on this assertion, appellants argue that the "[d]ebtors' management in this case or any other bankruptcy case, as a matter of law, cannot exclusively advocate for the interests of the shareholders, particularly as against creditors." (D.I. 34 at 17) (emphasis added).

While appellants may be correct in their observation that management cannot exclusively advocate for the interests of the shareholders, the statutory focus of § 1102(a)(2) is not whether shareholders are "exclusively" represented, but whether they are "adequately" represented. Until Congress recognizes that inherent conflicts of interest exist between management and public shareholders in the bankruptcy context that warrant the mandatory appointment of an equity committee, the statutory test remains "adequacy of representation" to be determined on the facts of each case. *In re Johns-Manville Corp.*, 68 B.R. at 158. Appellants have the initial burden of developing a factual record to demonstrate the need for adequate representation. *Id.* at 157.

*5 The bankruptcy court determined that an equity committee was not needed because management held a 35 percent equity interest, the debtor's capital structure was not complex, and there were no facts to suggest management was not aligned with non-insider shareholders. The bankruptcy court characterized management's 35 percent equity interests as a "substantial" interest, which is "just as interested in maintaining value as is the smallest public investor." (D.I. 16, Ex. 15 at 101, 102) The court refused to find management's loyalties to both creditors and shareholders relevant without specific facts. During the hearings, the court stated that "if the petitioning shareholders reach a point where they think additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so." (D.I. 16, Ex. 15 at 114) Appellants also argue that management's self-interest makes it incapable of adequately representing non-insider shareholders. (D.I. 34 at 24) The bankruptcy court stated it was "pure speculation" that management would not protect its 35 percent equity interest. *Id.* Appellants did not provide any evidence to the contrary.

The bankruptcy court also noted that, for the

purposes of determining whether shareholders are adequately represented, the complexity of capital structure is more relevant than the complexity of the debtor's business affairs. (D.I. 16, Ex. 25) The bankruptcy court reasoned that there was less need to appoint an equity committee in this case because there were not any different levels of debt or different classes of equity. (D.I. 16, Ex. 25) Based on the bankruptcy court's application of the facts to the law, the court concludes that the bankruptcy court did not abuse its discretion in finding that an equity committee was not necessary to assure adequate representation of shareholder interests.

## VI. CONCLUSION

For the foregoing reasons, the court will affirm the order of the bankruptcy court denying appellants' motion to direct the appointment of an equity committee. An order consistent with this memorandum opinion shall issue.

FN1. After this appeal was filed, Joseph Harrosh sold his shares of **Edison Brothers Stores.** (Opening Br. of Appellants at 2, fn.1)

FN2. As of the petition date, approximately 22,000,000 shares of debtors' common stock were outstanding. Those shares are widely held by more than 4,000 record holders and a substantial number of beneficial holders. (D.I. 16, Ex. 2)

FN3. Section 1102(a) of the Bankruptcy Code provides in relevant part that:
(1) As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.
(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee. (Emphasis added)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)
(Cite as: Not Reported in F.Supp.)

> FN4. The Third Circuit has distinguished three different kinds of facts used in the review of judicial findings: (1) concept-basic facts, (2) inferred facts, and (3) ultimate facts. *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981).* Basic facts are "historical and narrative events elicited at trial, admitted by stipulation, or not denied, where required." *Id.* Inferred facts are drawn from basic facts only to the extent that "logic and human experience indicate a probability that certain consequences can and do follow from the basic facts." *Id.* Finally, ultimate facts are conclusions of law or "at least a determination of a mixed question of law and fact." *Id.*

> FN5. The bankruptcy court stated: "This is a big, big case, but in terms of capital structure I think it's a plain vanilla." (D.I. 16, #15 at 110)

D.Del.,1996.
In re Edison Bros. Stores, Inc.
Not Reported in F.Supp., 1996 WL 534853 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Internal CM/ECF Live Database

## File an answer to a motion:
## 00-03837-JKF OWENS CORNING, A DELAWARE CORPORATION

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Pernick, Norman L. entered on 1/13/2006 at 4:02 PM EST
and filed on 1/13/2006
**Case Name:**       OWENS CORNING, A DELAWARE CORPORATION
**Case Number:**    00-03837-JKF
**Document Number:** 16697

**Docket Text:**
Objection to *(Objection of Debtors to Motion of Ad Hoc Committee of Preferred and Equity Security Holders for the Appointment of an Official Preferred and Equity Security Holders Committee. Related to DI [16495]).* Filed by OWENS CORNING, A DELAWARE CORPORATION (Attachments: # (1) Exhibit "A"# (2) Exhibit "B"# (3) Exhibit "C") (Pernick, Norman)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** U:\00-3837\874454.6\Objection.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=1/13/2006] [FileNumber=4541805-0]
[045f183ab075bb464f8d6a56190d9ca3324a24cedbd462f01a96d3d4364e5e0298f3
6c616295765aa55b7e61c1691dcff2d72f5e4337b6a85ce08381f31e17ab]]
**Document description:** Exhibit "A"
**Original filename:** U:\00-3837\874454.6\Exhibit A.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=1/13/2006] [FileNumber=4541805-1]
[113e73f5cdb85b9a69f1180605f13141e670b1b0a02067f496ab704d95a70ee32887
6a5ca136d2e32d705401e616c67d8bd1088e11266d8de07fcb4b4b0e1edf]]
**Document description:** Exhibit "B"
**Original filename:** U:\00-3837\874454.6\Exhibit B.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=1/13/2006] [FileNumber=4541805-2]
[725111745e7a17fb9fb3fbfdabf013de601bf7b37b918ce305eae8f7ee8a163798aa
8bebd1d00c804c177e418221419e6db5b7f300a5f0a41121eee86e8ff2c2]]
**Document description:** Exhibit "C"
**Original filename:** U:\00-3837\874454.6\Exhibit C.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=1/13/2006] [FileNumber=4541805-3]
[1bba884080d7c110d3efd0de434879f983502faf74b751895e2b5924ec335f77ff26
236e168d1b9b1649e444b02622e6d909fcbb709ce025d635d06efc3281a7]]

## 00-03837-JKF Notice will be electronically mailed to:

# EXHIBIT "K"

# Westlaw.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bankr.D.Del.)
**(Cite as: 2004 WL 1077913 (Bankr.D.Del.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re: NORTHWESTERN CORPORATION, Debtor.
**No. 03-12872 (CGC).**

May 13, 2004.

Scott D. Cousins, William E. Chipman, Jr., Charles
Michael Terribile, Greenberg Traurig, LLP,
Wilmington, DE, and Jess H. Austin, III, Karol K.
Denniston, Paul, Hastings, Janofsky & Walker LLP,
Atlanta, GA, for Debtors and Debtors-in-Possession.

Richard S. Cobb, Megan N. Harper, Landis Rath &
Cobb LLP, Wilmington, DE, and Lawrence C.
Gottlieb, Eric Haber, John Morris, Kronish Lieb
Weiner & Hellman LLP, New York, NY, for RCG
Carpathia Master Fund, Ltd., Performance Capital
and Smith Management LLC.

Neil B. Glassman, Charlene D. Davis, Erie M. Sutty,
The Bayard Firm, Wilmington, DE, and Alan W.
Kornberg, Ephraim I. Diamond, Talia Dil, Paul,
Weiss, Rifkind, Wharton & Garrison LLP, New
York, NY, for the Official Committee of Unsecured
Creditors Committee.

Mark S. Kenney, United States Office of the United
States Trustee, District of Delaware, Wilmington,
DE, Stephen E. Hermann, Richards, Layton &
Finger, PA, Wilmington, DE, and Thomas Moers
Mayer, Philip Bentley, Matthew J. Williams, Kramer
Levin Naftalis & Frankel LLP, New York, NY, for
Wilmington Trust Company as Indenture Trustee.

*MEMORANDUM OPINION*

CASE, Bankruptcy J.

**\*1** The two motions before the Court are (I) the
Motion of RCG Carpathia Master Fund, Ltd. and
Kellogg Capital Group LLC f/k/a Performance
Capital (1) for Permission to Present Testimony and
Submit Pre-Trial Statements in Connection With
Their Motion for Appointment of Official Equity

Security Holders Committee and (2) Requesting That
the Court Schedule a Hearing (the "Evidence
Motion") (Docket No. 1231); and (II) the Motion of
RCG Carpathia Master Fund, Ltd., Performance
Capital and Smith Management LLC (collectively the
"Movants") for Appointment of Official Equity
Security Holders Committee (the "Committee
Motion") (Docket No. 986). Upon consideration and
review of all relevant pleadings; oral argument; and
for the reasons set forth below, the Court denies both
motions.

*FACTS*

On September 14, 2003 (the "Petition Date"), the
Debtor filed a voluntary petition for relief under
chapter 11 of the Bankruptcy Code. The Debtor
continues to operate its business and manage its
properties as debtor-in-possession pursuant to
Sections 1107 and 1108 of the Bankruptcy Code.

An Official Committee of Unsecured Creditors (the
"Unsecured Creditors Committee") was appointed by
the Office of the United States Trustee, District of
Delaware, on September 30, 2003.

On March 11, 2004, the Debtor filed its disclosure
statement and plan of reorganization. A hearing on
the adequacy of the disclosure statement is scheduled
for May 17, 2004.

On March 24, 2004, RCG Carpathia Master Fund,
Ltd., Kellogg Capital Group LLC f/k/a/ Performance
Capital and Smith Management LLC filed a Motion
to Appoint an Equity Security Holders Committee.
Responses were filed by the Debtor, the Unsecured
Creditors Committee, The United States Trustee, and
Wilmington Trust Company as indenture trustee. The
motion was originally scheduled to be heard at the
regular omnibus hearing on April 8, 2004; it was
continued by consent to May 17, 2004.

The Committee Motion was filed several months
after the United States Trustee, on December 4, 2003,
refused Movants' November 18, 2003 request to form
a committee of equity security holders.

Two of the Movants [FN1] recently filed a Motion
for Permission to Present Testimony and Submit Pre-
Trial Statements in Connection With Their Motion
for Appointment of Official Equity Security Holders
Committee. The Evidence Motion was scheduled on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bankr.D.Del.)
(Cite as: 2004 WL 1077913 (Bankr.D.Del.))

Page 2

special notice and a hearing was held on May 12, 2004.

> FN1. Smith Capital LLC has not joined in the request for an evidentiary hearing.

### DISCUSSION

The Movants' Committee Motion seeks an order appointing an equity security holders committee to represent the holders of common stock pursuant to Section 1102(a)(2) of the Bankruptcy Code. Section 1102(a)(2) states that

On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

*2 11 U.S.C. § 1102(a)(2). Such a determination is made on a case-by-case basis. See In re Williams Communications Group, Inc., 281 B.R. 216, 220 (Bankr.S.D.N.Y.2002). Among the facts the court should consider when making this determination are; the solvency of the debtors, timing, the number of shareholders, the complexity of the chapter 11 case, and whether the cost of an additional equity committee significantly outweighs the concern for adequate representation. Id. at 219. In addition, appointing an official equity committee "should be the rare exception" and an equity committee

should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

Id. at 223.

At the heart of the parties' dispute is the value of the Debtor's enterprise. Debtor, through its experts and with the support of the Unsecured Creditors Committee, asserts that the estate is hopelessly insolvent and that equity is approximately $700 million out of the money. Therefore, it urges, supported by the Unsecured Creditors Committee and the United States Trustee, that the Committee Motion be denied but agrees that if the Court is to consider it further, an evidentiary hearing is required. The Movants assert that the Debtor's valuation fails even a minimal test of reasonableness and state that their expert is of the view that there is at least $200 million in value for equity.

The real issue here is which party should bear the cost of a valuation battle-the estate or the Movants. The Movants argue that it is appropriate for the estate to fund the costs of protecting the interests of equity given the size and complexity of the case and the possibility that value exists for equity. The objectors point out that the Movants have every right to raise their arguments in the context of plan confirmation but that the estate should bear the upfront cost where a favorable outcome is so dubious. Further, if they are successful, the Movants may assert a claim for reimbursement of their fees and costs under Section 503(b)(3)(D) of the Bankruptcy Code.

Against this background, the initial question is whether an evidentiary hearing is appropriate. The Courts concludes not. Let us assume the best outcome for the Movants-that the testimony of Mr. Harris (their expert) is sufficiently compelling to create a credible argument that a higher value may be appropriate and the testimony of Lazard Freres, Debtor's expert, is sufficiently suspect to put the Debtor's valuation in doubt. Does that justify the appointment of a committee? The Court thinks not. All that would do is put the issue of value in play, not tip the scale to the extent that the valuation battle should be funded by the estate. Remember that there is a $700 million shortfall that needs to be overcome before there is any value for equity. [FN2] While not impossible, that is a steep hill to climb; indeed, the Court could eventually accept nearly 80% of the additional value urged by the Movants and equity would still be out of the money. This does not satisfy the "substantial likelihood that [equity] will receive a meaningful distribution" test set forth in In re Williams.

> FN2. Roughly speaking, Mr. Harris' valuation indicates another $200 million for equity in value beyond the $700 million gap.

*3 Under these circumstances, it is not in the best interests of the estate or its constituents to shift the cost of this valuation dispute from the Movants to the estate. As pointed out by Debtor's counsel, the Movants acquired their equity position post-petition, [FN3] understanding the risk they undertook. They can decrease the risk by recruiting other equity holders to be part of an unofficial committee, thereby spreading the upfront costs. In any event, if they are correct, they are protected by Section 503(b)(3)(D) of the Bankruptcy Code. Given the admittedly speculative nature of their position, this is a fair allocation of risk.

> FN3. Movants' counsel did not take issue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1077913 (Bankr.D.Del.)
**(Cite as: 2004 WL 1077913 (Bankr.D.Del.))**

Page 3

with this statement at the hearing.

### CONCLUSION

For the foregoing reasons, the Evidence Motion (Docket No. 1231) is denied. Further, given the Court's conclusions on the Evidence Motion, the Committee Motion (Docket No. 986) is also denied. The May 17, 2004 hearing on the Committee Motion is vacated and the Debtor is directed to delete that item from the Notice of Agenda.

It is so ordered.

Not Reported in B.R., 2004 WL 1077913 (Bankr.D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3606929 (Expert Report and Affidavit) Declaration of Steven E. Hall (Jul. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "L"

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32351182 (E.D.Pa.)
(Cite as: 2002 WL 32351182 (E.D.Pa.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
William A.K. TITELMAN, Plaintiff
v.
RITE AID CORPORATION, Defendant
**No. Civ.A. 00-2865.**

Feb. 5, 2002.

Gerald S. Berkowitz, Malvern, PA, John H. Mc
Keon, Jr., Mt. Laurel, NJ, Marianne Bechtle, Robert
A. Klein, William J. O'Brien, Conrad, O'Brien,
Gellman & Rohn PC, Philadelphia, PA, for Plaintiff.

Alan J. Davis, Ballard, Spahr, Andrews & Ingersoll
LLP, Amy B. Carver, Ballard, Spahr, Philadelphia,
PA, David E. Schwartz, Skadden, Arps, Slate,
Meagher & Flom, LLP, New York, NY, Douglas L.
Flitter, Ballard, Spahr, Andrews & Ingersoll, LLP,
Philadelphia, PA, Jay S. Berke, Four Time Square,
Lisa R. D'Avolio, Skadden, Arps, Slate, Meagher &
Flom, Llp, New York, NY, William A. Slaughter,
Ballard Spahr Andrews and Ingersoll, Philadelphia,
PA, for Defendant.

Jason A. Snyderman, Akin Gump Strauss Hauer &
Feld LLP, David A. Bilson, Klett Rooney Lieber &
Schorling, Gerald E. Burns, Klett Rooney Lieber &
Schorling PC, Philadelphia, PA, for Respondent.

*ORDER AND MEMORANDUM*

MCLAUGHLIN, J.

*1 AND NOW, this *4th* day of February, 2002, upon
consideration of the plaintiff's Motion Pursuant to 28
U.S.C. § 1292(b) for Certification for Immediate
Appeal of the Court's Order of November 9, 2001
(Docket # 33), the plaintiff's memorandum and reply
in support thereof, and the defendant's opposition
thereto, IT IS HEREBY ORDERED that, for the
following reasons, the Motion is DENIED.

A district court has discretion under 28 U.S.C. §
1292(b) to decide whether or not to certify a case for

immediate appeal. *See Katz v. Carte Blanche Corp.,
496 F.2d 747, 754 (3d Cir.1974)* (en banc). In order
to so certify an issue for appeal, the district court
must, by order, certify that: (1) there is a controlling
question of law; (2) there are substantial grounds for
disagreement on the question; and, (3) immediate
appeal would materially advance the ultimate
termination of the litigation. *Id.; 28 U.S.C. §
1292(b).* A district court should, however, exercise its
discretion to grant certification mindful of the strong
federal policy against piecemeal appeals. *See
Zygmuntowicz v. Hospitality Invs., Inc., 828 F.Supp.
346, 353 (E.D.Pa.1993)* (citing *Freeman v. Kohl &
Vick Mach. Works, Inc., 673 F.2d 196, 201* (7th
Cir.1982)). It has also been cautioned that
certification is the exception, to be used only in the
rare case where an immediate appeal would avoid
expensive and protracted litigation. *Milbert v. Bison
Labs., Inc., 260 F.2d 431, 433 (3d Cir.1958); Orson,
Inc. v. Miramax Film Corp., 867 F.Supp. 319, 321
(E.D.Pa.1993).* In addition, a "motion for certification
should not be granted merely because a party
disagrees with the ruling of the district judge." *Max
Daetwyler Corp. v. R. Meyer, 575 F.Supp. 280, 282
(E.D.Pa.1983).*

Other concerns to be factored into whether to certify
an issue for immediate appeal include the avoidance
of harm to a party *pendente lite* from a possibly
erroneous interlocutory order and the avoidance of
possibly wasted trial time and litigation expense.
*Katz, 496 F.2d at 754.* Also, "because interlocutory
appeals are not favored, the presence of uniqueness,
exceptionality, or extraordinary importance of the
question of law involved, and the magnitude of [the]
case itself, are factors which should be taken into
consideration in every case in determining whether
1292(b) certification is appropriate." *Zenith Radio
Corp. v. Matsushita Elec. Indus. Co., MDL No. 189,
1979 WL 1689, at *4 (E.D.Pa. Aug.21, 1979).* The
moving party bears the burden of demonstrating that
"exceptional circumstances justify a departure from
the basic policy against piecemeal litigation and of
postponing appellate review until after the entry of a
final judgment." *Rottmund v. Continental Assurance
Co., 813 F.Supp. 1104, 1112 (E.D.Pa.1992).*

In the present case, the defendant does not contest
that the Court's November 9, 2001 Order (the
"Order") involves a controlling issue of law.
Therefore, the Court will address only the final two

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32351182 (E.D.Pa.)
(Cite as: 2002 WL 32351182 (E.D.Pa.))

prongs of the 1292(b) requirements, namely whether there is a substantial ground for a disagreement on the questions presented, and whether immediate appeal would materially advance the ultimate termination of the litigation. [FN1]

> FN1. Rite Aid also argues that because Titelman filed his motion for certification more than ten days after the issuance of the Court's Order that the motion should be denied as untimely under the teaching of *Milbert v. Bison Labs., Inc.,* 260 F.2d 431 (3d Cir.1958). The text of 1292(b) requires a party who has been granted certification to apply for appellate review with the Court of Appeals within ten days of the issuance of the district court's order. 28 U.S.C. § 1292(b). *Milbert* suggested that to comply with this requirement, a party should file a motion for certification within ten days of the date the order sought to be appealed from was issued. *Milbert,* 260 F.2d at 435. As Titelman notes, however, *Milbert* was decided before the adoption of Federal Rule of Appellate Procedure 5, which provides that the "time to petition runs from entry of the amended order" of certification rather than from the issuance of the original order sought to be appealed from. Fed. R.App. P. 5; *See,* 19 *Moore's Federal Practice,* § 203.32[2][b] (Matthew Bender 3d ed.2000) ("the order may be amended to include the required [certification] statement at any time"). The Court recognizes that there is authority for the proposition that a certification motion filed more than ten days from the issuance of the original order should be considered only if there is reason for the delay in seeking certification. *See Weir v. Propst,* 915 F.2d 283, 287 (7th Cir.1990). Given the Court's disposition of this motion on the merits, however, the Court declines to deny the motion as untimely.

*2 Titelman argues that several of the Court's rulings present substantial grounds for disagreement. First, Titelman argues that the Court's application of the parol evidence rule was contrary to Pennsylvania law because the allegedly fraudulent statements at issue were not "dealt with" in the parties' written employment agreements, and because those statements would not "normally and naturally" been included in the written agreements. Next, Titelman asserts that these agreements, which provide that the

written contracts are the entire agreement of the parties "with respect to the matters herein provided" permit consideration of the allegedly fraudulent statements because the subject of those statements were not provided for in the agreements. Titelman also argues that there is a substantial question as to whether Pennsylvania's parol evidence rule applies to instances of fraudulent nondisclosure or concealment as opposed to cases of affirmative misrepresentations. Finally, Titelman asserts that his claim for unjust enrichment should have been allowed to be pled in the alternative because the golden parachute provision of his employment agreements might be unenforceable.

The Court is not convinced that these issues present substantial grounds for disagreement. Although Titelman may have an honest and good faith disagreement with the Court's application of the parol evidence rule to bar his fraud in the inducement claim, the Court's Order is consistent with other reported decisions applying the parol evidence rule to bar claims of fraud in the inducement. *See, e.g., Haymond v. Lundy,* Civ. A. Nos. 99-5015 & 99-5048, 2000 WL 804432, at *7 (E.D.Pa. June 22, 2000); *North Am. Roofing & Sheet Metal Co., Inc. v. Bldg. & Constr. Trades Council of Phila. & Vicinity, AFL, No. Civ. A.* 99-2050, 2000 WL 230214, at *6 (E.D.Pa. Feb.29, 2000); *Sunquest Info. Sys. Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 656 (W.D.Pa.1999).

Moreover, Titelman has brought no case to the attention of the Court that has allowed a fraud in the inducement claim to go forward in the face of an integrated written contract negotiated and entered into by sophisticated parties. In addition, although Titelman argues that there is no Pennsylvania authority for the Court's holding that material statements which are relied on by a sophisticated party in entering into an integrated employment contract would naturally and normally be included in that contract, he brings no authority to the Court's attention that is contrary to the Court's reasoning. [FN2]

> FN2. Neither *Pilallis v. Elec. Data Sys. Corp.,* No. Civ. A. 97-5662, 1998 WL 211740 (E.D.Pa. April 28, 1998) nor *Brinich v. Jencka,* 757 A.2d 388 (Pa.Super.Ct.2000) are in opposition to this reasoning. In neither case were there allegations of fraud, nor did the plaintiffs allege materiality and reliance.

Likewise, Titelman cites no authority for his

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32351182 (E.D.Pa.)
(Cite as: 2002 WL 32351182 (E.D.Pa.))

Page 3

argument that Pennsylvania's parol evidence rule does not apply to claims of fraudulent nondisclosure and concealment. This omission, in conjunction with the cases cited by the Court's Order in which the parol evidence rule was applied to bar fraud claims alleging nondisclosure, casts doubt on whether there is a substantial ground for disagreement on this issue. *See HCB Contractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 652 A.2d 1278, 1279-80 (Pa.1995); *Haymond,* 2000 WL 804432, at *7; *North Am.,* 2000 WL 230214, at *6. For these reasons, the Court finds that although Titelman may have a good faith disagreement with Court's application of the parol evidence rule, there are not substantial grounds for disagreement on this issue.

*3 Nor does the Court find that there are substantial grounds for disagreement with regards to the Court's dismissal of Titelman's unjust enrichment claim. Consistent with Pennsylvania law, the Court dismissed this claim because both Titelman and Rite Aid recognize that the relationship between the parties is contractual in nature. *See Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969). Titelman has presented no case to the Court which has allowed an unjust enrichment claim to go forward despite the fact that the relationship between the parties was based on an integrated written contract.

Regardless, it is not clear that allowing an immediate appeal will materially advance the ultimate termination of this litigation. Of course, there is a possibility that without immediate appeal and a stay of the case pending that appeal, a trial on the fraud issues might be necessary if the Court's Order is reversed after the contract claims have been adjudicated. However, avoidance of a second trial is not the sole standard by which this requirement is weighed.

Factors to be considered in determining whether an immediate appeal would materially advance termination of a litigation include whether an immediate appeal could: (1) eliminate the need for trial; (2) eliminate complex issues so as to simplify trial; or, (3) eliminate issues to make discovery easier and less costly. *See, e.g., Orson, Inc. v. Miramax Film Corp.,* 867 F.Supp. 319, 322 (E.D.Pa.1994). None of these factors is present here. Regardless of the outcome of an appeal on the fraud issue, trial on the remaining contract issues will most likely be necessary. In addition, the Court's Order served to streamline this litigation by eliminating the fraud issues and the attendant need for fraud-related

discovery. The Court's Order also foreclosed the possibility that Rite Aid would seek to sever for trial the fraud and contract claims asserted in Titelman's complaint. Although some duplicative discovery and even a second trial might occur if the Court's Order is overturned on appeal after the contract claims have been fully adjudicated, this possibility must be weighed against the possibility that the Third Circuit would not reverse, meaning that the case would be unnecessarily delayed pending the interlocutory appeal.

In any event, the Court is not convinced that this is the sort of unique or exceptional case for which certification pursuant to 1292(b) was intended. This case presents a relatively ordinary dispute between an employee and his former employer about the inception and termination of their employment relationship. Titelman has not shown that he would be subjected to harm *pendente lite* absent an immediate interlocutory appeal of the Court's Order. *See Katz,* 496 F.2d at 754. Nor would allowing such an appeal potentially eliminate the need for trial and trial-related expenses. *Id.; See Johnson v. Alldredge,* 488 F.2d 820, 823 (3d Cir.1973) (purpose of 1292(b) is "to permit decision of legal issues as to which there is considerable question without requiring the parties first to participate in a trial that may be unnecessary"). In short, this case does not present the type of scenario which was intended to justify the invocation of 1292(b) in the face of the strong federal policy against piecemeal appeals.

*4 Because the Court's Order of November 9, 2001 does not present substantial grounds for a difference of opinion, because allowing immediate appeal from that order would not materially advance the ultimate termination of the litigation, and because this case does not present the sort of unique or exceptional circumstances that justify certification pursuant to 1292(b), Titelman's motion is denied.

Not Reported in F.Supp.2d, 2002 WL 32351182 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:00CV02865 (Docket) (Jun. 07, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.